Rebekah Schultheiss (Millard)
rebekah@millardoffices.com
OSB #121199
PO Box 7582
Springfield, OR 97475
t: 707.227.2401
*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PENDLETON DIVISION

| | |
|---|---|
| **JESSICA BATES**, <br><br> Plaintiff, <br><br> v. <br><br> **FARIBORZ PAKSERESHT**, in his official capacity as Director of the Oregon Department of Human Services, **LIESL WENDT**, in her official capacity as Deputy Director of the Oregon Department of Human Services, **APRILLE FLINT-GERNER**, in her official capacity as Interim Director of the Oregon Department of Human Services Child Welfare Division, **REBECCA GARRISON**, in her official capacity as certification supervisor for the Oregon Department of Human Services office in Malheur County, **CECILIA GARCIA**, in her official capacity as certification officer for the Oregon Department of Human Services office in Malheur County, <br><br> Defendants. | Case No.: <br><br><br><br><br><br> **VERIFIED COMPLAINT** |

**INTRODUCTION**

Jessica Bates feels called to open her home to children in need. On her way to work one day, Jessica heard a broadcast about a man who had adopted, which reminded Jessica the biblical command "to visit orphans and widows in their affliction" (James 1:27). Inspired, Jessica decided to adopt even though she is raising five children of her own after a car collision tragically killed her husband. Despite this, the sacrificial love extended to her in the Gospel compelled Jessica to act—to pursue the long Christian tradition of caring for orphans.

Unfortunately for Jessica, she lives in a state where officials look down on those with traditional religious beliefs about human sexuality. The Oregon Department of Human Services (the Department or DHS) has promulgated a rule that persons seeking to adopt must "accept" and "support" the sexual orientation and gender identity of any child the state could place in the applicant's home. OAR § 413-200-0308(2)(k). Under this rule, caregivers must agree to use a child's preferred pronouns, take a child to affirming events like Pride parades, or sign the child up for dangerous pharmaceutical interventions like puberty blockers and hormone shots—no matter a child's age, no matter whether a child actually desires these things, and no matter how deeply these requirements violate the caregiver's religious convictions.

This puts Jessica in a bind. Like countless people of faith, Jessica believes that our biological sex carries spiritual significance for who we are and how we should act. Jessica cannot affirm that a male is or should try to be female or vice versa. So Jessica alerted the Department that she will gladly love and accept any child for who they are, but she cannot say or do anything against her Christian faith. The state then put Jessica to a choice: abandon your religious convictions or forgo the possibility of ever adopting any child. When Jessica stood her ground, the Department rejected her application for not meeting its "adoption home standards."

Verified Complaint

Oregon's policy amounts to an ideological litmus test. Those with "correct" views on sexual ethics may adopt; those with religious views may not. Indeed, Jessica cannot access *any child welfare service*, whether it's foster care for toddlers or respite care for newborns. Because she will not agree to use a hypothetical child's preferred pronouns or facilitate a hypothetical gender transition, she cannot even adopt a newborn who has no concept of, much less a desire for, these things.

To make matters worse, Oregon inconsistently enforces its policy. On paper, the state requires applicants to "accept" and "support" the "spiritual beliefs" and "cultural identities" of any child. But in practice, the state does not require *every* applicant to show they are a suitable placement for *any* child. A family that hunts need not give up meat eating because some children are vegans. And Jews need not accommodate foreign gods because some children desire a home with a Hindu shrine. In the end, the only group excluded from the process up front are those with religious beliefs like Jessica's. Conservative Christians need not apply.

Perhaps worst of all, the Department's policy hurts children. Last year alone nearly 8,000 children touched Oregon's foster care system. Hundreds of them are waiting for their forever homes, and many of them may share Jessica's beliefs. But Oregon refuses to let Jessica even be considered for adopting these children because it thinks her religious beliefs make her unfit to be a parent. That means there's one less home for these children—all because officials are putting politics above people.

Oregon's policy violates the Constitution. It penalizes Jessica for her religious views, compels her to speak words that violate her beliefs, and deprives her of equal protection while accomplishing nothing for Oregon's children. Jessica need not check her religion at the door to show she is fit to love children in need. All she asks for is the chance to serve others and to access the state's programs on an equal playing field as everyone else. That is something the Constitution demands. And something Oregon officials should be reminded of.

Verified Complaint

## JURISDICTION AND VENUE

1.    This civil-rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

2.    This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3.    This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201–02 and Fed. R. Civ. P. 57; the requested injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and the requested costs and attorney fees under 42 U.S.C. § 1988 and Fed. R. Civ. P. 54.

4.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in the District of Oregon; the effects of the challenged statute are felt in this District; and the Defendants can and do perform official duties in this District.

5.    Venue is proper in this division under Local Rule 3-2(a)(2) because a substantial part of the events and omissions giving rise to the claims occurred in Malheur County, the effects of the challenged statute are felt in Malheur County; and Defendants can and do perform official duties in Malheur County.

## PLAINTIFF

6.    Jessica Bates is a United States Citizen who resides in Malheur County, Oregon.

## DEFENDANTS

7.    Defendant Fariborz Pakseresht is the Director of the Oregon Department of Human Services (the Department or DHS).

8.    The Department is responsible for the state's foster-care and adoption programs that are delivered through the Child Welfare Division. ORS § 409.010.

9.     Pakseresht is responsible for carrying out the Department's policies and practices, including interpretating and enforcing child welfare policies. ORS §§ 409.050, 409.100, 418.005. Pakseresht may also delegate "any power, duty or function" of his office and "[t]he official act of any person acting in the director's name and by the director's authority … shall be considered an official act of the director." ORS § 409.120.

10.     Defendant Liesl Wendt is the Deputy Director of DHS and has "full authority to act for the director" at his or her direction. ORS § 409.130.

11.     Defendant Aprille Flint-Gerner is the Interim Director of the Department's Child Welfare Division and helps to carry out the Director's responsibilities. ORS § 409.130.

12.     Flint-Gerner is responsible for carrying out the Division's policies and practices, including interpreting and enforcing its child-welfare policies related to the certification of resource parents and prospective adoptive parents.

13.     Defendant Rebecca Garrison is the certification supervisor stationed in the Department's Ontario office, which administers foster-care and adoption programs for Malheur County.

14.     Garrison is responsible for carrying out the Department's child-welfare policies and generally exercises final authority to approve or deny applications for those seeking certification as resource parents or prospective adoptive parents.

15.     Defendant Cecilia Garcia is a certification officer for child-welfare programs in Ontario and reports to Garrison.

16.     Garcia is also responsible for carrying out the Department's child-welfare policies and exercises authority to approve or deny applications for those seeking certification as resource parents and prospective adoptive parents.

17.     This lawsuit names the Defendants only in their official capacities.

## FACTUAL BACKGROUND

Jessica Bate's faith

18.     Jessica Bates is a Christian.

19.     She regularly attends a nondenominational church where she worships with her family.

20.     Jessica is a single mother of five children ages 10 through 17.

21.     Jessica's children are her greatest joy. They do well in school, are involved in a variety of school sports, and are active in their church youth group and other extracurricular activities.

