Rebekah Schultheiss (Millard)
rebekah@millardoffices.com
OSB #121199
PO Box 7582
Springfield, OR 97475
t: 707.227.2401
*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PENDLETON DIVISION

| | |
|---|---|
| **JESSICA BATES,**<br><br>Plaintiff,<br><br>v.<br><br>**FARIBORZ PAKSERESHT**, *et al.,*<br><br>Defendants. | Case No.: 2:23-cv-00474-AN<br><br>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Request for Oral Argument |

Plaintiff's motion for preliminary injunction

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................III

LOCAL RULE 7-1 CONFERRAL .................................................... 1

MOTION .................................................................................. 1

INTRODUCTION .................................................................... 5

SUMMARY OF FACTS ............................................................ 7

ARGUMENT ........................................................................ 13

    I.    Oregon's policy violates the Free Speech Clause. ........................ 13

        A.  Oregon seeks to compel Bates' speech. ........................... 14

        B.  Oregon seeks to regulate Bates' speech based on content and viewpoint. 18

        C.  Oregon intrudes on Bates' freedom of association. ................... 20

    II.    Oregon's policy violates the Free Exercise Clause........................ 23

        A.  Oregon's policy burdens Bates' religious exercise..................... 23

        B.  Oregon's policy is not neutral or generally applicable.............. 25

        C.  Oregon's policy treads on historical protections for religious speech........ 30

    III.  Oregon's policy fails strict scrutiny. ............................... 32

    IV.  Oregon's policy is overbroad. ....................................... 37

    V.   The remaining preliminary-injunction factors favor Bates........................ 39

CONCLUSION ..................................................................... 39

CERTIFICATE OF SERVICE .................................................... 41

Plaintiff's motion for preliminary injunction

TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island,*
   517 U.S. 484 (1996) ................................................................. 35

*ACLU of Nevada v. City of Las Vegas,*
   466 F.3d 784 (9th Cir. 2006) .................................................. 20

*American Beverage Association v. City & County of San Francisco,*
   916 F.3d 749  (9th Cir. 2019) ...................................... 13, 19, 39

*Anderson v. City of Hermosa Beach,*
   621 F.3d 1051 (9th Cir. 2010) ................................................ 16

*Ashcroft v. ACLU,*
   542 U.S. 656 (2004) ................................................................. 35

*Bergelectric Corporation v. Secretary of Labor,*
   925 F.3d 1167 (9th Cir. 2019) ................................................ 14

*Blais v. Hunter,*
   493 F. Supp. 3d 984 (E.D. Wash. 2020) ........................ 15, 24, 37

*Boy Scouts of America v. Dale,*
   530 U.S. 640 (2000) ...................................................... 14, 21, 22

*Brown v. Entertainment Merchants Association,*
   564 U.S. 786 (2011) ........................................................... 33, 38

*Burwell v. Hobby Lobby Stores, Inc.,*
   573 U.S. 682 (2014) ................................................................. 24

*Capitol Square Review & Advisory Board v. Pinette,*
   515 U.S. 753 (1995) ................................................................. 31

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ................................................................. 35

*Committee on Jobs Candidate Advocacy Fund v. Herrera,*
   No. C 07-03199 JSW, 2007 WL 2790351 (N.D. Cal. Sept. 20, 2007) ....................... 4

*Commonwealth v. Cronin,*
   2 Va. Cir. 488 (1855) .............................................................. 30

*Conant v. Walters,*
   309 F.3d 629 (9th Cir. 2002) .................................................. 20

*Connecticut General Life Insurance Company v. New Images of Beverly Hills,*
   321 F.3d 878 (9th Cir. 2003) .................................................... 4

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,*
  483 U.S. 327 (1987) ............................................................................... 22

*Crowe v. Oregon State Bar,*
  989 F.3d 714 (9th Cir. 2021) ................................................................. 20

*Danville Christian Academy, Inc. v. Beshear,*
  141 S. Ct. 527 (2020) ............................................................................ 31

*Doe v. Harris,*
  772 F.3d 563 (9th Cir. 2014) ................................................................. 39

*Elrod v. Burns,*
  427 U.S. 347 (1976) .............................................................................. 39

*Employment Division, Department of Human Resources of Oregon v. Smith,*
  494 U.S. 872 (1990) .............................................................................. 31

*FEC v. Wisconsin Right To Life, Inc.,*
  551 U.S. 449 (2007) .............................................................................. 33

*Frudden v. Pilling,*
  742 F.3d 1199 (9th Cir. 2014) ............................................................... 16

*Fulton v. City of Philadelphia,*
  141 S. Ct. 1868 (2021) ........................................... 23, 24, 25, 27, 32, 34

*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015) ................................................................. 13

*Green v. Miss United States of America, LLC,*
  52 F.4th 773 (9th Cir. 2022) ........................................... 14, 17, 19, 34

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
  515 U.S. 557 (1995) ................................................... 14, 16, 22, 34

*Iancu v. Brunetti,*
  139 S. Ct. 2294 (2019) .......................................................................... 19

*In re Adoption of 'E',*
  279 A.2d 785 (N.J. 1971) ....................................................................... 27

*In re Dickens v. Ernesto,*
  37 A.D.2d 102 (N.Y. App. Div. 1971) .................................................... 27

*In re National Security Letter,*
  33 F.4th 1058 (9th Cir. 2022) ............................................................... 19

*Janus v. American Federation of State, County, & Municipal Employees, Council 31,*
  138 S. Ct. 2448 (2018) ................................................................. 16, 34

*Johnson v. Couturier,*
  572 F.3d 1067 (9th Cir. 2009) ................................................................. 4

Plaintiff's motion for preliminary injunction

*Kennedy v. Bremerton School District,*
    142 S. Ct. 2407 (2022) ...................................................................... 23, 25, 30, 31, 32

*Lasche v. New Jersey,*
    No. 20-2325, 2022 WL 604025 (3d Cir. Mar. 1, 2022) ........................................... 21

*Lyng v. Northwest Indian Cemetery Protective Association,*
    485 U.S. 439 (1988) ........................................................................................... 23

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
    138 S. Ct. 1719 (2018) ............................................................................ 16, 25, 26, 38

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ........................................................................................... 35

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ................................................................... 16, 17, 25

*NAACP v. State of Alabama ex rel. Patterson,*
    357 U.S. 449 (1958) ........................................................................................... 21

*New York State Rifle & Pistol Association Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ....................................................................................... 23

*Obergefell v. Hodges,*
    576 U.S. 644 (2015) ..................................................................................... 16, 32

*Our Lady of Guadalupe School v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ................................................................................. 23, 31

*People of State of California ex rel. Van De Kamp v. Tahoe Regional Planning Agency,*
    766 F.2d 1319 (9th Cir. 1985) ............................................................................... 4

*People v. Phillips,*
    (N.Y. 1813) ........................................................................................................ 30

*Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary,*
    268 U.S. 510 (1925) ..................................................................................... 16, 31

*Porretti v. Dzurenda,*
    11 F.4th 1037 (9th Cir. 2021) ....................................................................... 13, 39

*R.J. Reynolds Tobacco Company v. Shewry,*
    423 F.3d 906 (9th Cir. 2005) ............................................................................... 14

*Ramirez v. Collier,*
    142 S. Ct. 1264 (2022) ....................................................................................... 35

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ............................................................................... 14, 19, 32

*Reynolds v. United States,*
    98 U.S. 145 (1878) ............................................................................................. 30

Plaintiff's motion for preliminary injunction

*Riley v. National Federation of the Blind of North Carolina,*
    487 U.S. 781 (1988) ................................................................................ 16, 19, 35

*Roberts v. United States Jaycees,*
    468 U.S. 609 (1984) ............................................................................... 13, 21

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63 (2020) ....................................................................................... 39

*Rosenberger v. Rector & Visitors of University of Virginia,*
    515 U.S. 819 (1995) ....................................................................................... 19

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,*
    547 U.S. 47 (2006) ......................................................................................... 14

*San Jose Christian College v. City of Morgan Hill,*
    360 F.3d 1024 (9th Cir. 2004) ...................................................................... 31

*San Jose. Parents for Privacy v. Barr,*
    949 F.3d 1210 (9th Cir. 2020) ...................................................................... 31

*Sherbert v. Verner,*
    374 U.S. 398 (1963) ....................................................................................... 25

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Board,*
    502 U.S. 105 (1991) ................................................................................. 25, 35

*Spence v. State of Washington,*
    418 U.S. 405 (1974) ....................................................................................... 15

*Stromberg v. People of State of California,*
    283 U.S. 359 (1931) ....................................................................................... 16

*Thomas v. Review Board of Indiana Employment Security Division,*
    450 U.S. 707 (1981) ................................................................................. 23, 24

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) ....................................................................... 31

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    137 S. Ct. 2012 (2017) ............................................................................ 23, 24

*Turner Broadcasting System, Inc. v. FCC,*
    512 U.S. 622 (1994) ................................................................................. 13, 18

*United Food & Commercial Workers Local 99 v. Brewer,*
    817 F. Supp. 2d 1118 (D. Ariz. 2011) ............................................................ 4

*United States v. Alvarez,*
    617 F.3d 1198 (9th Cir. 2010) ...................................................................... 20

*United States v. Ezeta,*
    752 F.3d 1182 (9th Cir. 2014) ...................................................................... 15

Plaintiff's motion for preliminary injunction

*United States v. Williams*,
  553 U.S. 285 (2008) ............................................................... 37

*Waln v. Dysart School District*,
  54 F.4th 1152 (9th Cir. 2022) .......................................... 26, 27

