**RAÚL R. LABRADOR**
  Idaho Attorney General
**THEODORE J. WOLD**
  Solicitor General
**JOSHUA N. TURNER**, (ID 12193)
  Deputy Solicitor General
Idaho Office of the Attorney General
700 W. Jefferson Street
Boise, ID, 83720
(208) 334-2400
Josh.Turner@ag.idaho.gov

**JOHN T. KAEMPF**, (OR 925391)
Kaempf Law Firm, PC
2021 SW Main Street, Ste. 64
Portland, OR 97205
(503) 224-5006
john@kaempflawfirm.com

*Counsel for State of Idaho*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| JESSICA BATES, | Case No.: 2:23-cv-00474-AN |
| Plaintiff, | |
| v. | **AMICI STATES' BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| FARIBORZ PAKSERESHT, *et al.*, | |
| Defendants. | |

State Amicus Brief
in Support of Plaintiff                              i

# TABLE OF CONTENTS

INTEREST OF AMICI ............................................................................................................. 1

SUMMARY OF ARGUMENT .................................................................................................. 2

ARGUMENT ........................................................................................................................ 3

    I.    Oregon's LGBTQIA2S+ Oath Requirement Sidelines People of Faith From Society ................................................................................................ 3

    II.    Oregon's LGBTQIA2S+ Oath Requirement Targets and Discriminates Against People of Faith ...................................................................................... 7

    III.    Oregon's LGBTQIA2S+ Oath Requirement Retaliates Against People of Faith ................................................................................................................. 9

CONCLUSION .................................................................................................................... 12

## TABLE OF AUTHORITIES

**CASES**

*Archdiocese of D.C. v. Wash. Metro. Area Transit Auth.*,
  140 S. Ct. 1198 (2020) .................................................................................. 6

*Ashcroft v. Free Speech Coalition*,
  535 U.S. 234 (2002) .................................................................................... 12

*Blais v. Hunter*,
  493 F. Supp. 3d 984 (E.D. Wash. 2020) ............................................... 8, 9

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*,
  518 U.S. 668 (1996) .................................................................................... 10

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*,
  512 U.S. 687 (1994) ...................................................................................... 3

*Brown v. Peyton*,
  437 F.2d 1228 (4th Cir. 1971) ..................................................................... 1

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940) ...................................................................................... 4

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) .................................................................................. 7, 8

*Employment Division, Department of Human Resources of Oregon v. Smith*,
  494 U.S. 872 (1990) ...................................................................................... 8

*Hartman v. Moore*,
  547 U.S. 250 (2006) .................................................................................... 10

*Hurley v. Irish-American Gay, Lesbian Bisexual Group*,
  515 U.S. 557 (1995) ...................................................................................... 4

*Interactive Digital Software Ass'n v. St. Louis County, Missouri*,
  329 F.3d 954 (8th Cir. 2003) ..................................................................... 11

*Kendrick v. Bowen*,
    657 F. Supp. 1547 (D.D.C. 1987) ............................................................................. 7

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022) ............................................................................................. 4

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
    138 S. Ct. 1719 (2018) ............................................................................................. 4

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ............................................................................................... 10

*Rutan v. Republican Party of Ill.*,
    497 U.S. 62 (1990) ................................................................................................... 4

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ................................................................................................. 8

*Texas v. Johnson*,
    491 U.S. 397 (1989) ............................................................................................... 10

*Thomas v. Collins*,
    323 U.S. 516 (1945) ................................................................................................. 4

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    137 S. Ct. 2012 (2017) ......................................................................................... 7, 8

*Video Software Dealers Ass'n v. Schwarzenegger*,
    556 F.3d 950 (9th Cir. 2009) ................................................................................. 11

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ................................................................................................. 4

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ................................................................................................. 9

*Zorach v. Clauson*,
    343 U.S. 306 (1952) ................................................................................................. 7

**STATUTES**

Or. Rev. Stat. § 418.039 ................................................................................................ 6

**OTHER AUTHORITIES**

*How to Become a Resource Parent,* OREGON.GOV .......................................................... 11

James Madison, *Memorial and Remonstrance* (1785) ......................................................... 3

Mobeen Vaid, *Can Islam Accommodate Homosexual Acts? Qur'anic Revisionism and the CaseofScott Kugle*, 34(3) AMERICAN JOURNAL OF ISLAM AND SOCIETY (July 1, 2017) .. 5