22.     Jessica is also a widow after her husband, David, died in a car crash on the morning of January 9, 2017.

23.     That morning, a man who had recently been released from a state hospital brutally abducted his ex-wife and fled police in a pickup truck when he crashed into David and Jessica's car on their commute to work.

24.     Jessica blacked out and suffered a concussion, broken bones, and a partially collapsed lung, while David died at the scene.

25.     Life after David's passing has been difficult for Jessica and her family. Her faith has anchored her through the grieving process, and she continues to find strength and take refuge in God.

26.     Life after David's passing has also been joyful. After David's death, her family, friends, church community, and work colleagues came together to support her, offering her donations, food, help driving her kids to and from sports, and reassuring her of God's provision.

27.     Through everything, Jessica remains thankful for the many blessings in her life, and her faith remains at the center of everything she does.

Verified Complaint

Jessica's desire to adopt a sibling pair

28.    Jessica desires to adopt children.

29.    One day, she was listening to a Christian broadcast about a man who adopted a child from foster care. Jessica felt as though God was speaking to her through that broadcast, saying: "those are my children."

30.    For Christians, caring for orphans has special significance because the Bible describes God's relationship with the church as one of adoption into God's family, in which those who receive the Holy Spirit and profess their belief in His Son become God's children and fellow heirs to His Kingdom. Romans 8:12–17; Galatians 3:26–29.

31.    The Bible also commands Christians to care for the orphan and to seek justice for the fatherless. James 1:27, Isaiah 1:17.

32.    Though Jessica's family has been through a lot, she has experienced first-hand how God has provided for her as a widow and cared for her children who miss their earthly father.

33.    Jessica desires to replicate what God has done for her by opening her home to two children who need a family that they can call their own.

34.    Specifically, Jessica desires to adopt a sibling pair, who are younger than nine years old. She hopes that by adopting two children, each child will be less likely to feel alone or isolated.

35.    She wants to adopt a sibling pair under the age of ten because her youngest child is currently ten.

36.    Initially, Jessica researched options for an international adoption out of Colombia but learned that the process was costly and that Colombia was reticent about allowing a single mother to adopt a sibling pair.

37.    Later, Jessica felt that she ought to pursue a domestic adoption because there are children who need homes in her own community.

Verified Complaint

38.    She also learned that domestic adoptions are more economical and therefore a realistic option for her family.

39.    At the end of March 2022, Jessica began the process of applying to become certified to adopt a child from Oregon's foster-care system.

The children in Oregon's foster care system

40.    In the year ending October 1, 2022, there were nearly 8,000 children who spent at least one day in Oregon's foster-care system. In Malheur County alone, there were 275 children who touched the foster care system.[1]

41.    When reunification with the family is not possible, a "primary goal of federal and state governments is to establish permanency for a child as soon as possible."[2]

42.    Indeed, the longer a child resides in foster care, the more "placement stability declines." Children who remain in foster care longer than 12 months are more likely to be uprooted.[3]

43.    "Placement instability can have deleterious effects on children that last throughout their lives."[4] Compared to children placed in stable and nurturing

---

[1] *See* Oregon's Child Welfare Data Set, OR.04 Count of Children in Foster Care (Total Served during Period): https://rom.socwel.ku.edu/Oregon_Public/AllViews.aspx?R=6104 [screenshot: https://perma.cc/MV8H-R6AZ].

[2] Oregon Department of Human Services, 2021 Child Welfare Data Book at 23 (Sept. 2022), https://perma.cc/E8P6-CQ5R.

[3] U.S. Department of Health and Human Services, Children's Bureau, Child Welfare Outcomes 2018: Report to Congress at 50–51 (2018), https://perma.cc/GFL8-XR6L.

[4] U.S. Department of Health and Human Services, Children's Bureau, Discontinuity and Disruption in Adoptions and Guardianships at 2 (Aug. 2021), https://perma.cc/PGA9-JCF5.

Verified Complaint

homes, an institutional or unstable placement history adversely affects a child's emotional, cognitive, and physical development.[5]

44.    Children who age out of the system without forming permanent familial bonds face a number of challenges. They "are at greater risk for homelessness … low educational attainment … early parenthood, and high rates of unemployment."[6]

45.    Oregon, however, struggles to quickly establish permanency for children in state custody. Of the children who left foster care in the 2022 fiscal year, the median time spent in foster care was 23.2 months.[7]

46.    In 2021, "the median time to adoption was 35.6 months for children whose adoptions were finalized."[8]

47.    And of the 2,763 children who left foster care in 2022, only a little over half of them were reunified with their families, while nearly 21% were adopted.[9]

---

[5] *E.g.*, Erin E. Lewis et al., *The effect of placement instability on adopted children's inhibitory control abilities and oppositional behavior* Dev. Psychol. Nov. 2007 43(6):1415–1427, https://doi.org/10.1037/0012-1649.43.6.1415; David M. Rubin et al., *The impact of placement stability on behavioral well-being for children in foster care*, Pediatrics. Feb. 2007, 119(2):336–44. https://doi.org/10.1542/peds.2006-1995.

[6] U.S. Department of Health and Human Services, Children's Bureau, Belonging Matters—Helping Youth Explore Permanency 4 (Sept. 19) ("A sense of belonging provides the security and self-assuredness needed to achieve potential in life."), https://perma.cc/2YWU-F5YF.

[7] *See* Oregon's Child Welfare Data Set, CM.15 Median Length of Stay at Foster Care Exit: https://rom.socwel.ku.edu/Oregon_Public/AllViews.aspx?R=248 [screenshot: https://perma.cc/C484-TDV9].

[8] Child Welfare Data Book 23, *supra* n.2.

[9] *See* Oregon's Child Welfare Data Set, CM.05.1 Federal Discharge reason (of those discharged): https://rom.socwel.ku.edu/Oregon_Public/AllViews.aspx?R=116 [screenshot: https://perma.cc/9THH-WDUL].

48.    Other children were neither adopted nor reunified with their families. 397 children (14.4%) left foster care in 2022 for a guardianship arrangement. 316 children (11.4%) left foster care in 2022 without a permanent home.[10]

49.    Another goal of child-welfare agencies is to help children preserve their familial ties by, for example, placing siblings together. This helps to provide stability and protects against trauma that stems from separation and removal from the home.[11]

50.    Indeed, agencies are encouraged to recruit, train, and support families who are willing and capable to receive sibling pairs.[12]

51.    As of the last day of the fiscal year 2021—the most recent year for which Oregon publishes its Child Welfare Data book—there were 2,586 children in state custody who were part of a sibling group.[13]

The Home Study and placement process

52.    To adopt or to provide foster care for a child in the legal custody of the state, a person must first obtain a "Home Study" approved by the state or a private agency licensed by the state. ORS § 109.276(7)(a); OAR §§ 413-120-0000(40); 413-120-0220(1).