*Watson v. Jones*,
  80 U.S. 679 (1871) ................................................................ 30

*West Virginia State Board of Education v. Barnette*,
  319 U.S. 624 (1943) ................................................ 14, 16, 17, 18

*Widmar v. Vincent*,
  454 U.S. 263 (1981) ............................................................... 21

*Wooley v. Maynard*,
  430 U.S. 705 (1977) .......................................................... 13, 35

## Other Authorities

Brief as Amici Curiae in Support of Appellant and Reversal of the District Court at
  29, *New Hope Family Services, Inc., v. Poole*, No. 19-1715 (2nd Cir. 2020) .......... 28

Brief of Amici Curiae California, et al. at 10, *State of Tennessee. v. Department of
  Education*, No. 22-5807 (6th Cir. Dec. 12, 2022) .................................... 29

Joint Motion for Entry of Permanent Injunction and Final Judgment, Doc 85-1 at 2,
  *Blais v. Hunter*, No. 2:20-cv-187 (D. Wash. Jun. 4,2021) ........................ 37

## Statutes and Regulations

Alaska Admin. Code tit. 7, § 67.230 ..................................................... 36

Ga. Code § 49-5-281(a)(3) ................................................................ 37

Miss. Code. § 11-62-3 ..................................................................... 37

OAR § 413-120-0246(1)(b) ................................................................ 8

OAR § 413-140-0032 ..................................................................... 28

OAR § 413-140-0035(2) .................................................................. 29

OAR § 413-140-0035(3) .................................................................. 29

OAR § 413-200-0308(1) ................................................................ 8, 15

OAR § 413-200-0308(2)(k) ........................................................ 1, 5, 8, 14, 35

ORS § 418.240 ........................................................................... 29

Tex. Hum. Res. Code Ann. § 45.004 ..................................................... 36

## LOCAL RULE 7-1 CONFERRAL

The parties made a good faith effort to resolve the issues presented in this motion through emails and a telephone conference. Plaintiff's counsel notified Defendants' counsel in advance before filing this motion.

## MOTION

Plaintiff Jessica Bates respectfully requests a preliminary injunction against Defendants under Federal Rule of Civil Procedure 65 to stop them from further violating her First Amendment rights.

Specifically, Plaintiff challenges Oregon Administrative Regulation § 413-200-0308(2)(k), which imposes requirements for persons applying for a Home Study—a necessary document to participate in foster-care or adoption programs. The rule requires Home Study applicants to demonstrate that they will "[r]espect, accept and support the … sexual orientation, gender identity and gender expression … of a child or young adult in the care or custody of the Department." *Id.*

Scope of injunction and persons bound

Plaintiff seeks an order enjoining Defendants and their officers, agents, servants, employees, attorneys, and other persons in active concert or participation with Defendants (who receive actual notice of this motion) from enforcing the rule to take the following actions:

1. Requiring Plaintiff or any other similarly situated Home Study applicant, at any stage of the adoption process, to:

    a. agree to speak words or otherwise affirm views on sexual orientation, gender identity, or gender expression that conflict with the applicant's sincerely held religious beliefs that sexual activity should only occur within the confines of a marriage between one

1

Plaintiff's motion for preliminary injunction

man and one woman, and a person should identify and seek to live consistent with their biological sex;

b. agree to avoid speaking or expressing their beliefs that sexual activity should only occur within the confines of a marriage between one man and one woman, and a person should identify and seek to live consistent with their biological sex;

c. agree to participate in or associate with—or to facilitate a child's participation or association with—activities and events that conflict with the applicant's sincerely held religious beliefs that sexual activity should only occur within the confines of a marriage between one man and one woman, and a person should identify and seek to live consistent with their biological sex;

d. agree to avoid participating in or associating with—or to avoid facilitating a child's participation in or association with—activities and events that are consistent with or express the applicant's religious views that sexual activity should only occur within the confines of a marriage between one man and one woman, and a person should identify and seek to live consistent with their biological sex;

2. Enforcing the rule to exclude any person at any stage of the adoption process, because of their beliefs related to sexual orientation, gender identity, or gender expression.

3. Under this requested order, Defendants are permitted to consider a Home Study applicant's views on sexual orientation, gender identity, and gender expression to evaluate individual placements. However, the Department may not penalize applicants because of their beliefs related to sexual

Plaintiff's motion for preliminary injunction

orientation, gender identity, or gender expression, or use those beliefs to disqualify applicants.

<u>Reason for injunction</u>

Defendants seek to condition Bates' access to foster-care and adoption services on her willingness to relinquish her First Amendment rights. Without a preliminary injunction, Defendants seek to compel Bates and others like her to speak words they disagree with, regulate their speech based on content and viewpoint, and burden their free-exercise rights via a rule that is not neutral or generally applicable. In support of her motion, Bates relies on any filed pleadings, including:

- The Verified Complaint (Compl.) (Doc. 1);
- Plaintiff's Brief in Support of her Motion for Preliminary Injunction (below);
- Jessica Bates' Declaration in Support of Plaintiff's Motion for Preliminary Injunction (Decl.) (Doc. 15);
- Appendix to Jessica Bates' Declaration in Support of Plaintiff's Motion for Preliminary Injunction (App.) (Doc. 15-1);
- Johannes Widmalm-Delphonse's Declaration in Support of Plaintiff's Motion for Preliminary Injunction (Doc. 16);
- Plaintiff's Reply in Support of her Motion for Preliminary Injunction (when filed); and
- Any other supporting documents (if filed).

Bates asks the Court to hear oral argument about her motion at a time and date set by the Court.

<u>Security</u>

District courts have "wide discretion in setting the amount of the bond, and the bond amount may be zero" if there is little chance of injury to the Defendants.

Plaintiff's motion for preliminary injunction

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (citation omitted); *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). In noncommercial cases, courts balance the equities, paying special attention to "the hardship a bond requirement would impose on the party seeking the injunction in addition to the expenses the enjoined party may incur as a result of the injunction." *Comm. on Jobs Candidate Advoc. Fund v. Herrera*, No. C 07-03199 JSW, 2007 WL 2790351, at *5 (N.D. Cal. Sept. 20, 2007).

Bates asks this Court to waive any bond requirement because she requests an injunction to vindicate her First Amendment rights. An injunction here risks no harm to the Defendants. *United Food & Com. Workers Loc. 99 v. Brewer*, 817 F. Supp. 2d 1118, 1128 (D. Ariz. 2011) ("There is no realistic likelihood that Defendants will be harmed by being enjoined from enforcing a law that constitutes viewpoint discrimination in violation of the First Amendment on its face."). Rather, allowing Bates' to apply for a Home Study without discriminatory barriers will give Oregon an additional placement for children in need. Plus, a bond would place unnecessary financial hardship on Bates as a mother of five children who works part time, Decl. ¶¶ 7, 9, potentially precluding her from vindicating her constitutional rights. *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir.), *amended*, 775 F.2d 998 (9th Cir. 1985) ("The court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.").

Plaintiff's motion for preliminary injunction

## INTRODUCTION

Jessica Bates wants to open her home to children in need. Like many people, her desire to adopt springs from her faith. The Bible instructs that religion, "pure and undefiled … is this: to visit orphans and widows in their affliction, and to keep oneself unstained from the world." James 1:27. Indeed, Christians have long answered the religious call to care for children, and today practicing Christians are almost twice as likely to adopt compared to the general public.[1] Meanwhile, the need is great for families willing to take in children who are hurting—in Oregon alone, nearly 8,000 children spent at least one day in the State's custody last year.

But when Bates sought to adopt last year, Oregon's Department of Human Services denied her application because of OAR § 413-200-0308(2)(k). This policy requires religious applicants to agree to violate their beliefs about sexual ethics and our human identity. Parents must agree to use preferred pronouns, affirm that a male can become a girl (and vice versa), and even stop attending church services if a pastor's teachings are inconsistent with the State's orthodoxy. Because of this rule, Bates cannot possibly adopt even though she wants to do so right now. She is permanently shut out of the system.

In short, prospective parents like Bates must pass an ideological litmus test to adopt—one that forces applicants to accept and promote the State's views on sexual orientation and gender identity. In this way, Oregon puts the faithful to a choice: renounce your beliefs and affirm the State's views or give up the hope of ever adopting. That's not possible for Bates. She will not renounce her religious beliefs by word or deed as a condition to serving children in need. Nor should she have to.

The Constitution protects Bates ability to serve for at least three reasons. First, Oregon violates Bates' freedom of speech. The DHS policy compels Bates to speak a message about sex and the human condition that she disagrees with. It

---

[1] https://perma.cc/6RHB-87LA.

Plaintiff's motion for preliminary injunction

regulates Bates' speech based on content because it targets speech because of the subject (sexual orientation and gender identity) and favors one viewpoint (affirming) over another (religious). And the policy infringes Bates' freedom to associate with her church, while forcing her to attend gay-pride parades and other activities celebrating ideas that conflict with her religious views.

Second, Oregon burdens Bates' religious exercise through a policy that is neither neutral nor generally applicable. On paper, the State requires applicants to unconditionally support a child's identity and beliefs. But in practice, the State only enforces its policy if it relates to sexual orientation and gender identity. Many families cannot support exogenous beliefs and practices, and the State accommodates these religious and secular constraints no problem. Bates also cannot support some beliefs and practices. Yet the State dismisses these constraints because it disdains her Christian views. But if Oregon accommodates religious and secular views on other topics, it can do the same for religious views about sexual ethics.