*News Release*, OREGON DEPARTMENT OF HUMAN SERVICES (April 6, 2023) ............... 2

Rabbi Avraham Peretz Friedman, *Martial Intimacy*, NISHMAT'S WOMEN'S HEALTH AND HALACHA ................................................................................................................ 5

William O. Douglas, Supreme Court Justice, *The One Un-American Act*, Speech to the Author's Guild Council in New York, on Receiving the 1951 Lauterbach Award (Dec. 3, 1952), *in* XXXVIII(4) VASSAR QUARTERLY (Mar. 1953) ........................... 12

**INTEREST OF AMICI**

In Oregon, anyone wishing to serve as a foster parent must swear an oath to the Oregon Department of Human Services. The oathtaker must pledge to "respect," "accept," and "support" the "sexual orientation," "gender identity," and "gender expression" of foster children—a pledge that in practice means confessing an ideology that demands everything from preferred pronoun use to chemical and surgical alteration. Many persons of faith cannot make this pledge without violating their core religious beliefs. So they are excluded from serving as foster parents.

Idaho, Alabama, Arkansas, Georgia, Iowa, Kansas, Kentucky, Mississippi, Missouri, Montana, Nebraska, South Carolina, Texas, and Virginia ("Amici States") are each signatories to the Interstate Compact on the Placement of Children and are directly impacted by Oregon's unconstitutional policy excluding, on account of their faith, otherwise qualified and well-suited families from fostering children. Amici States who may send children for placement in Oregon pursuant to the ICPC are concerned that Oregon's law systematically disqualifies many persons of faith from serving as foster parents. Contrary to the position Oregon seems to have taken, Amici States believe that "devotion to one's religious beliefs is considered to make one a more ethical, intelligent, useful member of society"—including in serving as foster parents. *Brown v. Peyton*, 437 F.2d 1228, 1230 (4th Cir. 1971).

Amici States are further concerned that Oregon's policy will creep and become more broadly exclusionary. Today, Oregon targets people of faith applying to serve as foster parents. Tomorrow, Oregon may disqualify countless others from public service on account of their beliefs or speech. The more widespread policies like Oregon's become, the more harm they will cause to Amici States and their citizens.

Accordingly, Amici States file this brief in support of Plaintiff Jessica Bates.

## SUMMARY OF ARGUMENT

Oregon has pledged that its "Child Welfare Division stands in support of transgender, non-binary, gender-fluid and other LGBTQIA2S+ children, young people and families, including those who are in foster care and those who have been adopted." *News Release*, OREGON DEPARTMENT OF HUMAN SERVICES (April 6, 2023), https://tinyurl.com/3a8mzxus. It has made good on that pledge by adopting administrative rules that impose another pledge requirement on foster parents: "legal requirements" that ensure "LGBTQIA2S+" "safe and supportive environments" for foster children. *Id.*

Religious applicants like Jessica Bates cannot take the required oath while living consistently with their deeply held religious beliefs. The good news for them is that the First Amendment prevents governments from making them choose between their faith and participation in society. No government can deny "religious people . . . the opportunity to exercise the rights of citizens simply because of their religious affiliations

or commitments, for such a disability would violate the right to religious free exercise." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 698 (1994). Oregon's law flunks this basic precept.

Oregon's law also penalizes people of faith because of their beliefs. It requires applicants to disclose their views on hotly disputed issues, and any applicant expressing a disfavored viewpoint is promptly disqualified from participation. Of course, the First Amendment disallows such retaliation.

Laws like the one at issue must be sharply and quickly rebuked. Experiments on liberty that go unchecked become strengthened by exercise and entangled in precedents. *See* James Madison, *Memorial and Remonstrance* (1785), https://tinyurl.com/bdds5am8. Here, it is not difficult to see the next applications of Oregon's unconstitutional law. Unchecked, it will spread and effectively ostracize people of faith from society. The First Amendment fortunately exists to prevent that very thing. And its protections apply against Oregon's law, which must be enjoined if the First Amendment is to be given force.