---

[10] Oregon's Child Welfare Data Set, CM.05.1 Federal Discharge reason (of those discharged): https://rom.socwel.ku.edu/Oregon_Public/AllViews.aspx?R=116 [screenshot: https://perma.cc/9THH-WDUL]. Most of these children "aged out" of the system. 262 children left foster care in 2022 upon turning 18. *See* Oregon's Child Welfare Data - OR.07 Youth Exiting Foster Care on/after Turning 18: https://rom.socwel.ku.edu/Oregon_Public/AllViews.aspx?R=6107 [screenshot: https://perma.cc/KS9V-B5AH].

[11] U.S. Department of Health and Human Services, Children's Bureau, Sibling Issues in Foster Care and Adoption 2 (2019), https://perma.cc/E2TX-M6WL.

[12] Child Welfare Data Book 23, *supra* n.2.

[13] Child Welfare Data Book 17, *supra* n.2.

53.     Persons seeking an independent adoption must generally also obtain a Home Study. OAR §§ 413-140-0035; -0010(11) (defining independent adoptions as adoptions in which the "child is not in the custody of the Department" and the petitioner is not seeking "a re-adoption, private agency adoption, or out-of-state public agency adoption").

54.     Department regulations define the Home Study as a "written evaluation of the prospective adoptive parent's suitability to adopt and parent a child who may be placed for adoption." OAR § 413-120-0000(39).

55.     The Home Study involves a series of steps, including interviews and a home inspection, meant to evaluate the applicant's ability to "meet the minimum standards for adoptive homes," rather than the applicant's suitability for a specific child. OAR § 413-120-0000(39).

56.     The Home Study for foster-care applicants similarly analyzes "the ability of the applicant to provide safe and appropriate care of a child or young adult" in state custody. OAR § 413-200-0260(26). It speaks to the applicant's ability to meet the minimum standards for foster parents (also referred to as resource parents), rather than the applicant's suitability for a specific child.

57.     The Home Study process can take six months from beginning to end, or sometimes longer. OAR § 413-200-0274(3).

58.     If a person decides to apply to the state for a Home Study, the first step is contacting a DHS office to communicate which service the applicant is interested in, whether that's becoming a resource parent or a potential adoptive parent (also called an adoptive resource).

59.     County offices will generally send the applicant an orientation packet, which includes links to orientation videos and preliminary forms.

60.     After completing the orientation materials, the applicant may submit a formal application for a Home Study.

61.     The Home Study application requires several items of information, including:

- An application form;

- An Adoptive Family Information and Placement Preference form;

- Four references;

- Consent to perform a background check, including a fingerprint-based criminal record check and a check for any reports of child neglect or abuse;

- Financial information, and;

- Medical information.

OAR § 413-120-0220(3).

62.     The Department may ask for additional information from the applicant in its discretion. OAR § 413-120-0220(4).

63.     In addition to submitting the application and required documents, an applicant must complete the Resource and Adoptive Family Training ("RAFT") program. OAR § 413-120-0246(1).

64.     RAFT is "the ODHS Child Welfare certification training curriculum for all resource parents, relative resource parents, and pre-adoptive parents."[14]

65.     The training is 27 hours spread across 9 classes and provides an overview of the adoption and foster-care system meant to help prepare parents for receiving and caring for a child.

66.     Once an applicant has submitted the required paperwork and completed the training, the last step is the home inspection (commonly also referred to as the "home study" but herein referred to as the home inspection).

---

[14] https://perma.cc/UVR5-JGWK.

Verified Complaint

67.    The Department need only conduct the home inspection if the applicant has thus far demonstrated their eligibility to become a resource or adoptive parent.

68.    The home inspection requires the certifier to conduct two home visits, interview the applicant and the applicant's family, and conduct a safety inspection to ensure the home is safe.

69.    The purpose of the home inspection is to further evaluate the applicant's general fitness as a parent. Regulations require the Department to:

- "Have face-to-face contact with each applicant and each other member of the household";
- Evaluate the applicant's "motivation for and interest in caring for a child";
- Evaluate "the children and young adults appropriate for placement in the home";
- Gather further "personal, family, and social history information" about the family; and
- Ensure that both the applicant and each member of the applicant's household are well-suited to caring for a child.

OAR § 413-200-0274(1)(a)–(j).

70.    At the end of the process, the certifier gathers and reviews all of the information to determine whether the applicant meets the Department's minimum standards. This includes checking the applicant's references, verifying that the applicant does not have any disqualifying criminal history or reports of child neglect, and consulting with the certifier's team.

71.    Upon information and belief, the final decision to approve or deny an application is carried out by a team that includes the applicant's assigned caseworker or certifier and the team supervisor.

Verified Complaint

72.    If an applicant meets the standards, the Department will issue a written notice of approval for adoption applicants and a "certificate of approval" for foster care applicants. OAR § 413-200-0274(2).

73.    A certificate of approval is necessary to become a foster parent. ORS § 418.630 ("No person shall operate a foster home without a certificate of approval issued by the Department of Human Services").

74.    In practice, applicants seeking to adopt also receive a certificate of approval allowing them to act as foster parents.

75.    After a home seeking to adopt is approved, the prospective parents wait for a match.

76.    Prospective parents can, for example, "put in" for specific children and hope that the Department responds favorably.

77.    The Department will also recruit and seek to identify homes with characteristics well suited for the particular child.

78.    The Department employs different methods for selecting a placement depending on the child's age, personal circumstances, and the type of placement options that are available.

79.    The child's caseworker, for example, may select a placement for children under the age of six where "each potential adoptive resource is a general applicant," *i.e.* a home where the parents are not related to or have a prior relationship with the child. OAR § 413-120-0020(1).

80.    In other circumstances, the Department will convene an adoption committee made up of interested stakeholders. OAR § 413-120-0020(2)–(3). The adoption committee provides a recommendation to an "Adoption Decision Specialist," who receives input from the committee and makes a placement selection. OAR § 413-120-0000(3), (9).

81. Either way, the Department gathers the available information to make an individualized assessment of the best placement that can successfully integrate the child and best "meet the current and lifelong needs of each child." OAR § 413-120-0700(1)(a) (describing responsibilities of the child's caseworker); OAR § 413-120-0053(5) (same for adoption committee).

82. For example, if a child's caseworker is tasked with finding a suitable placement, particularly for a child open to adoption by anyone, the caseworker "must conduct recruitment activities," like posting a "Waiting Child Bulletin" that advertises the child's availability to adoption workers and prospective parents. OAR § 413-120-0750(6).

83. The caseworker must "request input about the knowledge, skills, abilities, and commitment a potential adoptive resource needs to best meet the current and lifelong needs of the child from … [p]rofessionals who have worked closely with the child," including the child's attorney, CASA worker, or other caregiver. OAR § 413-120-0760(3).

84. The caseworker may, "on a case-by-case basis," consult with the child's birth parent to identify potential adoptive resources. OAR § 413-120-0760(1)(a).