For infringing on these First Amendment rights, the policy triggers strict scrutiny. It cannot survive. The State does not even enforce its policy evenhandedly and already grants categorical and individualized exemptions to others. Plus, there are alternative ways to achieve the State's goals. Rather than erect a categorical barrier to religious persons, the State can individually assess placements to ensure a good fit. The State already does this for others, so it must do the same for Bates.

Third, the policy's overinclusiveness violates the overbreadth doctrine. After all, most children in foster care do not identify as LGBT. And at least some children in foster care identify as Christian, Jewish, or Muslim and share Bates' religious views. People of faith are perfectly capable of caring for children like these. Yet Oregon insists these applicants give up their First Amendment rights anyway—revealing that its policy is not about protecting children but enforcing ideological purity.

While Oregon tramples on First Amendment rights, Bates and others like her suffer on the sidelines, unable to adopt or to even participate in child welfare programs of any kind. Forcing her to delay the process during the pendency of this litigation only extends her suffering. For these reasons, Bates asks this Court for a preliminary injunction to enjoin the State from enforcing its discriminatory policy against her and others like her, so that they can freely apply to help adopt and foster children in need.

## SUMMARY OF FACTS

### A. Bates' desire to adopt a sibling pair

In 2022, Jessica Bates began looking into adopting a sibling pair. Decl. ¶¶ 21, 29. She was inspired after listening to a Christian broadcast on her drive to work. *Id*. ¶¶ 15–17. Bates' faith has always been an important part of her life. After her husband died in a tragic car crash—leaving Bates to raise five children on her own—she finds special solace in the Psalmist's words describing God as "Father of the fatherless and protector of widows." Psalm 68:5; Decl. ¶¶ 11, 18. Bates now desires to do her part to extend God's sacrificial love to children in need. Decl. ¶ 20.

There is a great need for families willing to take in children lacking stable or loving homes. Thousands of children touch Oregon's foster-care system every year. Compl. ¶ 40. Bates lives in Malheur County, where 275 children came into state custody during the year ending October 1, 2022. *Id*. Some of these children are eventually reunited with their families. But sometimes, reunification is not possible, and the children require new homes. Compl. ¶ 41. Unfortunately, some children never find a permanent home and age out of the system. *Id*. ¶ 48.

### B. The Home Study process and minimum standards

1. The initial step for someone like Bates is the "Home Study." *Id*. ¶ 52. It is a document that evaluates the applicant's ability to temporarily (foster care) or

permanently (adoption) care for a child. *Id.* ¶¶ 54, 56. Importantly, the Home Study evaluates the applicant's *general* fitness as a parent according to the Department's "minimum standards." *Id.* ¶¶ 55–56.

The Home Study involves a few steps. Applicants must submit an application form, provide references, consent to background checks, and provide financial and medical information to show that they can adequately and safely provide for a child. *Id.* ¶ 55. Applicants must complete a 27-hour Resource and Adoptive Family Training or "RAFT" training program. *Id.* ¶¶ 63–65. And applicants must pass a home inspection which involves two home visits, a safety inspection, and interviews with the applicant and the applicant's family. *Id.* ¶¶ 66–69.

If an applicant is approved, prospective parents wait for a match. *Id.* ¶ 75. The Department will seek to identify suitable homes for a child, and parents can also "put in" for a specific child. *Id.* ¶¶ 76–80. The process involves a holistic assessment of the prospective parent's "knowledge, skills, abilities, and commitment … to best meet the current and lifelong needs of the child." *Id.* ¶ 81. Caseworkers will also consult stakeholders, including the child's attorney, Court Appointed Special Advocate, or biological parents. *Id.* ¶¶ 83–84.

When the Department identifies a potential adoption, it will generally place the child in the home for a six-month trial period. *Id.* ¶ 88. If everything goes well, the prospective parents can petition the court to finalize the adoption. *Id.* ¶ 89.

2. "Applicants have the burden of proving they possess the required qualifications to be approved as a certified resource family or as a potential adoptive resource." OAR § 413-200-0308(1). For example, applicants must show that they can care for a child's "[p]hysical and emotional safety and well-being," help the child to maintain familial ties, and foster the child's "identity" and "cultural, religious, and spiritual heritage." OAR § 413-120-0246(1)(b).

At issue in this case is § 413-200-0308(2)(k). It requires applicants to:

Plaintiff's motion for preliminary injunction

> **Respect, accept and support the** race, spiritual beliefs, **sexual orientation, gender identity and gender expression**, disabilities, national origin, cultural identities, immigration status and socioeconomic status **of a child or young adult in the care or custody of the Department**, and provide opportunities to enhance the positive self-concept and understanding of the child or young adult's heritage[.] (emphasis added)

3. Though § 413-200-0308 facially reads as a blanket policy, the Department enforces it haphazardly and allows for individualized exemptions. Compl. ¶ 241. For example, the Department does not strictly enforce the policy provisions related to cultural identity and spiritual beliefs. *Id.* ¶¶ 230–31. Instead, the agency only requires applicants "to be *open* to any child regardless of … cultural identity." *Id.* ¶ 235 (emphasis added). And the agency does not require parents to even be open to children with certain spiritual beliefs; accommodating parents who express a preference based on religion. *Id.* ¶¶ 232–38.

The State *does* strictly enforce the provisions related to sexual and gender identities. Every applicant must agree to affirm a (hypothetical) child's sexual orientation or gender identity and expression. *Id.* ¶ 239. Those who refuse are turned away. *Id.* ¶¶ 206–10. And the Department perceives applicants unwilling to affirm a child's LGBT identity as inimical to receiving LGBT children. *Id.* ¶ 240.

4. When it comes to ensuring that applicants are open to any child, the Department allows some categorical exemptions. *Id.* ¶ 218. The Department allows applicants to indicate an age preference. *Id.* ¶ 222. Or a faith preference. *Id.* ¶ 235. Or a sex preference. *Id.* ¶ 225. Or a preference against children who display "sexual behaviors" that are "inappropriate." *Id.* ¶ 224.

### C. Bates' dilemma

1. When Bates decided to adopt from foster care, her initial point of contact was with Rebecca Garrison, who oversees adoption and foster-care applications at

Plaintiff's motion for preliminary injunction

the DHS office in Ontario, Oregon. Decl. ¶ 30. Garrison directed Bates to connect with Cecilia Garcia, the certifier assigned to Bates' application. *Id.* ¶ 31.

Bates cruised through the first part of the application process. She completed her orientation materials, submitted her paperwork with consent forms, and signed up for and completed the RAFT training in a few months. Compl. ¶¶ 100–03.

During the training, however, Bates realized a potential conflict. Decl. ¶ 36 The RAFT instructor had explained that parents must agree to support a child's sexual orientation, gender identity, or gender expression. *Id.* ¶ 37–38. This meant parents must use a child's preferred pronouns and affirm a child's gender identity. *Id.* ¶ 40. Parents must allow children to dress consistent with their gender expression. *Id.* Parents must also seek out LGBT-affirming events like gay-pride parades. *Id.*

The class materials provide more examples of the Department's expectations. Training documents encourage families to display the rainbow flag, "pink triangle," or other "symbols indicating an LGBTQ-affirming environment," and to celebrate "diversity in all forms." *Id.* ¶ 45. Families must support a child's "self-expression" via clothes, jewelry and room decorations. *Id.* ¶ 44. And the RAFT training manual instructs parents not to force their children to attend activities, "including religious activities … that are … unsupportive of people with diverse SOGIE." *Id.* ¶ 47.

2. Bates' religious beliefs conflict with the Department's policy. As a Christian, Bates believes that the Bible accurately describes the differences between men and women. *Id.* ¶ 49. She believes that our souls are integrated with our physical bodies, that our biological differences carry spiritual significance, and that people should not seek to change or act contrary to their sex. *Id.* ¶¶ 50–54.

Because of her religious beliefs, Bates cannot say or do certain things. She will not use a child's preferred pronouns. *Id.* ¶ 93. She will not display a Pride flag or "pink triangle" in her home. *Id.* ¶ 116. She will not affirm a child's desire to

express themselves or dress as the opposite sex. *Id.* ¶ 115. She will not take a child to a gay-pride parade or facilitate the child's access to puberty blockers or cross-sex hormones in efforts to change their sex. *Id.* ¶¶ 117, 157.

Bates' beliefs also dictate that she *must* say and do certain things. She intends to raise her children in the Christian faith. *Id.* ¶¶ 73–81. She intends to share the Gospel with her family, including her beliefs about biblical manhood and womanhood. *Id.* ¶¶ 85, 89, 142. She intends to lead Bible study in her home and to attend church with her children as a family. *Id.* ¶¶ 75–76, 124.

### D. Oregon rejects Bates' application

In an email dated August 9, Bates notified Garcia of the potential conflict. *Id.* ¶ 152; App. 4. She explained that the training had "really emphasized … SOGI (sexual orientation gender identity) and that the host must respect, accept, and support children whose preferred pronouns & identity don't match their biological sex." App. 4. She explained that her "faith conflicts" with these requirements. *Id.* Though Bates had "no problem loving [children] and accepting them as they are," regardless of their sexual orientation or gender identity, she would "not encourage" or affirm behavior that went against her Christian beliefs. *Id.* After sending the email, weeks passed with no response. Compl. ¶ 172. A month later, Bates sent a second email. *Id.* ¶ 173. Again, no response. *Id.* ¶ 174. Over a month and half after the initial email, Garcia finally called Bates back. *Id.* ¶ 175.