## ARGUMENT

### I. Oregon's LGBTQIA2S+ Oath Requirement Sidelines People of Faith From Society.

Oregon's requirement to ally with specific LGBTQIA2S+ views tells religious people to take their faith and stay home. Unless they change their deeply held beliefs and embrace a now-favored ideology, Oregon officials automatically disqualify them

from participating in Oregon's foster system. That is classic viewpoint and religious discrimination. The First Amendment has no tolerance for such State-imposed orthodoxy. *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Quite the opposite. The First Amendment specially shields the domain of the mind and heart from government coercion or penalty. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 74-76 (1990); *Thomas v. Collins*, 323 U.S. 516, 531 (1945). And it does so in overlapping and complementary ways—"doubly protect[ing]" the religious. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022). The Amendment reminds governments that Americans are free to speak or not speak; *Hurley v. Irish-American Gay, Lesbian Bisexual Group*, 515 U.S. 557, 573 (1995); they're free to hold moral convictions and act on those convictions; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); and no government can invade the secured jurisdiction that is a man's conscience—not even by measures exerting subtle pressure on the religious. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). Oregon's law pays no heed to these principles, and it isn't subtle about it either.

For example, Oregon openly directs foster parents to provide foster children with "access to a variety of books, movies, and materials" that promote "same-gender relationships" and to display "LGBTQ-affirming" symbols, like pink triangles, rainbows, or ally flags—emphasizing, with bolded lettering, the directive applies "whether or not a youth in [their] care openly identifies as LGBTQ+." Dkt. #15-1 at

34-35. And foster parents are expressly forbidden from taking their foster children to "religious activities" or "family gatherings" that may be "unsupportive of people with diverse [Sexual Orientation, Gender Identity, and Expression]." *Id.* at 34.

Many believers of major religions cannot accept this canon. Christians like Ms. Bates believe that LGBTQIA2S+ ideology fundamentally rejects God as Creator. Dkt. #1 at ¶¶ 118-63. Many Jews recognize laws that mandate male-female union, which are "the paradigm *mitzvot* (commandments) because they reflect the uniquely Jewish approach to sanctifying the physical world through *mitzvah* observance." Rabbi Avraham Peretz Friedman, *Martial Intimacy*, NISHMAT'S WOMEN'S HEALTH AND HALACHA, https://www.yoatzot.org/intimacy/648/ (last visited May 23, 2023). And many Muslims reject same-sex attractions as sinful. Mobeen Vaid, *Can Islam Accommodate Homosexual Acts? Qur'anic Revisionism and the Case of Scott Kugle*, 34(3) AMERICAN JOURNAL OF ISLAM AND SOCIETY, 45-97 (July 1, 2017), https://www.ajis.org/index.php/ajiss/article/view/352/1935.

Oregon officials aren't winking and nodding with each other behind closed doors to exclude persons of faith. Oregon has made it official policy that the faithful cannot participate in a state program unless they sacrifice their convictions regarding human sexuality. As Ms. Bates's case demonstrates, when Oregon says foster parents must swear "respect," "accept[ance]," and "support," it enforces the oath requirement and won't tolerate anything short of an enthusiastic alliance proved by advance pledges of

State Amicus Brief
in Support of Plaintiff                                              5

specific action. *See* Dkt. #15-1 at 8 (explaining basis for Ms. Bates's disqualification was her refusal to facilitate cross-sex hormone treatments for children). The obvious outcome is persons of faith are excluded from the foster care system. *See Blais v. Hunter*, 493 F. Supp. 3d 984, 996 (E.D. Wash. 2020) (explaining that Washington's similar requirements "work to burden potential caregivers with sincere religious beliefs yet almost no others").

But the trajectory of the law is even more alarming. Nothing limits Oregon's LGBTQIA2S+ oath requirement for foster parents from being broadly applied to numerous other state services and effectively sidelining persons of faith from society. Guardians ad litem, state medical personnel, and public school teachers all work closely with children and cannot escape the same logic Oregon has applied against foster parents. And no one should think that anti-discrimination laws will give Oregon any hesitation in going after persons of faith in those fields. By statute, Oregon assures foster-parent applicants that "an individual may not be disqualified from providing child welfare services to a child or ward . . . [o]n the basis of . . . religion." Or. Rev. Stat. § 418.039. Yet that statute did nothing to protect Ms. Bates from Oregon's religious intolerance.