85. The caseworker must reach out to the adoption workers representing families the caseworker is considering to ensure they are "available and appropriate" for the specific child. OAR § 413-120-0021(2)–(4).

86. After the child's caseworker has identified potential placements, the caseworker schedules an "adoption placement selection" date to make a decision. OAR § 413-120-0021(4); *see also* OAR § 413-120-0021(5)(a) (caseworker must notify and solicit information from interested stakeholders at least ten days before scheduling selection date).

87.     After reviewing the input from stakeholders and the prospective caregivers' adoption workers, the caseworker and his or her supervisor makes a decision. OAR § 413-120-0021(11).

88.     If a selection is made, the Department will normally place the child in a home for a six-month trial period to allow the agency to supervise the placement and see how it progresses. OAR § 413-120-0860(6).

89.     The next step is finalizing the adoption. Prospective parents must generally petition the local circuit court in the county "with which the child has the most significant connection." ORS § 109.276(5).

90.     Every petition for adoption requires notice to DHS. ORS § 109.285(5).

91.     If the court approves the petition, it creates a legal parent-child relationship between the petitioner(s) and the child.

The minimum standards for adoptive homes

92.     The Department promulgates rules and regulations establishing standards for adoptive homes. ORS §109.276(7)(c).

93.     Prospective parents have the burden of demonstrating their "knowledge, skills, and ability to meet the current and lifelong needs of [a] child," including caring for the child's "[p]hysical and emotional safety and well-being," encouraging their familial relationships, and helping them to maintain their "identity, cultural, religious, and spiritual heritage." OAR § 413-120-0246.

94.     At the center of this case is OAR § 413-200-0308, which lists the "Personal Qualifications for Applicants and Certified Resource Families." This includes the ability to exercise sound judgment; provide for the child's safety and health; maintain a support network to help care for the child; provide for the household financially; discipline the child in a constructive manner; and ensure that

all household members cooperate with the Department, display maturity, and do not pose a health or safety risk to the child. OAR § 413-200-0308(2)(a)–(l).

95.    OAR § 413-200-0308(2)(k) also states that applicants must be willing to affirm various aspects of a child's identity and cultural background—the policy that Jessica challenges. It states that "[a]pplicants must":

> (k) **Respect, accept and support the** race, ethnicity, cultural identities, national origin, immigration status, **sexual orientation, gender identity, gender expression**, disabilities, spiritual beliefs, and socioeconomic status, **of a child or young adult in the care or custody of the Department**, and provide opportunities to enhance the positive self-concept and understanding of the child or young adult's heritage[.]

OAR § 413-200-0308(2)(k) (emphasis added).

Jessica's predicament

96.    Jessica initially progressed through the application process without any problems.

97.    After submitting an inquiry on everychildoregon.org, Jessica made contact with Rebecca Garrison, who supervises the certification process for the DHS office in Ontario, Oregon, which serves Malheur County.

98.    Ms. Garrison directed Jessica to reach out to Cecilia Garcia, the certifier assigned to Jessica's file who was responsible for guiding Jessica through the application process.

99.    After reaching out to Ms. Garcia, Ms. Garcia sent Jessica an email with a link to the Department's training materials, including orientation videos and a link to register for RAFT training.

100.    Jessica promptly completed the initial forms and training videos and registered for RAFT classes.

101.    In mid-May, she received an application for a Home Study.

102.    Jessica promptly submitted the application along with her fingerprints and consent papers for a background check.

103.    By the end of July, she completed the RAFT training.

104.    During the training, Jessica realized that her faith might conflict with some of the Department's expectations for adoptive parents.

105.    Her instructor had explained during class that—consistent with DHS regulations—parents "must respect, accept, and support" a child's sexual orientation, gender identity, or gender expression. OAR § 413-200-0308(2)(k).

106.    The instructor had also explained that adoptive and resource parents must use a child's stated pronouns and affirm a child's gender identity if the child's identity does not align with their biological sex.

107.    The instructor provided illustrative examples of how parents ought to support a child's sexual orientation or gender identity, like allowing a child to dress however they want and taking them to a Pride parade.

108.    Trainees received a RAFT participant manual that similarly instructs parents to be affirming of different sexual orientations and gender identities.

109.    For example, one handout Jessica received directs caregivers to "[c]elebrate diversity in all forms," and "[p]rovide access to a variety of books, movies, and materials, including those that positively represent same-gender relationships."

110.    The handout from ¶ 109 directs prospective parents to support a child's "self-expression through their choices of clothing, jewelry, hairstyle, friends, and room decoration."

111.    The handout from ¶ 109 suggests that prospective parents should display "'hate-free zone' signs or symbols indicating and LGBTQ-affirming environment (e.g. pink triangle, rainbow, or ally flag)," "whether or not a youth in your care openly identifies as LGBTQ+[.]"

112.    The handout from ¶ 109 also states that "[r]especting [a child's] gender identity and expression is very important," and parents should avoid "forcing youth to attend activities (including religious activities …) that are … unsupportive of people with diverse SOGIE."[15]

113.    The handout from ¶ 109 directs caregivers to "[A]lways ask someone for their pronouns," and notes that there "are an infinite number of pronouns as new ones emerge in our language."

114.    On information and belief, other handouts similarly instruct caregivers to affirm and support a child's sexual orientation, gender identity, and gender expression.

115.    On information and belief, one handout provides "Tips for Supporting Children and Youth," and tells prospective parents to use "acceptable," "appropriate and inclusive language," use the "language that [children] use to describe their sexual and gender identity," and to "[d]isplay rainbow flags and other messages and images, such as the GLSEN safe space sign[.]"

116.    On information and belief, another handout instructs prospective parents to seek out and "participate in LGBTQ community activities."

117.    Oregon's Child Welfare Procedure Manual similarly requires caregivers to adopt an affirming attitude. It instructs child-welfare professionals to remind caregivers to "[e]xpress affection" when they learn a child is gay or transgender, support the child's LGBT identity and gender expression, bring the child "to LGBT organizations or events.[16]

118.    Jessica religious beliefs conflict with the state's views.

---

[15] SOGIE meaning Sexual Orientation, Gender Identity, and Expression.

[16] https://perma.cc/YDT9-ZLHY.

119.    Jessica believes that the Bible provides the truth about our human nature and identity.

120.    Jessica believes that every human being is made in the image and likeness of God, that God created humans as male and female, and that our physical manifestation is an indelible part of who we are. Genesis 1:26–27.

121.    Jessica believes that men and women are equal in worth but also inherently different because a person's God-given sex has spiritual significance for who they are and how they should act. Genesis 1:27, 2:18–24.

122.    Jessica believes that a person cannot choose his or her gender because a person's earthly identity is inextricably intertwined with their sex.

123.    Jessica believes that persons should not seek to change their sex or engage in any conduct or speech that suggests a male can be a female, or vice-versa.

124.    For example, Jessica believes that a person should not go by pronouns that contradict or obscure their biological sex and that she should avoid using such pronouns to address other people. In that situation, Jessica would, for example, use only a person's name and avoid their preferred pronouns as best as she could.