Garcia explained that Bates' objections to affirming a child's sexual or gender identity clashed with the Department's policy. Decl. ¶ 155. To illustrate, Garcia asked Bates whether she would take her child to receive hormone shots as part of a gender transition. *Id.* ¶ 156. Bates explained that she would not and added that she thought it was child abuse to administer hormone shots on a young child. *Id.* ¶ 157

Garcia explained that Bates' position was a non-starter. *Id.* ¶ 158. Dumb-founded, Bates said it felt like the Department was rejecting her because of her religious beliefs. *Id.* ¶ 159. Garcia confirmed that it was because Bates' religious objections did not comply with Department regulations. *Id.* ¶ 160.

In its official denial letter, the Department explained that it was denying Bates' application for failure to comply with the Department's policy on affirming sexual and gender identities. App. 7. The letter acknowledged that Bates "would love and treat [children] as [her] own but would not support their lifestyle or encourage any behavior related to their sexual orientation or gender identity or expression." App. 8. It cited her refusal to facilitate a young child's access to hormone shots. *Id.* And it explained that: "You were told that the agency expects every applicant to be open to any child regardless of race, ethnicity and cultural identity, sexual orientation, gender identity, and gender expression." App. 7.

### E. Oregon's haphazard enforcement of its policy

Though religious applicants like Bates cannot obtain a Home Study from the Department, they can sometimes obtain one from a private agency. That's because some private agencies have authority to independently approve Home Studies. Compl. ¶ 247. And some of these agencies will work with applicants with religiously informed beliefs on sexual ethics similar to Bates'. *Id.* ¶¶ 249–51. These agencies do not strictly enforce § 413-200-0308(2)(k). *Id.* Unlike the State, which only grants exemptions based on the subject matter (gender identity v. cultural identity), these agencies grant exemptions to anyone unable to support or affirm a hypothetical child's beliefs, practices, or sexual orientation and gender identity. *Id.*

Obtaining a Home Study through a private agency would be difficult for Bates. It's unclear which agencies would work with Christians like her or how long they can continue to flout the plain language of the state's policy. *Id.* ¶ 254. Bates

Plaintiff's motion for preliminary injunction

also lives in a rural part of east Oregon hours away from the nearest state-contracted private agency. *Id.* ¶ 256; Decl. ¶ 27–28. Additionally, private agencies typically charge thousands of dollars in fees, presenting an additional barrier to families like Bates'. Decl. ¶ 26.

ARGUMENT

Bates seeks a preliminary injunction to stop the ongoing violation of her First Amendment rights. This requires showing a likelihood of success on the merits, a likelihood of suffering irreparable harm without an injunction, the balance of equities tipping in her favor, and the injunction serving the public interest. *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021). "The first factor … is the most important[.]" *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). And if Bates can show that she will likely prevail on her First Amendment claims, the other factors necessarily weigh in her favor. *See Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019). So Bates focuses on her free-speech, free-exercise, and overbreadth arguments here.

## I.    Oregon's policy violates the Free Speech Clause.

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). Hence, the government cannot coerce individuals to speak against their conscience. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Nor may it distort the marketplace of ideas by regulating speech based on the ideas or messages being expressed. *Turner*, 512 U.S. at 641. Or burden individuals' ability "to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Oregon seeks to do all three, which triggers strict scrutiny. *Reed v. Town of Gilbert*,

13

576 U.S. 155, 163 (2015) (content-based laws trigger strict scrutiny); *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 791 (9th Cir. 2022) (same for compelled speech); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (same for laws burdening expressive association).

### A. Oregon seeks to compel Bates' speech.

"It has long been established that the First Amendment prohibits the government from compelling citizens to express beliefs that they do not hold." *R.J. Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906, 915 (9th Cir. 2005).

To evaluate a compelled-speech claim, a court asks two questions: First, is there speech or some form of protected expression? Second, does the government compulsion affect the speaker's message? *See Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 63–64 (2006) (surveying cases in which compelled speech "affected" or "interfere[d]" with the "speaker's own message"); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572–73 (1995) (concluding that parade was expressive and that public-accommodation law "alter[ed]" parade's "expressive content"). The answer to both is "yes."

1. **Speech.** Oregon's policy facially regulates speech; "[i]t requires the individual to communicate by word and sign his acceptance of the [state's] political ideas." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943).

Start with the text according to its "plain meaning." *Bergelectric Corp. v. Sec'y of Lab.*, 925 F.3d 1167, 1171 (9th Cir. 2019)). "Applicants must … [r]espect, accept and support the … sexual orientation, gender identity, [and] gender expression" of a hypothetical child placed in their home. OAR § 413-200-0308(2)(k). This is facially a blanket policy. "Applicants have the burden of proving they" meet the Department's minimum standards just to get their foot in the door. OAR § 413-200-0308(1).

Dictionaries confirm that the policy requires certain speech. *United States v. Ezeta*, 752 F.3d 1182, 1185 (9th Cir. 2014). In this context, to "support" means to "advocate" for or "to promote the interests or cause of" a child's sexual or gender identity.[2] And to "accept" means "to give … approval to," or "to recognize as true."[3]

This policy requires Bates to say certain things and to use certain terms of address. During training, Bates' instructor explained that applicants must agree to use a child's preferred pronouns. Decl. ¶ 40. The training materials state that caregivers should "[a]lways ask someone for their pronouns." *Id.* ¶ 43. And other materials state that applicants should use "acceptable," "appropriate and inclusive language," including the language that the child uses "to describe their sexual and gender identity." Compl. ¶ 115. So whether it's pronouns that contradict a child's biological sex, or neopronouns that don't say anything about sex at all, *e.g.*, Decl. ¶¶ 97–99, Bates must agree to speak according to the State's guidelines. Other jurisdictions have interpreted similar regulations the same way, requiring caregivers to actively affirm a child's sexual or gender identity. *See*, *e.g.*, *Blais v. Hunter*, 493 F. Supp. 3d 984, 990–91 (E.D. Wash. 2020).

Oregon expects caregivers to affirm children in other ways too. Merely respecting the child's identity isn't enough. Oregon's training materials indicate that caregivers should celebrate "diversity in all forms," fly the rainbow flag or "pink triangle" in their home or display other "symbols indicating an LGBTQ-affirming environment." Decl. ¶¶ 45–46. These actions all implicate speech too. Flags and other symbols are "a primitive but effective way of communicating ideas." *Spence v. State of Wash.*, 418 U.S. 405, 410 (1974) (cleaned up) (protecting display of

---

[2] *Support*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/support.
[3] *Accept*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/accept.

Plaintiff's motion for preliminary injunction

upside-down American flag with superimposed peace symbol); *Stromberg v. People of State of Cal.*, 283 U.S. 359, 369 (1931) (protecting display of a red flag).

If the First Amendment protects anything, it "clearly includes pure speech." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1058 (9th Cir. 2010). It does not matter whether the speech is sublime or mundane. *See Hurley*, 515 U.S. at 574 (First Amendment protects "ordinary people engaged in unsophisticated expression"). And it does not require an "ideological message." *Frudden v. Pilling*, 742 F.3d 1199, 1206 (9th Cir. 2014).

Of course, the speech Oregon seeks to compel has "profound" meaning. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018). And the First Amendment protects the right to express religious views on biblical marriage and human sexuality. *Obergefell v. Hodges*, 576 U.S. 644, 679–80 (2015) (protecting religious objections to same-sex marriage); *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,* 138 S. Ct. 1719, 1727 (2018) (same); *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (protecting religious objections to "gender-identity-based pronouns"). This includes parents' rights "to direct the upbringing and education of children" in the faith. *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925).

2. **Message.** Oregon's policy compels speech; it punishes Bates for failing to "utter what is not in [her] mind." *Barnette*, 319 U.S. at 634.

The compelled-speech doctrine rests on the idea that "a speaker has the autonomy to choose the content of his own message." *Hurley*, 515 U.S. at 573. It protects the decision of "both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796–97 (1988). Forcing a St. Patrick's Day parade to include a LGBT group compels speech when the organizers object to the group's message. *Hurley*, 515 U.S. at 574–75. And forcing a pageant for "natural born female[s]" to include a male compels speech when the contestant contradicts the

pageant's message about womanhood. *Green*, 52 F.4th at 783, 786. Forcing someone to say something will nearly always affect the speaker's message.

Here, Bates wants to speak consistent with her Christian beliefs. She believes that God created humans as male and female in His image and that this carries spiritual significance for who we are, how we should act, and who we should marry. Decl. ¶¶ 50–54, 66–68. And because biological sex is fixed at the moment of conception, Bates believes that a person's gender is also fixed. *Id.* ¶ 52–53.

Bates cannot, consistent with her beliefs, do or say anything to affirm that a male can be a girl, or a that a female can be a boy, or that marriage is anything other than the union of one man and one woman. *Id.* ¶¶ 92, 118–19. This means she will not use or address anyone by pronouns that contradict or obscure their biological sex. *Id.* ¶ 93. She will not fly a "pink triangle" or rainbow flag in her home or take her child to events like Pride parades. *Id.* ¶ 116–17. To Bates, affirming that a male can identify as a girl, or vice versa, contradicts the truth about our embodied existence. *Id.* ¶¶ 114–15.

Yet Oregon's policy requires Bates to agree to use preferred pronouns, *id.* ¶ 40, to affirm a child's LGBT identity, *id.*, and to "confess by word or act" that all sexual orientations and gender identities should be celebrated, *Barnette*, 319 U.S. at 642. Indeed, "pronouns carry a message." *Meriwether*, 992 F.3d at 507. Forcing Bates to use preferred pronouns conscripts her "to communicate a message" she disagrees with; that "[p]eople can have a gender identity inconsistent with their sex." *Id.*; *Green*, 52 F.4th at 782–83. Rainbow flags and "pink triangles" similarly send a message with which she disagrees. Decl. ¶¶ 114, 116.