Whether intentional or not, Oregon's law punishes the religious for their beliefs. That runs counter to the whole purpose of the First Amendment, which "requires governments to protect religious viewpoints, not single them out for

State Amicus Brief
in Support of Plaintiff                                    6

silencing." *Archdiocese of D.C. v. Wash. Metro. Area Transit Auth.*, 140 S. Ct. 1198, 1200 (2020) (Gorsuch, J., respecting the denial of certiorari). Oregon would do well to remember that Americans "are a religious people whose institutions presuppose a Supreme Being" and that states must not "prefer[] those who believe in no religion over those who do believe." *Zorach v. Clauson*, 343 U.S. 306, 313-14 (1952). History need not be consulted long to learn that "a society is only truly free when individuals are left free from direct or indirect pressure to abandon their own cherished religious beliefs for whatever set of beliefs currently holds government favor." *Kendrick v. Bowen*, 657 F. Supp. 1547, 1569-70 (D.D.C. 1987).

## II. Oregon's LGBTQIA2S+ Oath Requirement Targets and Discriminates Against People of Faith.

Ms. Bates cannot live out her faith consistently and comply with Oregon's LGBTQIA2S+ policies. The same is true for numerous other faithful religious adherents. By placing a special burden on Ms. Bates based on her religious identity, Oregon has flouted basic Free Exercise Clause protections.

The Supreme Court has made clear that "[t]he Free Exercise Clause protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (cleaned up). In other words, a State may not deny an individual "a generally available benefit solely on account of religious identity"—doing so "imposes a penalty on the free exercise of

State Amicus Brief
in Support of Plaintiff                              7

religion that can be justified only by a state interest of the highest order." *Id.* (cleaned up).

Here, Oregon targeted and discriminated against Ms. Bates because of her religious beliefs. The only basis Oregon officials gave for her disqualification was her doctrinal stance on human sexuality. *See* Dkt. #15-1 at 8. Moreover, the materials Oregon provides foster parent applicants expressly denounce "religious" systems based on certain disfavored beliefs. *See* Dkt. #15-1 at 34 (forbidding "religious activities" that are "unsupportive" of "SOGIE" beliefs). There's no question that fostering is a "generally available benefit," and Oregon has denied that benefit solely on account of Ms. Bates's religious identity. *See Trinity Lutheran*, 137 S. Ct. at 2019. That is why the Court in *Blais v. Hunter* found a nearly identical Washington policy unconstitutional. 493 F. Supp. 3d 984, 1000 (E.D. Wash. 2020). The laws "condition the availability of benefits upon [the applicant's] willingness to violate a cardinal principle of her religious faith," which "effectively penalizes the free exercise of her constitutional liberties." *Sherbert v. Verner*, 374 U.S. 398, 406 (1963). Thus, Oregon impermissibly imposes a penalty on the free exercise of religion. *Trinity Lutheran*, 137 S. Ct. at 2019.

Oregon cannot justify its discriminatory law under *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), either. Cleverly crafted laws that amount to religious gerrymanders won't survive just because they're drafted with facial neutrality. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508

U.S. 520, 534 (1993). "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Id.* The policy and its implementing materials aren't covert, but regardless, as the *Blais* court correctly found, such "regulations and policy operate as a religious gerrymander and are thus not neutral." *Blais*, 493 F. Supp. 3d at 998. The *Smith* standard does not open the door for Oregon to "punish the expression of religious doctrines it believes to be false" or to "impose special disabilities on the basis of religious views or religious status." *Smith*, 494 U.S. at 877. Oregon has done both here, so the law should be enjoined.

It's important to keep in mind that enjoining the law does not prevent Oregon from protecting children or advancing other important state interests. But if Oregon is to "overbalance" First Amendment rights, it must demonstrate it has "interests of the highest order." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). It cannot burden religious rights and hope to benefit from only rational basis review.

### III. Oregon's LGBTQIA2S+ Oath Requirement Retaliates Against People of Faith.

Oregon's law also amounts to First Amendment retaliation. Oregon welcomed Ms. Bates's interest to serve as a foster parent and guided her through the application process until she spoke the wrong message. At that point, her services were no longer welcomed and she was immediately disqualified. The First Amendment prohibits that type of speech retaliation.

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256, (2006) (citation omitted). This means that a government official may not "deny a benefit to a person because of his constitutionally protected speech"—even when "a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). A government need not directly prohibit speech to run afoul of the First Amendment; it is enough if the government effort has a "deterrent, or 'chilling,' effect." *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996) (citation omitted).