125.    Jessica's beliefs about the institution of marriage reflect these inherent differences.

126.    Jessica believes that marriage is the life-long union of one man and one woman meant to symbolize and point people to God's everlasting covenant with His bride, the Church. Ephesians 5:31–32.

127.    Jessica believes that men and women have different and complementary roles within a marriage, that this complementary nature allows one man and one woman to come together as "one," and that sexual relations are only appropriate within the confines of a biblical marriage. Genesis 2:24.

128.    Jessica further believes she has a religious obligation to share her religious convictions.

129.    Jessica believes that God calls Christians to share the gospel with others, Matthew 28:19, including by raising up children in the faith and teaching them truths consistent with her faith, Ephesians 6:4.

130.    Jessica seeks to fulfill this command by lovingly caring for her children, bringing them to church with her, and generally raising her children in a Christian home and teaching them about the faith.

131.    Jessica is opposed to using coercive tactics on her children (or anyone) when it comes to sharing her faith. Instead, she seeks to share the gospel by word and deed, so that her children may desire what is right and true of their own accord. *Cf.* Philemon 1:8–15.

132.    But Jessica always seeks to speak the truth and is religiously obligated to avoid speaking falsehoods or deception of any kind. Ephesians 4:25; John 8:31–32.

133.    The agency rule requiring parents to "accept" and "support" the sexual orientation or gender identity of any child requires Jessica to violate her religious beliefs in several ways.

134.    First, the agency rule compels Jessica to speak words she is religiously obligated to avoid.

135.    For example, Jessica cannot use a person's pronouns if the pronouns conflict or obscure the person's biological sex. But under the rule, Jessica must agree to use a hypothetical child's preferred pronouns.

136.    And because there is an infinite number and variety of pronouns,[17] Jessica must be willing to use pronouns that she considers offensive—like vamp

---

[17] Indeed, "people come up with new pronouns all the time." LGBTQ NATION (Aug. 16, 2022) https://perma.cc/L7DA-GRAM. Or a person may go by no pronouns at all. Sam Krause, *What do you do when someone doesn't use any pronouns?*, PFLAG, https://perma.cc/9HTS-EFHS.

(vampire), wit (witch), or necro (necromancer) pronouns[18]—and that she would feel religiously obligated to avoid using.

137.    Further, Jessica cannot say or do any of things that the agency expects related to affirming a hypothetical child's sexual orientation or gender identity (*supra* ¶¶ 109–17), whether that's affirming that a child *is* transgender, flying a "pink triangle" or rainbow flag in her home, or taking a child to a Pride parade.

138.    But under the rule, Jessica must be willing to "[c]elebrate diversity in all forms," and speak positively and affirm the infinite number of sexual orientations and gender identities a hypothetical child may express or identify with.

139.    And because there is an infinite number and variety of gender identities, Jessica must be willing to affirm identities like "genderf**k,"[19] or "xenogenders" like "daimogender" and "witchgender."[20]

140.    Jessica considers these to be offensive and would feel religiously obligated to avoid affirming or supporting them.

141.    But the state requires Jessica to agree to use all of the above, forcing her to "confess by word or act [her] faith" in the state's orthodoxy. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

142.    Second, the agency rule compels Jessica to refrain from speaking words she is religiously motivated to express.

---

[18] Ezra Marcus, *A Guide to Neopronouns*, NY Times (Sept. 18, 2022) https://www.nytimes.com/2021/04/08/style/neopronouns-nonbinary-explainer.html [pdf: https://perma.cc/4ARL-9LS8].

[19] Jessica A. Clarke, *They, Them, and Theirs*, 132 Harv. L. Rev. 894, 991 & n.65 (2019) (describing "subversive genders—gender identities that parody or deconstruct the gender binary" including "genderfuck").

[20] Xenogenders are when a person's identity is "best described through their relationship with other beings or concepts," like the supernatural (demons) or magical (witches). *What you need to know about xenogender*, LGBTQ NATION (Mar. 2, 2022), https://perma.cc/2TW9-DQAT.

143.   For example, Jessica desires to share her religious beliefs with her children (whether biological or adopted), including her beliefs about our human nature and identity.

144.   But under the rule, Jessica must refrain from expressing her religious beliefs to her children because those beliefs do not "accept" or "support" the infinite number of sexual orientations and gender identities a child may express or identify with.

145.   This "stifles [her] speech on account of its message." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994).

146.   Third, the rule compels Jessica to engage in behavior she is religiously obligated to avoid.

147.   For example, Jessica cannot attend or participate in—or facilitate her children's attendance or participation in—gay-pride parades.

148.   But under the rule, Jessica must be willing to take her children to gay-pride parades or similar "LGBTQ community events" to celebrate the state's views on sexual orientation and gender identity. And because Jessica desires to adopt children under the age of ten, Jessica must be willing to accompany her children to these events too.

149.   This burden's Jessica's "ability to advocate public or private viewpoints," *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000), by forcing her to attend, or to facilitate her children's attendance at, events that directly contradict her religious beliefs.

150.   Fourth, the rule compels Jessica to refrain from behavior that is motivated by her religion.

151.   For example, Jessica and her children regularly attend Vale Christian Church, where the pastor teaches on Scripture, including biblical teachings on our human nature and identity.

152.    Jessica and some of her older children frequently attend Bible study at church on Thursday evenings, and Jessica's children also attend youth group.

153.    Vale Christian Church's statement of faith accords with Jessica's beliefs about marriage and our human identity. It states that "sexual intimacy is to be expressed only within the context of marriage," that "God instituted marriage between one man and one woman as the foundation of the family and the basic structure of human society," and that "marriage is exclusively the union of one man and one woman."

154.    Jessica and her children also pray and read scripture or devotionals most evenings.

155.    Jessica's children help her to pray for clients at a pregnancy clinic where Jessica volunteers twice a month.

156.    If Jessica is able to adopt, she intends to bring her adopted children to church with her and to include them in her family's prayer and Bible study time.

157.    But under the rule, Jessica must refrain from attending church with a hypothetical child, because her pastor's teachings may not "accept" or "support" the infinite number of sexual orientations and gender identities a child may express or identify with.

158.    Under the rule, Jessica must agree to refrain from holding Bible study in her home, because the Bible contains passages condemning same-sex romantic relationships.

159.    And if Jessica were required to avoid engaging in certain behavior with her adopted children, it would deter her from engaging in the same behavior with her biological children.

160.    Jessica desires and is religiously motivated to do things as a family with all her children to avoid making anyone feel isolated and excluded.

161.    So Jessica would feel deterred from holding a Bible study at home with her biological children if she could not include her adopted children.

162.    And Jessica would feel deterred from attending church with her biological children if she could not include her adopted children.