The State even requires Bates to communicate messages she views as sacrilegious. Some children use neopronouns that exist outside of the sex dichotomy, like vampire or demon-related pronouns. *Id.* ¶¶ 98–100. But Bates believes humans are made in God's image. And because there "are an infinite number of pronouns as

new ones emerge in our language," Oregon's policy knows no bounds. *Id.* ¶ 43. Adoptive parents must agree to affirm anything and everything under the sun, even if that means abandoning their own sincerely held beliefs.

Oregon's policy even goes further. The Department doesn't expect applicants to "simulate assent by words without belief." *Barnette*, 319 U.S. at 633. Instead, Oregon requires Bates to not just speak but to "accept" the State's orthodoxy and adopt an attitude that affirms the State's views. OAR § 413-200-0308(2)(k). Even the school in *Barnette* let the students feign the flag salute, but here the Bates must accept the State's views into her heart and "forego any contrary convictions of [her] own." *Barnette*, 319 U.S. at 633. This "invades the sphere of intellect and spirit" that lies beyond "all official control." *Id.* at 642.

In these ways, Oregon violates the compelled-speech doctrine by altering the content of Bates' speech and forcing her to communicate messages to which she objects.

### B. Oregon seeks to regulate Bates' speech based on content and viewpoint.

"Government action that stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government," is always suspect. *Turner*, 512 U.S. at 641. It suggests that the state is not seeking "to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." *Id.*

1. **Speech compulsion**. Because Oregon's policy compels Bates to speak contrary to her conscience, it regulates her speech based on content. Whether it's using neopronouns or celebrating "diversity in all forms," Oregon requires Bates to propagate the State's message on sexual orientation and gender identity.

"Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley*, 487 U.S. at 795; *Green*, 52 F.4th at 791 (same); *see also Am. Beverage Ass'n*, 916 F.3d at 759 (9th Cir. 2019) (Ikuta, J., concurring in the result) ("A government regulation 'compelling individuals to speak a particular message' is a content-based regulation that is subject to strict scrutiny" (citation omitted)).

It's telling that the State's policy only goes one way. Bates' speech must be accepting, supportive, and celebratory of a child's LGBT identity. So not only does the policy compel speech based on content (sexual orientation and gender identity), it compels speech based on viewpoint too (affirming). Favoring messages that are "positive" while disfavoring messages that are—in the eyes of the government— "offensive," or "derogatory" is textbook viewpoint discrimination. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). And viewpoint-based speech compulsions are about as unconstitutional as it gets. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is … an egregious form of content discrimination.").

2. **Speech restriction.** Oregon's policy also *restricts* Bates' speech in a content and viewpoint-based way.

Evaluating speech restrictions requires a two-step inquiry. *In re Nat'l Sec. Letter*, 33 F.4th 1058, 1071–72 (9th Cir. 2022) (citing *Reed*, 576 U.S. at 164). First, courts consider whether the law facially "draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163. Second, a facially neutral law may still be content based as applied if it "cannot be justified without reference to the content of the regulated speech," or if the government adopted the law because it disagrees with the speaker's message. *Id.* at 164 (cleaned up). Whether it's a speech compulsion or restriction, regulations that "target speech based on its communicative content" trigger strict scrutiny. *Id.* at 163.

Plaintiff's motion for preliminary injunction

Oregon's policy fails either step. First, Oregon's policy facially "targets words about a specific subject"—in this case sexual orientation and gender identity. *United States v. Alvarez*, 617 F.3d 1198, 1202 (9th Cir. 2010), *aff'd*, 567 U.S. 709 (2012). As already explained, Oregon's policy requires Bates to accept and support a child's gender identity by using preferred pronouns and celebrating their identity. *See supra* § I.A. The negative implication is that Bates cannot do anything to suggest a different view. But Bates desires to do exactly that by sharing her "beliefs about biblical manhood and womanhood and marriage" with her children at church, during Bible study, or when they come to her for maternal advice and support. Decl. ¶¶ 73–85.

Only "conversations that include discussions of [a particular subject] trigger the policy." *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002). Bates can share her beliefs about theology and history or politics and philosophy, but she can't share her beliefs about our human biology. In conversation about sex and human identity, Bates cannot express religious beliefs that are inconsistent with the State's views. That is a content-based speech restriction. *Id.*; *Alvarez*, 617 F.3d at 1202.

 "Moreover, the policy does not merely prohibit the discussion" of Bates' beliefs; "it condemns expression of a particular viewpoint"—that sexual conduct is only appropriate within a biblical marriage and that a person's gender is fixed by their biological sex. *Conant*, 309 F.3d at 637. Speech that contradicts the State's views on the human condition is prohibited, while speech that is affirming and accepting of the State's views is "exalt[ed]." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 793 (9th Cir. 2006).

## C. Oregon intrudes on Bates' freedom of association.

"The First Amendment protects the basic right to freely associate for expressive purposes[.]" *Crowe v. Ore. State Bar*, 989 F.3d 714, 729 (9th Cir. 2021)

(Per curiam). The freedom to associate "plainly presupposes a freedom not to associate" too. *Roberts,* 468 U.S. at 623. Oregon intrudes on both.

An expressive-association claim is similar to a free-speech one. First, Bates must "engage in some form of expression." *Dale*, 530 U.S. at 648. Second, she must show that the restriction or "forced inclusion … affects in a significant way [her] ability to advocate public or private viewpoints." *Id*. Intrusions on "the freedom to associate is subject to the closest scrutiny." *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460–61 (1958).

1. **Restriction.** Start with the restriction. Bates seeks to engage in several expressive activities. Going to church with her family is one. Decl. ¶ 75, *Widmar v. Vincent*, 454 U.S. 263, 269 (1981) ("religious worship and discussion.… are forms of speech and association protected by the First Amendment"). Sharing the Gospel with her children during Bible study and sending them to youth group are others. *Id*. ¶¶ 76–77; *Lasche v. New Jersey*, No. 20-2325, 2022 WL 604025, at *5 (3d Cir. Mar. 1, 2022) (recognizing a foster parent's "constitutionally protected" speech in "sharing their religious views on same-sex marriage").

But Oregon's policy forbids both. Bates' church (Vale Christian Church) promotes biblical teachings on sex and our human identity. Decl. ¶¶ 58–60; 69–70. Bates too seeks to pass on her religious beliefs on these topics to her children. *Id*. ¶ 85. But the State disfavors these views because it requires caregivers to celebrate "diversity in all forms." *Id*. ¶ 46. So prospective parents must avoid bringing their children to a church that is "unsupportive of people with diverse SOGIE." *Id*. ¶¶ 47, 122. And prospective parents must refrain from studying the Torah with their children because it contains passages that critique same-sex relations. *Id*. ¶ 123.

This infringes on Bates' ability to "inculcate" her values by word and "by example" on her children. *Dale*, 530 U.S. at 649–50. For many, "religious activity derives meaning … from participation in a larger religious community." *Corp. of*

*Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). So too for Bates. Attending church and Bible studies are important parts of how she raises her children in the faith. Decl. ¶¶ 73–76. And Bates intends to do these things as a family together with her adopted children too. *Id*. ¶¶ 128–29 (explaining that Bates does not want any child to feel excluded or left out).

2. **Compulsion.** Oregon also seeks to compel Bates to associate with events and activities she disagrees with. Recall that Oregon doesn't merely require specific acts, but a way of life that affirms the child's identity. *Supra* § I.A. One of the training materials, for example, instructs prospective parents to seek out "LGBTQ community activities." Compl. ¶ 116. And Bates' instructor encouraged families to take their children to events like Pride parades. Decl. ¶ 40.

There's no doubt these activities are expressive. Pride parades certainly are. Whether its protesters or patriots, people "march[] to make a point." *Hurley*, 515 U.S. at 568. And whether it's drag queen story hour or a screening of *The Adventures of Priscilla: Queen of the Desert*, people seek out "LGBTQ community activities" because they express a distinct message about sexuality and the human condition.

Attending these events "impair[s]" Bates' ability to "express those views, and only those views, that [she] intends to express." *Dale*, 530 U.S. at 648. If compelling the Boy Scouts to merely include a gay scoutmaster alters that group's message, *id*. at 655–56, surely forcing Bates to hold a Bible in one hand while she waves the Pride flag in the other during a gay-pride parade alters her message too, *see Hurley*, 515 U.S. at 574. "[I]t boils down to the choice of a speaker not to propound a particular point of view, and that choice is presumed to lie beyond the government's power to control." *Id*. at 575.

## II.    Oregon's policy violates the Free Exercise Clause.

The First Amendment "protects not only the right to harbor religious beliefs inwardly and secretly," but the "ability of those who hold religious beliefs of all kinds to live out their faiths in daily life." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022).

A law which substantially burdens a person's sincere religious exercise may violate the Free Exercise Clause in several ways. One way is to show that the law is not neutral or generally applicable. *Id.* at 2421–22. Another is to show that the law treads on the traditional "scope of that right." *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022) (Court looks at "text and history" to evaluate constitutional claims); *cf. Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020) (church autonomy doctrine "look[s] to the background against which the First Amendment was adopted" (cleaned up)). In this case, both paths lead to strict scrutiny. *Kennedy*, 142 S. Ct. at 2422.