Oregon's law runs headlong into this First Amendment no-no. During the application process, Oregon requires foster parent applicants to disclose their views on LGBTQIA2S+ issues. If they take the oath and speak the right message, they're allowed to proceed and participate. But if they refuse the oath and speak the wrong message, they are promptly disqualified and denied the benefit. That is textbook First Amendment retaliation. And it also snubs "a bedrock principle underlying the First Amendment"—that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Any interest Oregon asserts in protecting minor children is insufficient. First, Oregon does not need to exclude all religious dissenters in order to see to it that less than 2% of children have LGBTQIA2S+-supportive placements. In fact, Oregon's Department of Human Services states that it "work[s] together with [foster parents]" to "decide which children best suit [their] family and home," and so "[b]efore a child comes into [their] home, [foster parents] will be given information about the child to help [them] decide if the placement is right for [them]." *How to Become a Resource Parent,* OREGON.GOV, https://tinyurl.com/yc7xwwus (last visited May 17, 2023). Accordingly, protection of children appears to be pretextual.

Second, Oregon's status of wards of foster children does not give it license to engage in viewpoint discrimination. A state "cannot silence protected speech by wrapping itself in the cloak of parental authority." *Interactive Digital Software Ass'n v. St. Louis County, Missouri*, 329 F.3d 954, 960 (8th Cir. 2003). Oregon's overbroad requirements—for instance, directing foster parents to expose all children to materials that promote LGBTQIA2S+ views on the one hand and forbidding exposure to environments unsupportive of LGBTQIA2S+ views on the other—is a blatant attempt to "restrict speech in order to control a minor's thoughts," which a state may not do. *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 962 (9th Cir. 2009).

A final point. Amici States are not minimizing the need to protect children. Indeed, States are principally responsible for the welfare of their citizens. Amici States

will be amongst the first to defend laws that properly protect society's most vulnerable. But pretextual protective measures that have deeply corrosive veins are a cancer to societal welfare. They warrant no deference because their aim is not legitimate protection. And the consequences of sacrificing foundational liberties can never be justified. First Amendment liberties are sentinels of society, safeguarding and maintaining true citizen welfare. *See* William O. Douglas, Supreme Court Justice, *The One Un-American Act*, Speech to the Author's Guild Council in New York, on Receiving the 1951 Lauterbach Award (Dec. 3, 1952), *in* XXXVIII(4) VASSAR QUARTERLY, 2 (Mar. 1953) ("Restriction of free thought and free speech is the most dangerous of all subversions. It is the one un-American act that could most easily defeat us."); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) ("First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end."). Oregon's law cannot withstand First Amendment scrutiny.

## CONCLUSION

For the foregoing reasons, Oregon's law should be enjoined.

State Amicus Brief
in Support of Plaintiff                                    12

Respectfully Submitted,

| | |
|---|---|
| **RAÚL R. LABRADOR** | **THEODORE J. WOLD** |
| Attorney General | Solicitor General |
| *State of Idaho* | |

Date: May 26, 2023

/s/ *Joshua N. Turner*
Joshua N. Turner (ID 12193)*
Deputy Solicitor General
Idaho Attorney General's Office
Statehouse, Room 210
Boise, ID 83720

**KAEMPF LAW FIRM, PC**
John T. Kaempf, (OR 925391)
2021 SW Main Street, Ste. 64
Portland, OR 97205
(503) 224-5006
john@kaempflawfirm.com

*Admitted Pro Hac Vice*

*Additional State Signatories*

| | |
|---|---|
| STEVE MARSHALL<br>Attorney General<br>*State of Alabama* | LYNN FITCH<br>Attorney General<br>*State of Mississippi* |
| TIM GRIFFIN<br>Attorney General<br>*State of Arkansas* | ANDREW BAILEY<br>Attorney General<br>*State of Missouri* |
| CHRISTOPHER M. CARR<br>Attorney General<br>*State of Georgia* | AUSTEN KNUDSEN<br>Attorney General<br>*State of Montana* |
| BRENNA BIRD<br>Attorney General<br>*State of Iowa* | MICHAEL T. HILGERS<br>Attorney General<br>*State of Nebraska* |
| KRIS W. KOBACH<br>Attorney General<br>*State of Kansas* | ALAN WILSON<br>Attorney General<br>*State of South Carolina* |
| DANIEL CAMERON<br>Attorney General<br>*Commonwealth of Kentucky* | KEN PAXTON<br>Attorney General<br>*State of Texas* |

JASON S. MIYARES
Attorney General
*Commonwealth of Virginia*