163.    This burdens Jessica's ability to "inculcate" her values on her children. *Dale*, 530 U.S. at 649.

Oregon rejects Jessica's application because of her religious beliefs

164.    After Jessica completed the RAFT classes, she forwarded her certificate of completion to Ms. Garcia.

165.    Ms. Garcia responded enthusiastically ("That's great!") and asked how the training went.

166.    In an email dated August 9, Jessica responded that she found the training "thorough and helpful."

167.    Jessica also raised that part of the training weighed on her conscience.

168.    She stated as follows:

> Cecilia … [t]here is one thing that I feel I need to mention to you. One of the things the training really emphasized is SOGI (sexual orientation gender identity) and that the host must respect, accept, and support children whose preferred pronouns & identity don't match their biological sex. I don't know how many children there are out there under the age of 9 who fall into this category (and to me it's kind of crazy that society is wanting to get kids thinking about this stuff at such young ages; I think we should let them keep their innocence), so this may not even be an issue, but I need to let you know I cannot support this behavior in a child. I have no problem loving them and accepting them as they are, but I would not encourage them in this behavior. I believe God gives us our gender/sex and it's not something we get to choose. Basically, my faith conflicts with this & I just felt that I needed to let you know.

169.    In short, Jessica sought to explain that she could not say or do anything that went against her Christian faith.

170.    Jessica even thought her concerns might be a nonissue. At that time, she sought to adopt a child under the age of nine, and it would be highly unlikely a young child, let alone an infant, would begin to identify as transgender.

171.    Even pro-LGBT advocacy groups estimate that transgender identities present in only 1.18% of youth in Oregon, ages 13–17.[21] Though some organizations believe the number is higher in foster care, the subset of children who are under the age of nine and transgender is presumably even smaller because children like newborns and infants do not express a gender identity (or a sexual orientation).

172.    Ms. Garcia did not respond to Jessica's email.

173.    On September 6, Jessica sent a follow up email, checking on her application status and asking if they could proceed with the home study.

174.    Again, Ms. Garcia initially did not respond.

175.    On September 22, over a month after Jessica sent her August 9 email, Ms. Garcia finally called Jessica to deliver the bad news.

176.    Ms. Garcia explained that Jessica was ineligible to adopt because of her religious beliefs. Specifically, Ms. Garcia explained that because Jessica was unwilling to use a child's preferred pronouns or affirm a child's transgender identity, Jessica could not comply with DHS regulations.

177.    Ms. Garcia provided Jessica with an example and asked how she would respond if the Department hypothetically asked her to take a child to receive hormone shots (meant to facilitate a gender transition).

178.    Jessica responded that she would not take this hypothetical child to receive hormone shots and expressed that it was child abuse to administer these

---

[21] https://perma.cc/5XL6-TVZ3.

types of pharmaceutical interventions to a child who, in the context of that conversation, was under the age of nine.

179.    Ms. Garcia explained that Jessica's stance did not comply with the RAFT training or with DHS regulations and she was therefore disqualified.

180.    Jessica was dumbfounded and also perplexed by the denial because she had satisfactorily met all of the standards for adoptive homes up until this point, except that she was unwilling to agree to affirm a hypothetical infant or young child's transgender identity.

181.    Jessica stated that this felt as though she was being denied because of her religious beliefs.

182.    Ms. Garcia stated that Jessica could not meet the state's standards.

183.    Jessica asked Ms. Garcia if there were other options available, like finding a sibling pair under the age of nine where neither child had gender dysphoria or expressed a transgender identity.

184.    Ms. Garcia explained this was not an option because a child might express gender dysphoria later in life—even if the chances of this were extremely remote—and the state needed assurance that Jessica would support and affirm that child's gender identity, whatever it might be and whenever it might hypothetically manifest.

185.    Ms. Garcia told Jessica that if she changed her mind—referring to her willingness to comply with the state's policy—the Department could likely proceed with her application.

186.    The next day, on September 23, Jessica emailed Ms. Garcia and asked for a written explanation of why she was ineligible to adopt.

187.    A few days later, Ms. Garcia responded and asked for a release of information before providing more details.

Verified Complaint

188.    Jessica visited the DHS office the next day to sign a release of information but did not hear back from Ms. Garcia.

189.    On October 6, Jessica sent a second follow up email, asking how long it would take to receive a written explanation.

190.    On October 14, Jessica received a response from Ms. Garcia confirming that "[t]he agency has made a decision and determined that your application will be denied." It also stated that: "You will be receiving a letter of formal denial however, a timeline cannot be provided at this moment. I have cc'd my supervisor so you can have her information per your request."

191.    On November 1, Jessica sent yet another email to Ms. Garrison, Ms. Garcia's supervisor, asking about the denial letter.

192.    On November 8, Ms. Garrison responded that Jessica would receive a letter "by the middle of next week."

193.    On November 18, Jessica had still not received the denial letter and sent a second email to Ms. Garrison.

194.    On November 22, Ms. Garcia emailed Jessica a copy of the final denial letter.

195.    The denial letter states that Jessica does not meet the adoption-home standards under OAR § 413-200-0308(2)(k), which requires foster and adoptive parents to "respect, accept, and support," a young child's sexual orientation and gender identity.

196.    In support of the denial, the letter cites portions of Jessica's August 9 email to Ms. Garcia, including Jessica's statement that she could not support or encourage certain behavior that went against her religious beliefs, and that she believed "God gives us our gender/sex and it's not something we get to choose."

197.    The letter states that "the agency expects every applicant to be open to any child regardless of race, ethnicity and cultural identity, sexual orientation,

gender identity, and gender expression," without acknowledging that Jessica is open to any child, regardless of the child's race, ethnicity, cultural identity, sexual orientation, gender identity, or gender expression.

198.   Further, the letter states that if a child placed with Jessica later "became aware" that they identified as gay or transgender, Jessica would still "love and treat them as [her] own but would not support their lifestyle or encourage any behavior related to their sexual orientation or gender identity or expression" that went against her religious beliefs.

199.   Finally, the letter cites Jessica's religious objection to transporting a child for "hormone shot appointments," and that she considers these types of interventions to be child abuse.

Oregon's categorical rule against certain religious persons

200.   Jessica is eager to welcome a sibling pair into her home and wants to restart the adoption certification process as soon as possible.

201.   If not for Oregon's policy and the fact that the Department already denied her application, she would re-apply immediately.

202.   And but for the policy, Jessica is capable and qualified to adopt.

203.   But Jessica is unable to obtain a Home Study from the state because of her religious beliefs, and reapplying would be futile given Oregon's policy.

204.   Like any faithful member of a religion, Jessica seeks to conform her behavior to her religious tenets and will not say or do anything that contradicts her Christian faith.

205.   Many religious persons in this country and around the world, including many Christians, Jews, and Muslims, share Jessica's beliefs and seek to live lives consistent with those beliefs.

206.   Yet the state categorically bars people like Jessica from adopting or fostering a child because of their views.

207.   In considering Jessica's religious beliefs, the state was not considering whether Jessica's home was suitable for a particular child or sibling pair.

208.   Instead, the state considered Jessica's religious beliefs against a blank canvas, requiring her and all other applicants to agree with the state's views on sexual orientation and gender identity as a condition for adopting *any* child.