### A.  Oregon's policy burdens Bates' religious exercise.

"[T]he Free Exercise Clause protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988)). The state burdens religious exercise when it "conditions receipt of an important benefit upon conduct proscribed by a religious faith … thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717–18 (1981).

*Fulton v. City of Philadelphia* is instructive. 141 S. Ct. 1868 (2021). There, the Supreme Court considered whether Philadelphia could stop referring children to a Catholic adoption agency because the agency objected to certifying same-sex couples. *Id.* at 1874. The Court thought it "plain" that the City's actions burdened

Plaintiff's motion for preliminary injunction

the agency's religious exercise "by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs." *Id.* at 1876.

Like the adoption agency in *Fulton*, Oregon also puts Bates to a choice. It conditions Bates' access to adoption services on her willingness to violate her beliefs. Bates will not use a child's preferred pronouns or affirm that a child can be transgender. *Supra* § I.A. Neither will Bates take her child to receive hormone shots for a "gender transition." Decl. ¶¶ 156–57. But Oregon requires these things— forcing Bates to speak against her religious beliefs and to facilitate "an immoral act by another." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014).

This puts "substantial pressure" on Bates to violate her conscience. *Thomas*, 450 U.S. at 717–18. Bates is "obviously free to worship" the way she chooses, but "that freedom comes with a cost: abandoning the chance to receive [a] foster care license." *Blais,* 493 F. Supp. 3d at 1000 (holding similar Washington state regulation burdened foster parents' religious exercise).

The Department may argue that its rule doesn't coerce anyone because Bates need not adopt a child. But Bates "is not claiming any entitlement" to adopt. *Trinity Lutheran*, 137 S. Ct. at 2022. Instead, she seeks only to access the Department's adoptions services the same as others "without having to disavow [her] religious" beliefs. *Id.* And a law may burden religious exercise indirectly in this way. *Thomas*, 450 U.S. at 718 ("compulsion may be indirect" and still pose a "substantial" burden). When the freedom to live consistent with one's beliefs "comes at the cost of automatic and absolute exclusion from the benefits of a public program," the state is penalizing the free exercise of religion. *Trinity Lutheran*, 137 S. Ct. at 2022.

That there may exist alternative paths to adoption is also irrelevant. Suppose a private agency is willing to approve Bates' home study. This would only confirm that the rule lacks general applicability. *Infra* § II.B.1. Plus, Bates sought certification from the State because it is more economically feasible than adoption

24

through a private agency. Decl. ¶¶ 25–26. Forcing her to pay more for the same outcome because of her religious beliefs is still a religious penalty. *Cf. Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991) ("A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech."); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (putting religious person to a choice of violating religious tenets or foregoing unemployment benefits was akin to "a fine"). Moreover, the State cannot cure a free-exercise violation by directing Bates to go elsewhere. Oregon is still violating the Constitution by denying Bates equal access to a benefit to which she is otherwise qualified because of her religious beliefs.

### B. Oregon's policy is not neutral or generally applicable.

Because the Department's policy burdens Bates' religious exercise, it must be neutral and generally applicable. Oregon's policy is neither, which triggers strict scrutiny. *Kennedy*, 142 S. Ct. at 2422.

1. **Neutrality.** Oregon's rule is not neutral because it validates secular beliefs while disfavoring religious ones.

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs …." *Fulton*, 141 S. Ct. at 1877. Whatever the government's views, religious beliefs about biblical marriage and our human identity "are protected views and in some instances protected forms of expression." *Masterpiece*, 138 S. Ct. at 1727; *Meriwether*, 992 F.3d at 511. States "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of [these] religious beliefs and practices." *Masterpiece*, 138 S. Ct. at 1731.

*Masterpiece* is instructive. There, a state civil-rights commission ruled that a Christian baker violated anti-discrimination laws when he declined to design a same-sex wedding cake. *Id.* at 1723. The commission ignored that he served all

people and objected to conveying certain messages, but the commission allowed other bakers to decline to create customized cakes "because of the offensive nature of the requested message." *Id.* at 1731. And though the commission dismissed the Christian baker's willingness to sell cakes "to gay and lesbian customers as irrelevant," it credited the other bakers for selling other goods to its customers in place of the offensive cakes. *Id.* at 1730–1731 (cleaned up). This inconsistent treatment violated the First Amendment's command of neutrality. The commission valued some conscience-based objections but not others based on its "own assessment of offensiveness." *Id.* at 1731.

The same principle applies here. As Oregon requires of every home, Bates is willing to take in any child regardless of race, culture, sexual orientation, or gender identity. As Oregon permits of other homes, Bates will not say or do certain things that would violate her conscience. But only in Bates' case does Oregon impute an unwillingness "to be open to any child." Compl. ¶¶ 232–240. And only in Bates' case does her conscience-based objection make her ineligible to adopt.

The State's hostility to religion surfaces in other ways too. Consider that Oregon accommodates a Home Study applicant's preference against children with "sexual behaviors" that the State calls "inappropriate." Compl. ¶ 224. Who decides what is inappropriate? Oregon may embrace a male teenager who wants to share a room with girls and access the girls' locker room at school. But a conservative Muslim family may not. Here too, Oregon "elevates one view of what is offensive over another," conveying "official disapproval of" Christian and other religious beliefs. *Masterpiece*, 138 S. Ct. at 1731.

If Oregon respects secular reasons for avoiding certain conduct, it must respect religious reasons too. *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022) (failing to enforce a policy against secular messages precluded enforcement against a religious message). Just as the Department cannot disqualify

Plaintiff's motion for preliminary injunction

caregivers for being atheists, it cannot exclude persons because they are religious. *See In re Dickens v. Ernesto*, 37 A.D.2d 102, 104 (N.Y. App. Div. 1971) (state could not "prefer[] religion to no religion in adoption placements"); *In re Adoption of 'E'*, 279 A.2d 785, 794 (N.J. 1971) (court could not place children "only in the homes of believers" under the First Amendment). The Department's failure in this regard triggers strict scrutiny.

2. **General applicability.** Oregon's rule also lacks general applicability because the State selectively pursues its interests.

"General applicability requires, among other things, that the laws be enforced evenhandedly." *Waln*, 54 F.4th at 1159. So a law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton,* 141 S. Ct. at 1877. And a rule violates equal-protection principles even more when it's enforced arbitrarily.

Again, *Fulton* is instructive. Though Philadelphia claimed that the Catholic adoption agency had violated its nondiscrimination policy, that policy allowed for exemptions in the agency's "sole discretion." *Id.* at 1878–79. "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable … because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude[.]" *Id.* at 1879 (cleaned up).

Oregon undermines its interests on at least four fronts. First, the Department regularly grants individualized exemptions. For example, it's vested with discretion to "waive the home study requirement for some adoptions." Compl. ¶ 242 (quoting OAR § 413-140-0032). So persons seeking to adopt a relative need not profess their belief in the State's views if they obtain a waiver. *Id.* ¶ 244.

The Department grants individualized exemptions to others too—so long as the applicants agree with the State's views on sexual orientation and gender

Plaintiff's motion for preliminary injunction

identity. Though Oregon's policy reads as a categorical rule, it often declines to enforce it. Compl. ¶¶ 231–38. Instead, it only expects applicants "to be open to any child regardless of race, ethnicity and cultural identity, sexual orientation, gender identity, and gender expression." *Id.* ¶¶ 197, 235.

Everyday examples prove the point. For example, a Jewish child may observe complex social and dietary customs that would challenge "even the most loving, well-meaning and sincere adoptive parents who are [not Jewish]."[4] So are only religious Jews capable of supporting these customs eligible to adopt? And some Hindu children may wish to erect a shrine to a Hindu god. So are followers of the Abrahamic faiths ineligible to adopt because they spurn foreign gods?

Indeed, what happens to the child that shares Bates' biblical beliefs about marriage? The policy facially requires families to agree to support a child's spiritual beliefs. So must same-sex couples agree to affirm that marriage is the union of one man and one woman? Or what about vegan children who refuse to break bread with meat eaters?[5] Must a family that hunts deer and loves bacon promise eat Tofurky instead?

In short, this policy—requiring applicants to agree to "accept" and "support" any child's identity or beliefs—is not generally enforced. Secular applicants need not agree to support cultural or spiritual beliefs that violate the applicant's conscience. But the policy is enforced against those who disagree with the State's views on sexual orientation and gender identity. They must agree to support beliefs and practices that violate their conscience. In that case, it does not matter that Bates is open to receiving any child. Compl. ¶ 197. Because Bates is religious, the

---

[4] The Jewish Coalition for Religious Liberty, Agudath Israel of America, The Rabbinical Alliance of America, The Coalition for Jewish Values, Brief as Amici Curiae in Support of Appellant and Reversal of the District Court at 29, *New Hope Family Services, Inc., v. Poole*, 966 F.3d 145 (2nd Cir. 2020) (No. 19-1715).
[5] https://perma.cc/2MZM-2SJH.

Plaintiff's motion for preliminary injunction

State requires more—Bates must be willing to unconditionally "support [a child's] lifestyle [and] encourage any behavior related to their sexual orientation or gender identity or expression." *Id.* ¶ 198.