209.   Further, the state requires applicants to agree to its views on sexual orientation and gender identity, regardless of the specific program to which the applicant is applying.

210.   In other words, Jessica's religious beliefs preclude her from participating in *any* child welfare services.

211.   Applicants seeking to provide only respite care—*i.e.* babysitting a child for several hours or days at a time—are categorically barred from participating in foster-care programs if they disagree with the state's views on sexual orientation and gender identity.

212.   Applicants seeking to care only for newborn infants under the age of two are categorically barred from participating in foster-care programs if they disagree with the state's views on sexual orientation and gender identity.

213.   Applicants seeking to adopt a teenager who shares their faith and worships at their church are categorically barred from participating in adoption programs if they disagree with the state's views on sexual orientation and gender identity.

214.   Even applicants seeking to adopt a child who is not in foster care are barred from pursuing the adoption if they disagree with the state's views on sexual orientation and gender identity unless the Department issues a discretionary waiver. ORS § 109.276(7)(b); OAR § 413-140-0032(2) (giving DHS discretion to

waive home study requirement for independent adoptions when (a) one of the biological parents retain parental rights (b) the petitioner "qualifies as a relative" under the Department rules, or (c) in certain circumstances when the child is born to a surrogate mother).

215.    So a couple seeking to adopt a child from a close family friend are categorically barred from pursuing the adoption if they disagree with the state's views on sexual orientation and gender identity.

216.    And a mother who wants a couple from her temple or mosque to adopt her child cannot ensure that the child is raised in a loving and faithful home if her religious community disagrees with the state's views on sexual orientation and gender identity.

217.    In effect, Oregon excludes entire religious communities from participating in child welfare programs because of their religious views.

Oregon's selective enforcement and hostility toward certain religious beliefs

218.    Oregon does not require applicants for child-welfare services to be open to caring for any child, regardless of the child's personal circumstances and background.

219.    Instead, the state selectively enforces its rules and purported interests against applicants with certain religious beliefs.

220.    For example, on information and belief, the Department requires applicants to fill out an "Adoptive Family Information and Placement Preference form" to express their preferences for certain types of children.

221.    The Department allows applicants to express a preference against children who display a history of trauma or physical or cognitive challenges.

Verified Complaint

222. The Department allows applicants to express a preference for children based on age, which is a protected characteristic in Oregon. ORS § 659A.030 (employment); ORS § 659A.403 (public accommodations).

223. Jessica, for example, was allowed to indicate that she was interested in adopting a sibling pair under the age of nine.

224. The agency allows applicants to express a preference against children with "sexual behaviors," which it defines as "inappropriate sexual activity."

225. The Department also allows applicants to express a preference for children based on sex.

226. So an applicant can indicate that they are not interested in adopting or providing foster care for a boy because they are not prepared or well situated to care for someone of the male sex.

227. And an applicant can indicate that they are not interested in adopting or providing foster care for a girl because they are not prepared or well situated to care for someone of the female sex.

228. Yet "the agency expects every applicant to be open to any child regardless of … gender identity, and gender expression."

229. Further, even if an applicant is open to any child regardless of gender identity or gender expression (as Jessica is), the agency also requires every applicant to agree to "support" a hypothetical child's gender identity or gender expression. OAR § 413-200-0308(2)(k).

230. The same policy requires applicants to agree to "support" a hypothetical child's "spiritual beliefs" or "cultural identities." OAR § 413-200-0308(2)(k).

231. But the Department does not enforce OAR § 413-200-0308(2)(k) in an evenhanded manner. Instead, it selectively enforces its certification standards

against religious persons who disagree with the state's views on sexual orientation and gender identity.

232.   On information and belief, the Department does not require applicants to show that they will unconditionally "support" any and all "spiritual beliefs" and practices. § 413-200-0308(2)(k).

233.   On information and belief, the Department does not interpret an applicant's unwillingness to accommodate certain spiritual beliefs as hostility to receiving children with those spiritual beliefs.

234.   Hence, the Department will certify applicants who may not "accept and support" some spiritual beliefs or even allow certain spiritual practices in their home.

235.   On information and belief, the Department will certify applicants who are not even "open" to receiving certain children based on religion. In its final denial letter to Jessica, the Department stated that it "expects every applicant to be open to any child regardless of race, ethnicity and cultural identity, sexual orientation, gender identity, and gender expression," but not spiritual beliefs. *Supra* ¶ 197.

236.   On information and belief, the Department also does not require applicants to show that they will unconditionally "support" any and all "cultural identities" and practices. OAR § 413-200-0308(2)(k).

237.   On information and belief, the Department does not interpret an applicant's unwillingness to accommodate certain cultural identities or practices as hostility to receiving children with those cultural identities.

238.   Hence, the Department will certify an applicant who may not "accept and support" some cultural identities or even allow certain cultural practices in their home.

239.   But the Department requires applicants to show that they will unconditionally "support" any and all sexual orientations, gender identities, and

gender expressions, even if doing so would violate the applicant's deeply held religious beliefs.

240.    And the Department interprets Jessica's unwillingness to "support" certain sexual orientations and gender identities as an unwillingness to receive children of diverse sexual orientations and gender identities into her home, though she communicated that she had no problem receiving an LGBT child.

Oregon's haphazard enforcement of its rule

241.    Though Oregon refuses to grant Jessica an exemption from its policy, the state does not uniformly enforce its policy or interests.

242.    For example, not every petition for adoption in the State of Oregon requires a Home Study. The Department may, in its discretion, "waive the home study requirement for some adoptions." OAR § 413-140-0032; ORS § 109.276(7)(b).

243.    The Department may waive a Home Study for independent adoptions when one biological parent retains parental rights. OAR § 413-140-0032(2)(b)(A).

244.    The Department may waive a Home Study for independent adoptions when "[t]he petitioner qualifies as a relative," which includes persons related by blood, persons who have cared for the child "on a continuous basis since birth and for at least six months immediately prior to the petitioner's request," and persons who have lived with the child "on a continuous basis for at least one year immediately prior to the petitioner's request[.]" OAR § 413-140-0032(2)(b)(B).

245.    The Department may also waive a Home Study for independent adoptions in which the child is born to a surrogate mother. OAR § 413-140-0032(2)(c).

246.    Nor does Oregon enforce its policy consistently against families who apply to private agencies.

247.    Oregon can license private child welfare agencies to approve home studies independently of the state. ORS § 418.205 (defining a "[c]hild-caring agency" under the chapter); ORS § 418.240 (setting out licensing criteria for child-caring agencies)*;* OAR § 413-140-0035(2)–(3) (describing requirements for private agencies to certify a home seeking an independent adoption).

248.    The Department requires these agencies to comply with its policies, including § 413-200-0308(2)(k). ORS § 109.276 (all home studies are "for the purpose of demonstrating that [applicants] meets the minimum standards for adoptive homes as set forth in the department's administrative rules"). And the Department reviews and audits the private agencies' certifications for compliance with the policy. ORS § 418.255.