Second, Oregon provides categorical exemptions that undermine its interest. For example, some people need not even obtain a Home Study to adopt. *Id.* ¶ 242. The Department also accommodates certain sex-based preferences. *Id.* ¶ 225. A family may prefer a boy because they want him to share a room with their son. Or a family may prefer a girl because they have a daughter who experienced sexual trauma. That preference turns on biology as much as gender identity. Oregon even believes that "sex-based discriminatory actions," like sex-specific bathrooms and dress-codes, discriminate based on gender identity. Br. of Amici Curiae Cal. et al. at 10, *State of Tenn. v. Dept. of Educ.*, No. 22-5807, Dec. 12, 2022 (6th Cir.).[6] But here, Oregon permits one and not the other. That makes little sense.

Third, Oregon does not even enforce its discriminatory policy evenhandedly. Like many states, Oregon contracts private agencies to conduct home studies and certify resource and adoptive families. ORS § 418.240. And private agencies have the power to independently approve home studies. OAR § 413-140-0035(2)–(3).

This leads to arbitrary enforcement of Oregon's rules. Some agencies are willing to approve applicants who have religious beliefs like Bates. Compl. ¶ 249. But state agencies like Ontario DHS are not. So approval hinges on the agency processing the application.

So sometimes Oregon enforces its policy. Sometimes it does not. And it all depends on where you apply, what your religious views are, and whether you fall into a special exemption. That is hardly a neutral and generally applicable rule, and the policy therefore triggers strict scrutiny.

---

[6] https://perma.cc/9HJG-RXYC.

Plaintiff's motion for preliminary injunction

### C. Oregon's policy treads on historical protections for religious speech.

Courts have historically understood our free-exercise rights, and particularly religious-speech rights, against a background of equitable norms favoring religious exemptions. This history helps to delineate the scope of our First Amendment rights. *Kennedy*, 142 S. Ct. at 2428 (line "between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers" (cleaned up)); *Reynolds v. United States*, 98 U.S. 145, 162 (1878) (courts look to "history" to ascertain scope of religious freedom).

Consider some of the earliest free-exercise cases, like *People v. Phillips*, decided in 1813.[7] There, a New York court granted an exemption to a priest who refused to disclose the substance of a confession.[8] And in 1855, a Virginia court similarly protected statements made under the Sacrament of Penance. *Commonwealth v. Cronin*, 2 Va. Cir. 488 (1855). In 1871, the Supreme Court too accepted that religious liberty was an integral part of how courts equitably interpret the law. *Watson v. Jones*, 80 U.S. 679, 728–29 (1871) (acknowledging the "full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine" that did not threaten the peace and safety of others).

Statutory exemptions from this period corroborate these norms. Most of the early colonies and states accommodated Quakers who refused to swear oaths by permitting them to testify by affirmation.[9] States similarly accommodated pacifists who refused to bear arms, recognizing the "superior claim of religious 'conscience' over civil obligation, even at a time of 'universal calamity.'"[10]

---

[7] Court of General Sessions, City of New York (June 14, 1813).
[8] Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1411 (1990) ("an exemption was constitutionally required").
[9] *Id.* at 1467–68.
[10] *Id.* at 1468–69.

Plaintiff's motion for preliminary injunction

The modern Supreme Court has continued this tradition. Cases like *Barnette*, *Wooley*, and *Kennedy* show that religious speech lies at the heart of the First Amendment. *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) ("[A] free-speech clause without religion would be Hamlet without the prince."). So too religious instruction. *See Our Lady of Guadalupe*, 140 S. Ct. at 2066; *Pierce*, 268 U.S. at 534–35.

This is why *Employment Division v. Smith* recognized that penalizing religious speech is the paradigmatic example of government overreach. 494 U.S. 872, 881–82 (1990). It similarly recognized the religious rights "of parents … to direct the education of their children." *Id.* at 881 (citing *Pierce*, 268 U.S. 510). The Ninth Circuit has similarly recognized "hybrid rights" claims involving infringements on free-speech and free-exercise rights. *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004) (cleaned up)[11]; *see also Danville Christian Acad., Inc. v. Beshear*, 141 S. Ct. 527, 529 (2020) (Gorsuch, J., dissenting from denial of application) (noting validity of hybrid-rights doctrine).

In short, history and tradition teach that religious exemptions were the "default norm."[12] Our robust respect for the faithful "is no accident," but "a natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent." *Kennedy*, 142 S. Ct. at 2421. So long as an exemption did not threaten "the peace or safety of the state," courts elevated religious duties over the obligations of civil society.[13]

---

[11] Some panels have questioned whether the hybrid rights doctrine is valid, but none have cited to, or had the authority to overrule *San Jose. See Parents for Priv. v. Barr*, 949 F.3d 1210, 1237 (9th Cir. 2020), *Tingley v. Ferguson*, 47 F.4th 1055, 1089 n.5 (9th Cir. 2022).

[12] Stephanie Barclay, *The Historical Origins of Judicial Religious Exemptions*, 96 Notre Dame L. Rev. 55, 104–08, 116 (2020).

[13] McConnell, *supra* n.8 (surveying state constitutions protecting religious exercise except upon threats to the "peace and safety").

Plaintiff's motion for preliminary injunction

This tradition protects Bates. Her desire to share the Gospel and to instruct her children in the faith is the type of case that "the First Amendment doubly protects" because of its religious nature. *Id*. Here, the free-speech and free-exercise clauses "work in tandem" providing "overlapping protection for expressive religious activities." *Id*. Because Oregon's policy burdens her religious speech, this too triggers strict scrutiny.

## III.    Oregon's policy fails strict scrutiny.

Because Oregon's policy impermissibly burdens Bates' free-speech and free-exercise rights, it triggers strict scrutiny. To pass, the State must prove that applying its rule to Bates is the most narrowly tailored means of achieving a compelling government interest. *Reed*, 576 U.S. at 171–72. "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881.

1. **Compelling interest.** The Department will argue that it seeks to promote the best interests of the children in its custody. But this describes the State's interest at too "high [a] level of generality" to justify its burden. *Id*. Philadelphia made a similar argument in *Fulton*: defending its anti-discrimination policy as necessary to promote "equal treatment of prospective foster parents and foster children." *Id*. But the question was "not whether the City ha[d] a compelling interest in enforcing its non-discrimination policies generally, but whether it ha[d] such an interest in denying an exception to [the agency]." *Id*.

Here too, the Court must ask whether it must exclude Bates to promote the best interests of children in foster care. It need not for at least five reasons.

First, allowing Bates and those like her to adopt does not harm children. Far from it. Millions of Americans share her views "based on decent and honorable religious or philosophical premises." *Obergefell*, 576 U.S. at 672. Even Oregon

Plaintiff's motion for preliminary injunction

believes these homes are safe for children because Oregon does not seek to remove children from families who share Bates' beliefs in biblical marriage and biological sex. *Cf. Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011) (law banning the sale of violent video games to minors was fatally underinclusive because children could still access materials). People with religious views like Bates are just as capable of parenting as others.

Second, Oregon must concede that some children can and should be placed in homes with traditional religious views on sex and our human identity, like children who are themselves religious. Excluding Bates from these placements doesn't promote the State's interests *at all. See FEC v. Wisc. Right To Life, Inc.*, 551 U.S. 449, 478 (2007) (opinion of Roberts, C.J.) ("A court applying strict scrutiny must ensure that a compelling interest supports *each application* of a statute restricting speech."). Indeed, the policy, on its face, requires religious children go to homes that will affirm their spiritual beliefs. *See* Compl. ¶ 252.

As a fallback, Oregon may argue that a child's LGBT identity can evolve. *See* Decl. ¶ 163. Indeed, children who identify as transgender will often desist and be at peace with their biological sex.[14] Moreover, every child's identity may evolve. A child raised in one religion may convert to another or a child raised with no religion may become devout. But Oregon doesn't require applicants to embrace any and all religious or cultural beliefs. Compl. ¶¶ 231–38.

Third, the examples above show that Oregon actually undermines its own interests. The Department's policy calls for every child to be affirmed and accepted for who they are, so presumably the State must recruit religious families that can holistically support religious children who share Bates' views. But Oregon does the

---

[14] James M. Cantor, Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy, J. of Sex & Marital Therapy (Dec. 14, 2019), https://doi.org/10.1080/0092623X.2019.1698481.

Plaintiff's motion for preliminary injunction

opposite: excluding the very families children are craving for support. *Cf. Fulton*, 141 S. Ct. at 1881–82 (rejecting City's interest in "[m]aximizing the number of foster families" because inclusion of religious agency would likely "increase, not reduce, the number").

Fourth, the State can require caregivers to provide equal care without compelling them to violate their beliefs. *Cf. Hurley*, 515 U.S. at 579 (applying antidiscrimination laws "to produce speakers free of … biases" was a "fatal objective"); *Green*, 52 F.4th at 792 (making similar point). Here, Bates is open to any child regardless of sexual or gender identity and willing to love and accept that child like her own, just as the policy requires. She just cannot do or say anything to affirm ideas that go against her conscience. "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning." *Janus*, 138 S. Ct. at 2464. So the State cannot "interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579.

Fifth, Oregon already provides exemptions to its policy, so it's hard to see why it "can brook no departures" here. *Fulton*, 141 S. Ct. at 1882. After all, some children within Oregon's system identify as LGBT, but most do not. Other children may identify as Christian or pagan, carnivore or vegan, cottagecore or goth. The State must place these children in affirming homes too. OAR § 413-200-0308(2)(k) (applicants must "support" a child's "spiritual beliefs" and "cultural identities"). And because each child and family is unique, the State does not demand spiritual or cultural uniformity—except when it comes to their views on sexual or gender identities. Only religious applicants like Bates are penalized for their beliefs. This shows the Department is motivated by ideology, not child safety or prosperity. And "where the State's interest is to disseminate an ideology … such interest cannot

Plaintiff's motion for preliminary injunction

outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S. at 717.