249.    But, on information and belief, some private adoption and foster-care agencies in Oregon interpret the policy in § 413-200-0308(2)(k) narrowly and differently than the Department and are willing to work with and certify religious applicants like Jessica.

250.    On information and belief, these agencies do not erect a categorical barrier to applicants because they have strong religious beliefs that may conflict with the Department's policy.

251.    On information and belief, these agencies recognize that *no* family is well situated to care for *any* child. They seek to recruit as many qualified families as possible to increase the odds of finding a well-situated match for every child.

252.    This accords with the other provisions of the law, which requires private child-placing agencies, "[s]o far as practicable," to place children with foster homes "of the same religious faith as that held by the child or the child's parents." ORS § 418.280(d).

253.    On information and belief, Oregon certifies these private agencies even though their practices contradict the plain language of the policy.

254.    But at any time, Oregon can begin to apply its policy as written to Home Study applicants who seek certification from the state or from private agencies, thereby preventing all applicants with religious beliefs like Jessica from obtaining a home study in Oregon.

255.    No matter where Jessica turns, she is at the mercy of the certifying agency to grant her an exemption from the plain language of Oregon's policy.

256.    Additionally, accessing a private agency would be difficult for Jessica. She lives in a rural part of eastern Oregon that is, according to the Department's website, more than six hours away (by car) from the nearest state-contracted private agency.[22]

257.    Private agencies also typically charge fees, whereas the state does not, making it much more expensive for Jessica to adopt.

LEGAL ALLEGATIONS

First Cause of Action:
First Amendment: Freedom of Speech, Association, and Assembly

258.    The First Amendment, applicable to the States through the Fourteenth Amendment, forbids any law "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend. I.

259.    Jessica's desire to (a) engage in certain speech like sharing her faith with her children, (b) refrain from certain speech like neopronouns, (c) associate with certain groups like her church, and (d) avoid associating with certain groups like Pride parades, are each protected under the Free Speech or Freedom of Assembly Clauses.

---

[22] https://perma.cc/6AKM-N59T.

260.    Oregon's discriminatory policy violates Jessica's free-speech, assembly and free-association rights by conditioning her access to child welfare services on her willingness to give up constitutional rights. Specifically:

- it requires her to agree to speak words to which she objects, to refrain from speaking, to associate with events and with messages to which she objects, and to refrain from associating with events and messages with which she wishes to associate; and

- regulates her speech based on content and viewpoint.

261.    The discriminatory policy does not serve any valid or compelling interest in a narrowly tailored way when it infringes on Jessica's free-speech and free-association rights.

262.    Oregon's discriminatory policy is also facially invalid because it imposes vague and overbroad restrictions on speech that that give enforcement officials unbridled discretion.

263.    Accordingly, the state's policy violates the Free Speech and Freedom of Assembly Clauses.

<u>Second Cause of Action</u>
<u>First Amendment: Free Exercise</u>

264.    The First Amendment, applicable to the States through the Fourteenth Amendment, forbids any law prohibiting or penalizing the free exercise of religion. U.S. Const. amend. I.

265.    Jessica's religiously motivated desire to (a) engage in certain speech like sharing her faith with her children, (b) refrain from certain speech like neopronouns, (c) associate with certain groups like her church, and (d) avoid associating with certain groups like Pride parades, are each protected under the First Amendment.

Verified Complaint

266.    By putting Jessica to a choice between fidelity to her religious beliefs and accessing child-welfare services, Oregon's discriminatory policy significantly burdens Jessica's religious exercise.

267.    The state's policy is not neutral or generally applicable. It imposes special disabilities based on religious beliefs, categorically excludes persons from child welfare services based on religious beliefs, prefers certain religious and secular beliefs over Jessica's religious beliefs, and provides for categorical and individualized exemptions without extending an exemption to religious persons like Jessica.

268.    By categorically excluding religious persons from accessing a government program, the state's policy also acts as a religious litmus test that is inconsistent with the history and tradition of the Free Exercise Clause.

269.    The state's policy also burdens Jessica's religious exercise in conjunction with her First Amendment rights to free speech, assembly, and free association. It compels Jessica to speak words that violate of her religious beliefs, to refrain from speaking her religious beliefs, to associate with events and with messages that violate her religious beliefs, and to refrain from associating with events and with messages that express her religious beliefs.

270.    The discriminatory policy does not serve a valid or compelling interest in a narrowly tailored way when it infringes on Jessica's religious exercise.

271.    Accordingly, the state's policy violates the Free Exercise Clause.

Third Cause of Action:
Fourteenth Amendment: Equal Protection

272.    The Fourteenth Amendment guarantees "the equal protection of the laws." U.S. Const. amend. XIV, § 1.

273.    By categorically excluding Jessica from child-welfare services because of her religious beliefs, the policy invidiously discriminates based on religion and

treats Jessica worse than similarly situated persons who do not share her religious beliefs.

274.    Accordingly, the policy violates the Equal Protection Clause.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment against Defendants and provide Plaintiff with the following relief:

(A)    A declaration that the state's policy in OAR § 413-200-0308(2)(k) related to sexual orientation, gender identity, and gender expression, facially and as-applied violates Plaintiff's and others' constitutionally protected rights to free speech, free association, assembly, religious exercise, and equal protection of the law;

(B)    A preliminary and permanent injunction to stop Defendants and any person acting in concert with them from enforcing the state's policy facially, against Plaintiff, or against other similarly situated persons at any point throughout the adoption or foster process;

(C)    That this Court award Plaintiff's costs and expenses in this action, including reasonable attorney fees, in accordance with 42 U.S.C. § 1988;

(D)    That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment;

(E)    That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

(F)    That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiff; and

Verified Complaint

(G)    That this Court grant any other relief that it deems equitable and just

in the circumstances.


Respectfully submitted this 3rd day of April, 2023.

 *s/Rebekah Schlutheiss*

Rebekah Schultheiss (Millard)
rebekah@millardoffices.com
OSB #121199
PO Box 7582
Springfield, OR 97475
t: 707.227.2401
*Counsel for Plaintiff*

Jonathan A. Scruggs*
jscruggs@ADFlegal.org
AZ Bar No. 030505
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
t: 480.444.0020


Johannes Widmalm-Delphonse*
jwidmalmdelphonse@ADFlegal.org
VA Bar No. 96040
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
t: 571.707.4655


Christiana Kiefer*
ckiefer@adflegal.org
DC Bar No. 176922
ALLIANCE DEFENDING FREEDOM
440 First Street NW,
Suite 600
Washington, DC 20001
t: 202.393.8690


*Counsel for Plaintiff*
*\*Pro Hac Vice Application Forthcoming*

**DECLARATION UNDER PENALTY OF PERJURY**

I, Jessica Bates, a citizen of the United States and a resident of the State of Oregon, verify under penalty of perjury that I have read the above complaint and that its contents related to my personal experiences are true and correct to the best of my knowledge, except for the matters stated on information and belief.

Executed this 2ND day of April, 2023, at Vale, Oregon.

41                                              Verified Complaint