Sixth, singling out views on gender identity are not even consonant with the Department's policy. As already explained, prospective parents can prefer a boy or a girl. Compl. ¶ 225. But prospective parents cannot prefer a male who identifies as a boy or a female who identifies as a girl. There's no reason one preference is valid but the other is not. *See supra* § II.B.

Seventh, the State can seek to change minds by persuasion rather than coercion through educational campaigns promoting its views on the human condition. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996) (citing "educational campaign" as alternative); *Riley*, 487 U.S. at 800 (government can "communicate the desired information to the public" rather than compel speech).

2. **Narrow Tailoring.** Oregon's policy also fails because it is overinclusive, and not "the least restrictive means among available, effective alternatives," *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Here, "the government must demonstrate that alternative measures … would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014); *Ashcroft*, 542 U.S. at 665 (same). And this Court can look to other jurisdictions to see what actually works. *See Ramirez v. Collier*, 142 S. Ct. 1264, 1279–80 (2022).

First, as explained further below, the State's policy is overinclusive and overbroad. *Infra* § IV. It doesn't just exclude religious caregivers from adoption, it excludes them *from every child-welfare service*, no matter the child's or caregiver's circumstances and no matter how speculative the State's interest are. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 539 (1993) (government's method must be tied to the specific interest, "not a religious classification that is said to bear some general relation to it").

Second, the State can extend exemptions to the faithful that it already provides to others. If families with secular objections to affirming certain beliefs and practices are fit to parent, there's no reason to categorically exclude people like Bates. *See supra* § II.B. Indeed, other agencies already extend exemptions to religious families in Oregon. Compl. ¶ 249. And elsewhere in the adoption context, many states accommodate child-welfare agencies that decline to place children in homes where the placement violates the agency's religious tenets. *E.g.*, Tex. Hum. Res. Code Ann. § 45.004. Religious accommodations like these do not imperil in any way the State's ability to protect children.

Third, states can protect the bests interests of children without requiring homogenous beliefs about sexual orientation and gender identity. Alaska, for example, requires caregivers to support a "child's choice of participation in religious or faith-based services" and "ethnic or cultural events" without requiring caregivers to violate their deeply held beliefs about sexual and gender identity. Alaska Admin. Code tit. 7, § 67.230. West Virginia does the same, requiring caregivers to "encourage and support the religious beliefs, heritage and language" of a child and merely to "be sensitive to a child's gender identity and sexual orientation."[15]

Fourth, the State can provide specific exemptions to people who believe in biblical marriage and biological sex. Mississippi explicitly protects these religious beliefs in child-welfare programs. Miss. Code. § 11-62-3 (prohibiting discrimination against those who "intend[] to guide, instruct, or raise a child based upon religious beliefs" in marriage and the immutability of biological sex); *see also* Ga. Code § 49-5-281(a)(3) (protecting foster parents' rights to promote their "values and beliefs, so long as the values and beliefs of the foster child and the birth family are not infringed upon"). And Washington state recently agreed not to require home-study

---

[15] W. Va. Dep't of Health and Hum. Servs., Office of Children and Adult Servs., Home Finding Policy at 57, https://perma.cc/7CY7-NBKG.

Plaintiff's motion for preliminary injunction

applicants "to express agreement with any policy regarding LGBTQ+ issues that conflicts with the applicant's sincerely held religious views." Joint Mot. for Entry of Perm. Inj. and Final J., Attach. 1 at 2, *Blais*, No. 2:20-cv-187 (D. Wash. Jun. 4, 2021) (Doc. 85-1).

Fifth, Oregon can enforce its putative interest by "address[ing] LGBTQ+ concerns at the placement stage, rather than at licensing." *Blais*, 493 F. Supp. 3d at 1000 (noting agency could also "address the issue at a later, more appropriate age"). Indeed, regulations already require Oregon to holistically evaluate a caregiver's "knowledge, skills, abilities, and commitment … to best meet the current and lifelong needs" of a child. Compl. ¶ 83.

The State's interests are insufficient and there are many other ways to accomplish the State's goals. *See Blais*, 493 F. Supp. 3d at 1000. Oregon can easily allow Bates and others like her to foster and adopt.

## IV.    Oregon's policy is overbroad.

The statute's overinclusiveness also violates the overbreadth doctrine. Under this rule, "a statute is facially invalid if it prohibits a substantial amount of protected speech" relative to its "plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008).

"The first step … is to construe the challenged statute." *Id.* at 293. Here, Oregon's policy compels speech by requiring Home Study applicants to agree to use preferred pronouns and to otherwise affirm a child's sexual or gender identity. *See supra* § I.A. Persons seeking to adopt, including those seeking an independent adoption, must comply with the policy. *Id.* ¶¶ 52–53. Persons seeking to provide foster care must also comply with the policy. *Id.* ¶ 52. In fact, nearly everyone seeking access to child-welfare services of any kind must comply with the policy, unless the State grants a waiver. *Id.* ¶ 214.

Plaintiff's motion for preliminary injunction

This policy sweeps too broad. As already explained, religious beliefs about biblical marriage and our human identity "are protected views and in some instances protected forms of expression." *Supra* § I.A (quoting *Masterpiece*, 138 S. Ct. at 1727). And Bates submits that the State never has a valid interest to compel speech because it disagrees with the message. *Id.* But even if this Court accepts that prospective parents who actually receive LGBT children ought to affirm the child's sexual or gender identity, the policy extends well beyond even that reach.

Start with the fact that most children in foster care are not LGBT. So a child who identifies consistent with their biological sex can be placed in a home that objects to using preferred pronouns. And children who are not gay or lesbian can be placed in homes that believe marriage is the union of one man and one woman. If Oregon's concern is the best interests of LGBT children, it need not intrude on homes where no LGBT children are present. *Cf. Brown*, 564 U.S. at 804 (ban on selling violent video games to minors was "vastly overinclusive" because not all parents objected to their children accessing the banned materials).

Indeed, some children cannot express an LGBT identity at all. So a family that seeks to care for newborns need not agree to use preferred pronouns because newborns do not understand what pronouns are. And a family that seeks to provide respite care for infants need not abandon their views on marriage, because infants do not express a sexual orientation. These examples show that the State's hypothetical concerns about a child's evolving identity are also a red herring. *See* Decl. ¶ 163. Utilizing religious homes in these contexts poses no risk to children, but Oregon excludes them anyway.

Further, some children are religious. So a Muslim home may be a good fit for a Muslim child. And a Jewish home may be a good fit for a Jewish child. Indeed, "Jewish religious law imposes a prohibition on placing children up for adoption

Plaintiff's motion for preliminary injunction

outside of the community."[16] But the State compels religious homes who disagree with the State's views to speak against their conscience, excluding entire religious communities from adoption and foster care and harming children from these communities more than anyone.

## V.    The remaining preliminary-injunction factors favor Bates.

Because Bates is likely to succeed on her First Amendment claims, the other injunction factors fall into place. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo,* 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). In this circuit, merely showing a "colorable First Amendment claim" is sufficient to show a likelihood of irreparable injury. *Am. Beverage Ass'n*, 916 F.3d at 758.

Because "the government opposes a preliminary injunction, the third and fourth factors merge into one inquiry." *Porretti*, 11 F.4th at 1047. Raising "serious First Amendment questions compels a finding that … the balance of hardships tips sharply in Plaintiff['s] favor." *Am. Beverage Ass'n*, 916 F.3d at 758. "Indeed, 'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Id.* (citation omitted). The Ninth Circuit has enjoined laws designed to combat online sex trafficking that violate free speech rights. *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (explaining state could "employ other methods" to pursue its interests). Surely that means there is a "significant public interest in upholding First Amendment principles" here too. *Id.*

## CONCLUSION

This Court should issue a preliminary injunction and enjoin the Department from using its policy to discriminate against religious applicants like Bates.

---

[16] The Jewish Coalition for Religious Liberty Amici Brief at 34, *supra* n.4.

Respectfully submitted,

*s/Johannes Widmalm-Delphonse*

Rebekah Schultheiss (Millard)
rebekah@millardoffices.com
OSB #121199
PO Box 7582
Springfield, OR 97475
t: 707.227.2401
*Counsel for Plaintiff*

Johannes Widmalm-Delphonse*
jwidmalmdelphonse@ADFlegal.org
VA Bar No. 96040
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, Virginia 20176
t: 571.707.4655

Jonathan A. Scruggs*
jscruggs@ADFlegal.org
AZ Bar No. 030505
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
t: 480.444.0020

Christiana Kiefer*
ckiefer@adflegal.org
DC Bar No. 176922
ALLIANCE DEFENDING FREEDOM
440 First Street NW,
Suite 600
Washington, DC 20001
t: 202.393.8690

*Counsel for Plaintiff*
*Admitted Pro Hac Vice*

Plaintiff's motion for preliminary injunction

**CERTIFICATE OF SERVICE**

I hereby certificate that on April 18, 2023, I filed a true and accurate copy of

the foregoing document with the Clerk of Court using the CM/ECF system, and will

serve the same on the following parties via email:

Deanna Chang
Deanna.J.Chang@doj.state.or.us
t: 503.949.1546
Sara Van Loh
sara.vanloh@doj.state.or.us
t: 503.881.9008
Oregon Department of Justice
100 SW Market St,
Portland, OR 97201

Dated: April 18, 2023

*s/ Johannes Widmalm-Delphonse*

Counsel for Plaintiff

Plaintiff's motion for preliminary injunction