ELLEN F. ROSENBLUM
Attorney General
DEANNA CHANG  #192202
Senior Assistant Attorney General
ALEX C. JONES #213898
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Deanna.J.Chang@doj.state.or.us
        Alex.Jones@doj.state.or.us

Attorneys for Defendants


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION


| | |
|---|---|
| JESSICA BATES , | Case No.  2:23-cv-00474-AN |
| Plaintiff, | DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| FARIBORZ PAKSERESHT, in his official capacity as Director of the Oregon Department of Human Services, LIESL WENDT, in her official capacity as Deputy Director of the Oregon Department of Human Services, APRILLE FLINT-GERNER, in her official capacity as Interim Director of the Oregon Department of Human Services Child Welfare Division; REBECCA GARRISON, in her official capacity as certification supervisor for the Oregon Department of Human Services office in Malheur County, CECILIA GARCIA, in her official capacity as certification officer for the Oregon Department of Human Services office in Malheur County, | |
| Defendants. | |

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     BACKGROUND ................................................................................................... 2

        A.      LGBTQIA2S+ children and youth are vulnerable to a myriad of harms. ............. 3

                1.      LGBTQIA2S+ children and youth are more likely to be abused or
                        neglected. ........................................................................................ 3

                2.      National statistics show LGBTQIA2S+ children in foster care are
                        particularly vulnerable. ..................................................................... 3

                3.      Familial acceptance is critical to improving outcomes for
                        LGBTQIA2S+ children and young adults. .............................................. 4

                4.      Negative impacts of childhood remain into adulthood. ............................ 4

        B.      Oregon's child welfare laws ......................................................................... 5

        C.      Plaintiff's application to become a resource parent. ....................................... 7

III.    LEGAL STANDARDS ........................................................................................ 8

IV.     ARGUMENT ...................................................................................................... 9

        A.      Plaintiff is unlikely to succeed on the merits of her First Amendment
                claims. ..................................................................................................... 9

                1.      The rule does not unconstitutionally infringe on the free exercise of
                        religion. ......................................................................................... 10

                        a.      The rule is neutral and generally applicable with respect to
                                religion. ................................................................................ 11

                                i.      OAR 413-200-0308(2)(k) is neutral toward religion. ....... 11

                                ii.     OAR 413-200-0308(k)(2) is generally applicable. ........... 13

                        b.      The rule does not unconstitutionally infringe on Plaintiff's
                                right to free speech because it regulates conduct, not
                                speech. .................................................................................. 14

                2.      The rule satisfies strict scrutiny ...................................................... 19

                        a.      The state, as *de facto* parent of children in ODHS care and
                                custody, has a compelling interest in not placing those
                                children in home environments that have been shown to
                                significantly increase risks of depression, substance abuse,
                                and suicide. ............................................................................ 19

                        b.      The rule furthers the state's compelling interest by ensuring
                                that children are not exposed to the significant, documented

Page i

harms associated with parental rejection of a child's sexual orientation, gender identity, or gender expression........................ 24

      c.     The rule is narrowly tailored to the needs of the children that ODHS serves.................................................................... 26

    3.     The rule is not overbroad. ......................................................... 29

B.    Plaintiff is unlikely to suffer irreparable harm in the absence of preliminary relief. ................................................................................. 30

C.    The balance of equities weighs against an injunction, because of the likely harm to the children whom the rule protects. ...................................... 31

V.    CONCLUSION............................................................................................... 31

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .............................. 9

*Blais v. Hunter*, 493 F.Supp.3d 984 (E.D. Wash. 2020) ........................................... 28

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ...... 10, 11, 12, 13

*CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832 (9th Cir. 2019) ........................... 30

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ................................. 15

*E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832 (9th Cir. 2020) ................................. 9

*Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990) ..................... 10, 13

*Fulton v. City of Phila.*, 141 S.Ct. 1868 (2021) ........................................ 10, 11, 13, 23

*Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466 (9th Cir. 1984) ................................. 30

*Henry A. v. Willden*, 678 F.3d 991 (9th Cir. 2012) ................................................ 16, 20

*Lipscomb v. Simmons*, 962 F.3d 1374 (9th Cir. 1992) ............................................. 20

*Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) .................................................... 8

*Malik v. Brownz*, 16 F.3d 330 (9th Cir. 1994) .................................................... 10

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S.Ct. 1719 (2018) ....... 10, 11

*McGowan v. Maryland*, 366 U.S. 420 (1961) ...................................................... 12

*Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S.Ct. 2361 (2018) .............. 15

*New York v. Ferber*, 458 U.S. 747 (1982) ...................................................... 19, 20

*Nken v. Holder*, 556 U.S. 418 (2009) .............................................................. 9

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ............................................ 15

*Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020) ...................................... 10

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014) ................................................ 15

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992) ................................... 15

*Prince v. Massachusetts*, 321 U.S. 158 (1944) .............................................. 19, 20, 21

*Short v. Brown*, 893 F.3d 671 (9th Cir. 2018) .................................................... 9

*Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833 (9th Cir. 2010) ..................... 16, 18, 20

Page iii

*Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) ................................................................ 11, 15

*United States v. Williams*, 553 U.S. 285 (2008) ....................................................................... 30

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ................................................................ 9

**Statutes**

ORS 418.016 ............................................................................................................................. 6

ORS 418.046 ............................................................................................................................. 12

ORS 418.200 ............................................................................................................................. 5

ORS 418.630 ............................................................................................................................. 5

ORS 418.635 ............................................................................................................................. 5

ORS 418.640 ............................................................................................................................. 5

**Rules and Regulations**

OAR 413-120-0830 ................................................................................................................... 16

OAR 413-120-0860 ................................................................................................................... 16

OAR 413-140-0010 ................................................................................................................... 27

OAR 413-140-0032 ................................................................................................................... 13

OAR 413-140-0035 ................................................................................................................... 27

OAR 413-200-00308 ................................................................................................................. 11

OAR 413-200-0260 ................................................................................................................... 27

OAR 413-200-0296 ................................................................................................................... 17

OAR 413-200-0308 ............................ 2, 6, 8, 9, 11, 12, 13, 14, 17, 18, 24, 25, 26, 27, 28, 30, 31

OAR 413-200-0335 ................................................................................................................... 6, 12

OAR 413-200-0352 ................................................................................................................... 12

OAR 413-200-0358 ................................................................................................................... 17

OAR 413-200-0377 ................................................................................................................... 17

OAR 413-200-0383 ................................................................................................................... 17

OAR 413-200-0386 ................................................................................................................... 17

OAR 413-200-0388 ................................................................................................................... 26, 27

OAR413-200-0272 ................................................................................................................... 5

Page iv

**Other**

Caitlin Ryan et al., *Family Acceptance in Adolescence and the Health of LGBT Young Adults*, 23 J. Child & Adolescent Psychiatric Nursing 205, 208–09 (2010) ........................... 12

*Family Acceptance in Adolescence and the Health of LGBT Young Adults*, 23 J. Child & Adolescent Psychiatric Nursing 205, 212 (2010) .................................................................. 22

Page v

I.      INTRODUCTION

There are few more noble pursuits than raising a healthy and happy child who will enter adulthood with self-confidence, stability, and the tools to face whatever challenges life may bring.  These qualities are instilled in children through the love, support, and acceptance of their families and friends.  When children cannot remain with their family of origin, despite supports available from the state, those children enter Oregon's child welfare system.  Resource parents (historically known as foster parents) and adoptive families willing to adopt children who cannot be reunified with their parent(s) are invaluable to the child welfare system, and their dedication to children is admirable.  But the role of a resource parent or adoptive parent is difficult – likely more difficult than raising one's biological child.  Children experiencing foster care often have greater needs than the average child, or may have suffered traumas before entering the child welfare system.  And resource parents are not the sole decision-makers when it comes to the safety and well-being of the child in their care.  Even prospective adoptive parents, who ideally will ultimately adopt the child, must care for the child during a transitional period of post-placement supervision, during which the child is legally in the custody of the state.

When a child enters the foster care system, the Oregon Department of Human Services (ODHS) steps into the role normally occupied by a child's biological parent.  ODHS becomes the *de facto* parent and makes choices that ordinarily would be made by the child's biological parent, with a statutory obligation to pursue the best interests of the child.  This case is not about the substantive due process rights of children and young adults experiencing foster care.  It is about the best interests of those children and young adults, and a rule adopted by ODHS to assist in furthering those interests.  Resource parents and adoptive parents must demonstrate that they are capable of, and willing to, place the interests of the child above their own.  Plaintiff admits that she is not able to do that with respect to LGBTQIA2S+[1] children or young adults, and as a

---

[1] LGBTQIA2S+ is an acronym for Lesbian, Gay, Bisexual, Transgender, Queer and/or Questioning, Intersex, Asexual, Two-Spirit, and other ways people choose to identify.

Page 1 -    DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

result, her application to become an adoptive parent was denied.  The basis for the denial was not that ODHS disapproves of her religion or beliefs, or that ODHS wants to restrict her right to free speech.  The basis for the denial was simply that Plaintiff admitted that she could not and would not comply with OAR 413-200-0308(2)(k), one of the child welfare system rules designed to protect these vulnerable children and therefore, refused to place the best interests of the child(ren) before her own.

ODHS's rule requiring resource parents and adoptive resources to respect, accept, and support the sexual orientation, gender identity and expression (SOGIE) of children in ODHS care and custody does not unconstitutionally infringe upon Plaintiff's First Amendment rights. Plaintiff is unlikely to prevail on the merits of her claim, and is she unlikely to suffer irreparable harm by allowing this case to proceed in the normal course.  Furthermore, the balance of equities and public interest in ensuring that vulnerable children experiencing foster care are placed in homes that will respect, accept, and support who they are, regardless of their SOGIE, far outweighs any harm to Plaintiff.  Plaintiff's motion for a preliminary injunction should be denied.

## II.    BACKGROUND

Children in Oregon's child welfare system have already experienced significant disruptions to their family lives.  Many of these children have faced physical and emotional abuse prior to entering the child welfare system, and the disruption resulting from placement in foster care can add to the emotional scars these children bear.  It is an unfortunate truth that LGBTQIA2S+ children and young adults experience these traumas at a significantly higher rate than straight cisgender children. These traumas translate into higher rates of, among other things, depression, suicide, and substance abuse that often continue into adulthood.

Page 2 -    DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

A.    **LGBTQIA2S+ children and youth are vulnerable to a myriad of harms.**

1.    **LGBTQIA2S+ children and youth are more likely to be abused or neglected.**

In a 2020 nationwide study, more than half of transgender and non-binary youth reported having seriously considered suicide in the past year, while more than 20% reported having attempted suicide in that year.  Declaration of Deanna Chang (Chang Decl.) at Exh. 1, The Trevor Project, *National Survey on LGBTQ Youth Mental Health 2020*; Chang Decl. at Exh 2, GAO Report to the Chairman of the Subcommittee on Worker and Family Support, Committee on Ways and Means, House of Representatives, *"FOSTER CARE Further Assistance from HHS Would be Helpful in Supporting Youth's LGBTQ+ Identities and Religious Beliefs,"* GAO-22-104688, April 2022 (GAO Report) at 6 (citing 2020 Trevor Project Survey).  Multiple studies show that LGBTQIA2S+ youth are more likely to experience abuse and neglect, and those who enter foster care are more likely to have a range of adverse experiences and outcomes.  Chang Decl. at Exh. 2, *GAO Report* at 1 (citations omitted).  LGBTQIA2S+ youth are "especially at risk for experiencing multiple forms of victimization."  *Id.* at 5-6.  Many LGBTQIA2S+ youth experience familial rejection, exploitation, abuse and neglect.  Chang Decl. at Exh. 3, U.S. Department of Health and Human Services Administration on Children, Youth and Families, Information Memorandum Log No: ACYF-CB-IM-22-01, March 2, 2022 (HHS Info Memo).

2.    **National statistics show LGBTQIA2S+ children in foster care are particularly vulnerable.**

In addition to the harms faced by LGBTQIA2S+ youth generally, numerous studies show that, nationally, LGBTQIA2S+ youth are markedly overrepresented in the foster care system and are more likely than other youth to experience adverse experiences in foster care.  Chang Decl. at Exh. 2, *GAO Report* at 1 (citations omitted).  Some studies indicate that up to 30% of youth in foster care nationally identify as LGBTQIA2S+, in contrast to approximately 10% in the general population.  *Id.*  Moreover, those studies also show that youth are "more likely to be mistreated, experience more time in foster care, experience more placements in foster care, and less likely to

Page 3 -    DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

be placed in 'family-based' settings." *Id.* at 6-7 (citations omitted).  Other studies show a higher prevalence of homelessness among LGBTQIA2S+ youth in foster care.  Chang Decl. at Exh. 3, *HHS Info Memo* at 3.  These experiences in foster care often add to the fears, shame, and rejection already experienced by LGBTQIA2S+ children and young adults, leading to even higher incidents of depression, suicidal thoughts and actions, and substance abuse.

  **3.**  **Familial acceptance is critical to improving outcomes for LGBTQIA2S+ children and young adults.**

  A parent's refusal to accept a child's SOGIE has a significant impact on the health and well-being of the child.  Rates of depression, suicide, and harmful behaviors are closely correlated with the level of acceptance the LGBTQIA2S+ children and young adults feel in their home.  One study found that "highly rejected" LGBTQIA2S+ young adults were more than eight times more likely to have attempted suicide than LGBTQIA2S+ young adults who were not rejected by their parents at all or only "rejected a little."  Chang Decl., Exh. 4, San Francisco State University, *Supportive Families, Healthy Children* at 5.  Similarly, "highly rejected" LGBTQIA2S+ young adults were nearly six times as likely to report high levels of depression, more than three times as likely to use illegal drugs, and more than three times as likely to be at risk for sexually transmitted disease.  *Id.*

  **4.**  **Negative impacts of childhood remain into adulthood.**

  The disparities in physical, emotional, and mental health of LGBTQIA2S+ and non-LGBTQIA2S+ children often persist into adulthood.  The statistics relating to adverse outcomes based on the level of rejection of parents demonstrate not only how important acceptance and support of the family is, but also that the acceptance and support that a child feels growing up has a substantial impact into adulthood.  As noted above, the young adults surveyed were 21-24 years old, well after many young adults leave foster care.  Additional data from a national report indicates that LGBTQIA2S+ young adults aging out of foster care are more likely to struggle to

Page 4 - DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

attain self-sufficiency, reporting higher rates of economic hardship than non-LGBTQIA2S+ young adults aging out of foster care. Chang Decl. at Exh. 2, *GAO Report* at 7 (citation omitted).

**B.    Oregon's child welfare laws.**

ODHS is statutorily required to "protect the best interests of children in foster homes" and enact rules that "carry out the intent and purpose" of the child welfare laws.  ORS 418.640. A foster child is a "child who is in the legal custody of the [Oregon] Department of Human Services..."  ORS 418.200.  Children and young adults experiencing foster care have essential rights under Oregon law.  Those rights are set out in the "Oregon Foster Children's Bill of Rights" and include  the right to be treated with respect; to be part of a family and to be treated as such; to have clean and appropriate clothing that corresponds to the gender identity of the child; to make decisions about their bodies; to determine and express their gender and sexual identities for themselves; and to "receive respect, be nurtured, and attend activities" in accordance with who they are.  Chang Decl. at Exh. 5, Oregon Foster Children's Bill of Rights. ODHS, as the legal custodian of children and young adults in foster care, seeks to ensure that those rights are respected for each and every child and young adult in the child welfare system. As a result, resource families must satisfy certain requirements in order to become certified and remain certified.

In order to operate a foster home, a person must first obtain a certificate of approval. ORS 418.630 ("No person shall operate a foster home without a certificate of approval issued by the Department of Human Services.").  ODHS is required to assess whether the foster home meets certain statutory requirements, and upon confirmation of compliance, will issue a certificate to operate a foster home.  ORS 418.635; OAR 413-200-0272.  Certified foster homes are inspected periodically to ensure that the standards prescribed by ODHS are being maintained, and that the children residing within that home are receiving proper care.  ORS 418.635.  The certificate can be revoked by the Department after notice and opportunity for a hearing if any violations of the applicable statute and rules are discovered.  ORS 418.635.

Page 5 -    DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

The process to become a certified foster home is long, detailed, and comprehensive. With respect to the home, ODHS prescribes how and where a child can sleep, when devices such as baby monitors can be used, how tools and other potentially dangerous items are stored, and the number and location of smoke and carbon monoxide detectors, to name a few.  OAR 413-200-0335.

Individual applicants must agree to undertake certain activities and, in some cases, forego certain activities in order to become a certified resource parent.  For example, a certified resource parent is not permitted to take the child or young adult experiencing foster care outside the State without the consent of ODHS.  OAR 413-200-0335(4)(d).  Applicants and members of the household over the age of 18 must undergo criminal records checks.  ORS 418.016(1).

ODHS also evaluates, among many other factors, an applicant's finances, to determine whether there are adequate resources to support the household; the applicant's relationships with other members of the household and in the community; and the applicant's "lifestyle and personal habits," to avoid the possibility of criminal activity or misuse of alcohol or drugs. ODHS may also request medical records of the applicant or require the applicant to undergo an expert evaluation from a health care professional.  OAR 413-200-0308(2)(f) – (i).

Other requirements are more general, such as whether the applicant will be able to meet "the safety, health, and well-being needs" of the child, or ensuring that the child has opportunities to participate in "age-appropriate or developmentally-appropriate activities, including extracurricular, enrichment, cultural, and social activities."  OAR 413-200-0308(2)(d) and (3)(c).

These inquiries into the lives of the applicants are necessary in order to protect and further the best interests of the child and to ensure that ODHS does all it can to provide a safe, stable, and loving home for all the children who are in ODHS custody and care.

Page 6 -   DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

C.    **Plaintiff's application to become a resource parent.**

Plaintiff is a widowed mother of five children between the ages of 10 and 17. Declaration of Jessica Bates in Support of Motion for Preliminary Injunction (Bates Decl.), ECF #15 at ¶ 7, 11.  She expressed interest in adopting a sibling pair under 10 years old.  *Id*. at ¶ 21. After considering various ways to adopt children, she decided to adopt through ODHS, both because it was more economical than a private adoption and because it was convenient to her location.  *Id*. at ¶¶ 24-28.  On May 7, 2022, Plaintiff submitted an Application for Approval by the Department of Human Services to Care for a Child in the Care or Custody of Public Child Welfare (Application).  Declaration of Cecilia Garcia (Garcia Decl.) at ¶ 3.  Plaintiff proceeded through several portions of the certification process, including completion of ODHS's required Resource and Adoptive Family Training course (RAFT) on July 28, 2022.  *Id*. at ¶¶ 5-6.

During the RAFT course, Ms. Bates became aware that, as an adoptive resource, she would be required to "affirm a child's sexual or gender identity," including using the child's preferred pronouns, permitting the child to dress and express themselves in accordance with their SOGIE, and taking the child to affirming events.  ECF # 15, Bates Decl. at ¶¶ 37-40.  These requirements conflict with Ms. Bates' belief that gender and sex are assigned permanently at the time of conception, and that a person should not seek to change their sex or, as she has put it, "engage in any conduct or speech that suggests a male can be a female and vice versa."  *Id*. at ¶¶ 52-54.  Additionally, Ms. Bates believes that only a man and a woman can be married, *id*. at ¶ 67, and that "sexual acts should only occur within the confines of a biblical marriage."  *Id*. at ¶ 69.

Ms. Bates has declared that she would take the position with any adoptive or foster child that "names, pronouns, . . . attire, and sports participation should depend upon the biological sex identity, rather that self-perceived gender identity."  *Id*. at ¶¶ 65, 71-73.  And she admits that she could not and will not "respect, accept and support. . .the sexual orientation, gender identity and

Page 7 -    DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

DC4/sv3/784806409

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

gender expression" of a child in ODHS care and custody whose SOGIE does not correspond with their sex assigned at birth, in violation of OAR 413-200-0308(2)(k).  *Id.* at ¶ 90.

Upon completion of the RAFT course, Ms. Bates contacted Cecilia Garcia, her certifier at ODHS, stating that "One of the things the training really emphasized is SOGI (sexual orientation gender identity) and that the host must respect, accept, and support children whose preferred pronouns & identity don't match their biological sex.  ***  I need to let you know I cannot support this behavior in a child.  I have no problem loving them and accepting them as they are, but I would not encourage them in this behavior."  Garcia Decl. at ¶ 7.  Ms.  Garcia and Plaintiff discussed her email in a September 2022 telephone call.  During that call, Plaintiff seemed confused that a child who was eight years old or younger would know if they were LGBTQIA2S+.  *Id.* at ¶ 10.  Plaintiff reiterated at that time that she would not support the lifestyle or encourage the behavior of a child whose SOGIE did not correspond to their biological sex, and questioned more than once why ODHS couldn't just give her "a kid who's not like that."  *Id.* at ¶ 11.  Ms. Garcia explained to Ms. Bates that ODHS cannot make any guarantees with respect to the SOGIE of a child, and that the chances of a child coming into foster care being LGBTQIA2S+ are higher than average.  *Id.* at ¶ 9.  Ms. Bates was also told that ODHS needed resource families to be open to all children.  *Id.*

Although Ms. Bates' application for certification was still at a relatively early stage in the process, ODHS opted to deny her application at that point since it was clear that Ms. Bates was not willing or able to comply with OAR 413-200-0308(2)(k).  *Id.* at ¶ 14.

## III.    LEGAL STANDARDS

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (emphasis original).  To obtain a preliminary injunction, plaintiffs must establish that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities

Page 8 -    DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

tips in their favor; and (4) an injunction is in the public interest." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). When the government is a party, courts consider the last two factors together, because the defendants' equities merge with the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A plaintiff must establish each of the elements. *Winter*, 555 U.S. at 20–21.

"[S]erious questions going to the merits" combined with a balance of hardships that tips sharply towards the plaintiff can satisfy those two factors together, so long as the plaintiff also shows that there is a likelihood of irreparable injury. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Because the balance of equities and public interest are considered together, the *Alliance* balancing test requires Plaintiff to show that her claims raise serious constitutional questions and that the balance of equities tips sharply in her favor—that is, that her own irreparable injury in complying with the law while the case is decided greatly exceeds the public interest served by the law. In the event a court is persuaded that a preliminary injunction is appropriate, it must be no broader "than necessary to provide complete relief to the plaintiffs before the court." *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 855–56 (9th Cir. 2020).

## IV.    ARGUMENT

### A.    Plaintiff is unlikely to succeed on the merits of her First Amendment claims.[2]

It is certainly true that the Constitution protects an individual's right to freely exercise their religion and their right to free speech, but these guarantees are not absolute. There are many instances where a legitimate governmental interest infringes on a person's First Amendment rights in a manner that is entirely constitutional. OAR 413-200-0308(2)(k), requiring that certified resource families and adoptive resources "[r]espect, accept and support

---

[2] Although Plaintiff's Complaint also raises an equal protection claim, Complaint, ECF #1 at ¶¶ 272–74, Plaintiff's Motion for Preliminary Injunction relies only on her First Amendment claims and does not argue that OAR 413-200-0308(2)(k) violates the Equal Protection Clause. Accordingly, this response addresses only the First Amendment claims.

Page 9 -    DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

the race, ethnicity, cultural identities, national origin, immigration status, sexual orientation, gender identity, gender expression, disabilities, spiritual beliefs, and socioeconomic status of a child or young adult in the care or custody of the Department, and provide opportunities to enhance the positive self-concept and understanding of the child or young adult's heritage" is an expression of one such legitimate governmental interest.  Given the significant over-representation of LGBTQIA2S+ children and young adults in foster care and the risks to a child's physical, mental, and emotional health that placement in a non-affirming home can have, ODHS's obligation to protect these children more than justifies any incidental impact that Plaintiff may experience.

### 1.    The rule does not unconstitutionally infringe on the free exercise of religion.

The Constitution's right to the free exercise of religion prohibits governmental action that is "hostile to the religious beliefs of affected citizens . . . and that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S.Ct. 1719, 1731 (2018).  While the Constitution protects sincerely held religious beliefs, the free exercise of religion is not unlimited.  *Malik v. Brownz*, 16 F.3d 330, 333 (9th Cir. 1994).  Religious convictions do not exempt a person from regulations that are both neutral and generally applicable.  *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878-79 (1990); *Fulton v. City of Phila.*, 141 S.Ct. 1868, 1876 (2021) (declining to overturn *Smith*).  Moreover, even if a "law has the incidental effect of burdening a particular religious practice," it "need not be justified by a compelling governmental interest" if it is neutral and of general applicability.[3]  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993), *citing Smith*, 494 U.S. 872.

---

[3] Plaintiff appears to assert a "hybrid rights" argument, arguing that strict scrutiny applies because the state's policy burdens both religion and speech.  Plaintiff's Motion for Preliminary Injunction 31–32.  But the hybrid rights doctrine, if valid, would apply only if Plaintiff can show that her free-speech claim has a "likelihood of success" on its own terms; she cannot use one "failing constitutional claim[]" to bootstrap another.  *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1237–38 (9th Cir. 2020).  In any event, the Ninth Circuit has all but repudiated the hybrid

Page 10 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

**a.      The rule is neutral and generally applicable with respect to religion.**

ODHS's rule requiring resource parents to respect, accept, and support children regardless of their SOGIE is not based on hostility to any religion, nor does it pass judgment upon or question the legitimacy of any religious beliefs.  Because OAR 413-200-0308(2)(k) is both neutral and generally applicable, it does not constitute an impermissible infringement on Plaintiff's freedom to exercise her religion.

**i.      OAR 413-200-0308(2)(k) is neutral toward religion.**

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Phila.*, 141 S.Ct. at 1877 (2021).  If the intent of a law is to "infringe upon or restrict practices because of their religious motivation, the law is not neutral."  *Church of the Lukumi Babalu Aye*, 508 U.S. at 533. The inquiry to determine the object of a law begins with the text.  *Id.* at 533.  Other factors that courts look to in assessing the neutrality of a governmental action include "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece Cakeshop,* 138 S.Ct. at 1731.

Here, OAR 413-200-00308(2)(k) has no reference to any religion or faith in the text of the rule.  Nor is there any administrative history surrounding that rule that would indicate any attempt by the State to infringe or restrict on religious practices.  Instead, there are numerous statutory provisions that underscore the State and ODHS's interest in pursuing the best interests of the child, and in promoting the health, safety and welfare of all children and young adults for whom ODHS has responsibility, including those who are LGBTQIA2S+.  *See, e.g.*, ORS

---

rights doctrine. *See, e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055, 1089 n.5 (9th Cir. 2022) ("We have cast doubt on whether this [hybrid rights] exception exists, and we have not applied strict scrutiny to a challenged law on this basis.").

Page 11 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

418.046(3)(f)(C) (Child Welfare Equity Advisory Committee may provide "recommendations for changes to policies, procedures, administrative rules or legislation to ensure that the commission and the department are effectively serving. . .[l]esbian, gay, bisexual, transgender, queer and other minority gender identity communities"); OAR 413-200-0335(1)(b)(A) (ODHS "must consider the age, gender, gender expression, and gender identity. . . when determining appropriate sleeping arrangements"); OAR 413-200-0352(1)(d) (resource family is required to provide "adequate clothing that is age-appropriate and meets the cultural and gender identity and gender expression of the child or young adult").

Not only is there no evidence that the rule was enacted with the purpose of infringing on any exercise of Plaintiff's or any other religion, there is no evidence that the rule is enforced differently for people of particular religions or no religion.  Requiring resource parents to respect, accept and support LGBTQIA2S+ children does not prevent Plaintiff from exercising her religion.  But even if it did, such an inadvertent impact would not make the rule unconstitutional.  The Supreme Court has recognized that "adverse impact will not always lead to a finding of impermissible targeting."  *Church of the Lukumi Babalu Aye*, 508 U.S. at 535. And, as is the case here, "a social harm may have been a legitimate concern of government for reasons quite apart from discrimination."  *Id.*, citing *McGowan v. Maryland*, 366 U.S. 420, 442 (1961).  Here, the rule addresses the severe harm that children in foster care suffer when they lack the parental support that they need.  That harm occurs when a parent rejects a child's SOGIE for *any* reason, religious or otherwise.  *See* Exh. 7, Caitlin Ryan et al., *Family Acceptance in Adolescence and the Health of LGBT Young Adults*, 23 J. Child & Adolescent Psychiatric Nursing 205, 208–09 (2010) (finding a consistent correlation between "family acceptance" and health outcomes, "regardless of background characteristics" such as "childhood religious affiliation" and "childhood family religiosity").  Accordingly, the rule requires that *all* applicants, regardless of religion, be willing to respect, accept, and support a child's SOGIE.

There is simply nothing, whether overt or covert, that indicates any intention that OAR 413-200-

Page 12 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

0308(2)(k) restrict any religious practices or infringe on practices because of a hostility to any religion.  The rule is neutral both on its face and in effect.

### ii.    OAR 413-200-0308(k)(2) is generally applicable.

In addition to being neutral, laws that burden religious practices must be generally applicable to be permissible.  *Church of the Lukumi Babalu Aye*, 508 U.S. at 542, citing *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. at 879-881.  In pursuing legitimate interests, a government may not selectively place burdens only on conduct motivated by religious belief.  *Id*. at 543.  For example, government ordinances prohibiting ritual slaughter of animals were not generally applicable when they failed to prohibit nonreligious slaughter of animals.  *Id*. at 534.  "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'"  *Fulton v. City of Phila*., 141 S.Ct. at 1877 (quoting *Smith,* 494 U.S. at 884 (additional citations omitted)).  Thus, in *Fulton*, the Supreme Court found that a law was not generally applicable where it "incorporates a system of individual exemptions, made available. . .at the 'sole discretion' of the Commissioner."  *Id*. at 1878.

Plaintiff attempts to analogize this case to *Fulton* by arguing that "the Department regularly grants individualized exemptions."  PI at 27.  In support of that statement, Plaintiff points to OAR 413-140-0032, which allows waiver of the home study requirements for *independent adoptions*.  The home study requirements for independent adoptions do not include OAR 413-200-0308(2)(k), which only applies to applicants who seek to provide care for "a child or young adult in the care or custody of the Department."  Thus, there are no "individualized exemptions" from OAR 413-200-0308(2)(k).  If the child is in the care or custody of DHS, the rule applies.  If it is an independent adoption, the rule does not apply.  Independent adoptions differ from adoptions through foster care in several fundamental ways.  First, and most importantly, independent adoptions generally involve a biological parent who is participating in the decision whether the adoptive home is appropriate.  In contrast, when a child is adopted

Page 13 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

through foster care, ODHS is standing in the shoes of the child's parent.  In those shoes, it is incumbent upon the Department to make all necessary inquiries to ensure children are placed in loving and secure homes where their individual needs can be met.

Plaintiff also claims that ODHS "often declines" to enforce OAR 413-200-0308(2)(k), citing to several paragraphs in its Complaint.  Those paragraphs, however, are based only on information and belief and contain no specific information about situations or circumstances where ODHS has declined to enforce the rule.  *See* Complaint, ECF #1 at ¶¶ 231-238.  Plaintiff has cited no evidence either in her Complaint or in her motion for a preliminary injunction that ODHS fails to enforce OAR 413-200-0308(2)(k) or that it selectively enforces it.  Instead, Plaintiff poses a number of hypothetical questions, none of which have any bearing on ODHS's practices and consequently, provide no support for Plaintiff's claim that the rule is not generally applied.

Because OAR 413-200-0308(2)(k) is both neutral and generally applicable, it is constitutional regardless of whether it has an adverse impact on Plaintiff's exercise of her religion.

      **b.      The rule does not unconstitutionally infringe on Plaintiff's right to free speech because it regulates conduct, not speech.**

OAR 413-200-0308(2)(k) is a regulation on applicants' conduct as caregivers, with an incidental burden on speech, subject to rational basis review.  The requirement that a certified resource family or potential adoptive resource respect, accept, and support the SOGIE of a child in the care and custody of ODHS is a regulation on the person's conduct as an approved caregiver for a particularly vulnerable population of children.  That requirement is analogous to other laws that the Supreme Court and the Ninth Circuit Court of Appeals have upheld as regulations of conduct with incidental impacts on speech, which are subject to rational basis review.

Page 14 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

"States may regulate professional conduct, even though that conduct incidentally involves speech." *Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S.Ct. 2361, 2372 (2018). For example, a state may enact laws that have the effect of restricting or compelling lawyers' or doctors' speech as an aspect of the conduct of their profession. *See, e.g.*, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 449 (1978) (upholding rules limiting lawyers' communication with potential clients); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992) (opinion of O'Connor, Kennedy, and Souter, J.J.), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) (law requiring physicians to "provide information about the risks of abortion, and childbirth, in a manner mandated by the State," implicated physicians' speech rights "only as part of the practice of medicine, subject to reasonable licensing and regulation by the State").

Even a regulation on conduct that is "performed through speech alone" is subject to rational basis review, if that conduct consists of the practice of a licensed profession that is within the state's power to regulate. *Pickup v. Brown*, 740 F.3d 1208, 1229–32 (9th Cir. 2014), *abrogated in part by NIFLA*, 138 S. Ct. 2361; *see also Tingley v. Ferguson*, 47 F.4th 1055, 1077 (9th Cir. 2022) (reaffirming the holding of *Pickup* regarding "professional conduct"). For example, the Ninth Circuit Court of Appeals has twice upheld laws prohibiting mental health care providers from practicing "sexual orientation change efforts" or "conversion" therapy on minors, "even when that treatment is performed through speech alone." *Pickup*, 740 F.3d at 1230–32; *Tingley*, 47 F.4th at 1077–78. As the court explained, "[m]ost medical treatments require speech, * * * but a state may still ban a particular treatment it finds harmful; otherwise, any prohibition of a medical treatment would implicate the First Amendment and unduly limit the states' 'power to regulate licensed professions.'" *Tingley*, 47 F.4th at 1077 (quoting *Pickup*, 740 F.3d at 1229).

Likewise, a state may reasonably regulate the provision of childcare to a child in the state's care and custody, even if that childcare requires speech. Certified resource families and

Page 15 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

adoptive families provide care for Oregon's most vulnerable children—children who, due to their "special relationship with the state," have a "federal constitutional right to state protection." *See Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842, 846 (9th Cir. 2010); *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012). Both resource parents and adoptive parents provide care for those children. Although an adoptive parent may ultimately assume legal parenthood of the child, the adoption process will involve a period of "post-placement supervision," during which the adoptive resource will care for a child who is still legally in the custody of ODHS. *See* OAR 413-120-0830(1) (prior to placement, caseworker must arrange post-placement supervision); OAR 413-120-0860(2) (describing post-placement supervision); OAR 413-120-0860(4) (changes in the adoptive resource's situation during post-placement supervision "may require an updated home study prior to making a determination to proceed with finalization of the adoption"). And even after adoption, a child's constitutional liberty interest in state protection can continue if the state's approval of the adoption created a danger to the child's welfare. *Tamas*, 630 F.3d at 843–44.

Accordingly, an applicant to become a certified resource family or an adoptive family must meet detailed, rigorous requirements in order to be entrusted to perform a service that is in many ways more vital and more delicate than that of a doctor or a lawyer. Thus, although the applicant might not be a "professional" in the ordinary sense of the word, the principle underlying the "professional conduct" exception applies with even greater force. Just as a state may protect patients by regulating the licensed practice of medicine, even when that practice involves speech, the state may also protect the children in its care and custody by imposing reasonable conditions on the care of those children, even when that care involves speech.

Requiring an applicant to respect, accept, and support various aspects of a child's identity is a regulation on that person's childcaring conduct that implicates their speech as a caregiver. So too are many other requirements for applicants, certified resource families, and adoptive families. Some rules have the effect of prohibiting certain speech. For example, a certified

resource family must not "[u]se derogatory remarks about the child or young adult," "[t]hreaten removal from the certified resource family home," or "[r]eprimand or discipline in any manner due to the child or young adult discussing their child welfare experience." OAR 413-200-0358(2)(f), (l), (p). In addition, "[w]hen utilizing social media, a resource parent may not identify any child or young adult, in the care or custody of the Department placed in the home, and that child or young adult's photo may not be tagged." OAR 413-200-0377(3). Other rules have the effect of requiring certain speech. A certified resource family "must report information to the Department upon reasonable cause to believe that any child or young adult with whom the individual comes in contact has suffered abuse or neglect * * *." OAR 413-200-0386(1). A certified resource family must also ensure that the child or young adult placed with them "is taught age appropriate health and hygiene practices." OAR 413-200-0308(3)(b). All of those requirements implicate speech as an aspect of childcare duties.

The requirement to respect, accept, and support the child's identity might also implicate an applicant's association with others, if that association is incompatible with the respect, acceptance, and support that the rule requires. But the rule is not unique in that respect. Just as many requirements implicate speech, others have the effect of limiting the people with whom the caregiver may associate. In additional to the requirements that apply to applicants themselves, each applicant must assure that "members of the household" meet certain requirements, including "[h]av[ing] a lifestyle and personal habits free of criminal activity, and abuse or misuse of alcohol or drugs[.]" OAR 413-200-0308(2)(l)(C). The Department may deny an application to become a certified resource family if a person with one of certain criminal convictions is a member of the household or "frequents the home" of the applicant. OAR 413-200-0296(2)(g). Further, a certified resource family must notify an ODHS certifier or certification supervisor whenever *any* "individual joins or leaves the household, including an individual who frequents the home." OAR 413-200-0383(2)(a). The rules contain no exception for persons who frequent the home for religious or expressive purposes.

Page 17 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

As those varied requirements illustrate, there are many contexts in which a resource parent's or adoptive parent's duties as a caregiver might effectively limit her ability to speak and associate as she chooses. That is the nature of childcare—especially when a person is entrusted with the care of a child who is not her own. As a full-time caregiver for a vulnerable child, a resource parent or adoptive parent must always be willing to put the child's interests first. To protect those interests, the state has imposed requirements and limitations on that person's conduct as approved caregivers. Given the varied demands of childcare, regulations on a person's conduct as a resource parent or adoptive resource will likely have a greater overall impact, including impacts on the person's speech and association, than a regulation on a person's conduct as a doctor or lawyer. But that is the nature of the job that the applicant takes on. In accepting the responsibility to care for Oregon's most vulnerable children, the applicants accept obligations and limitations that are commensurate with the vital service they perform.

In this context, strict scrutiny is not appropriate. Regulations on a resource parent's or adoptive parent's conduct as a caregiver are likely to impact how that person speaks or associates with others. But that is because that person's speech or association, as it relates to the child, will often be inseparable from the conduct of caregiving itself. The state has an obligation to regulate that caregiving conduct. To subject those regulations to a presumption of unconstitutionality would unduly limit the state's power to protect the children in its care and custody by imposing reasonable conditions on the care of those children. Strict scrutiny would also, in effect, presume that the expressive rights of the applicant outweigh the child's right to state protection, which includes the right to "protection from harm inflicted by a foster parent." *See Tamas*, 630 F.3d at 842. In contrast, rational basis review would properly allow the state, as the child's *de facto* parent, to put the child's rights and interests first.

An applicant's willingness to respect, accept, and support a child's identity, including SOGIE, forms an inextricable component of how the applicant will care for the child. Thus, to the extent that OAR 413-200-0308(2)(k) impacts Plaintiff's speech or association, it does so as a

Page 18 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

regulation of the conduct that certified resource families and adoptive resources are entrusted to perform: caring for the well-being of the child. The rule's impacts on speech and association are therefore subject to rational basis review. The rule satisfies rational basis review for the same reasons that it also satisfies the heightened standard of strict scrutiny, as explained below.

### 2. The rule satisfies strict scrutiny

Even if this court were to determine that strict scrutiny applies to ODHS's rule, there is little doubt that ODHS's overwhelming interest in ensuring the health, safety, and welfare of the LGBTQIA2S+ children who are entrusted to its care is compelling. Because the rule cannot be written any more narrowly and still further that compelling interest, it survives strict scrutiny as well as rational basis review.

### a. The state, as *de facto* parent of children in ODHS care and custody, has a compelling interest in not placing those children in home environments that have been shown to significantly increase risks of depression, substance abuse, and suicide.

A state's interest in "safeguarding the physical and psychological well-being of a minor" is "compelling." *New York v. Ferber*, 458 U.S. 747, 756–57 (1982). A resource parent's or adoptive parent's refusal to respect, accept, and support a child's or young adult's SOGIE poses a real and significant threat to the physical and psychological well-being of the children in the state's care and custody. The state cannot prevent every instance of bigotry or discrimination against LGBTQIA2S+ youth. But, as the *de facto* parent of highly vulnerable children, it has a compelling state interest in protecting them from harm caused when resource or adoptive parents refuse to respect, accept, and support a foster child's or young adult's SOGIE.

"[T]he interests of society to protect the welfare of children, and the state's assertion of authority to that end," are "no mere corporate concern of official authority." *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944). "It is the interest of youth itself, and of the whole community, that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed [adults] and citizens." *Id.* Accordingly, the Supreme

Page 19 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

Court has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *Ferber*, 458 U.S. at 757.

Even in the context of a parent's constitutionally protected authority over her own children, "neither rights of religion nor rights of parenthood are beyond limitation." *Prince*, 321 U.S. at 166. "Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways." *Id.* at 165. Likewise, a parent "cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds." *Id.* at 166. "The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death." *Id.* at 166–67.

An interest in protecting children is even more pressing when it concerns the state's need to protect children who are in the state's care and custody, including children in foster care. "[T]he state functions as the *de facto* parent of a child in foster care," with a responsibility "to safeguard the well-being of this helpless and vulnerable population." *Tamas*, 630 F.3d at 843. Until the child is adopted, the state occupies "the role of caregiver," and the child has a "federal constitutional right to state protection." *Tamas*, 630 F.3d at 843, 846; *Henry A.*, 678 F.3d at 1000. "Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Lipscomb v. Simmons*, 962 F.3d 1374, 1379 (9th Cir. 1992). The child's liberty interest, guaranteed by the due process clause of the Fourteenth Amendment, includes the child's interest "in being shielded from harm inflicted by a foster parent." *Tamas*, 630 F.3d at 842. The state's constitutional duty to protect the child can even extend beyond adoption, if the state's approval of the adoption created a danger to the child's welfare. *Id.* at 843–44.

Page 20 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

Thus, an interest in protecting the children in the state's care and custody is even more compelling than the already-compelling interest that has justified state laws that impact parents and children generally.  Restrictions on a parent's speech or conduct as it relates to the upbringing of her own children must overcome not only the parent's First Amendment rights, but also her "parental right as secured by the due process clause of the [Fourteenth] Amendment." *See Prince*, 321 U.S. at 164; *see also id.* at 166 ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom includes preparation for obligations the state can neither supply nor hinder.").  Here, in contrast, the state itself has the responsibility to act as the child's parent, and it is the *child's* due process right that the state must consider.  In this context, the child's interests are paramount.

The state's interest in this case, accordingly, is to protect the health and safety of the population for whom the state itself functions as a parent.  That population is particularly vulnerable, having found themselves in state custody through no fault of their own, often because of neglect or abuse.  The state has a compelling interest in protecting that group of children and young adults, considering that population's particular vulnerabilities and needs.

One aspect of the foster care population that the state must consider is the high proportion of LGBTQIA2S+ youth in the state's care.  Research indicates that, nationally, up to 30% or more of youth in foster care may identify as LGBTQIA2S+.  Chang Decl. at Exh. 2, *GAO Report* at 1; Chang Decl. at Exh. 6, U.S. Dep't of Health & Human Servs., Admin. for Children & Families, Children's Bureau, *Supporting LGBTQ+ Youth: A Guide for Foster Parents* at 5 (2021) (citing studies showing that 34.1 percent of youth in foster care in New York City, and 32 percent in Ohio's Cuyahoga County, identified as LGBTQIA2S+).  LGBTQIA2S+ youth in foster care are "more likely to be mistreated, experience more time in foster care, experience more placements in foster care, and less likely to be placed in 'family-based' settings." *Id.* at 6-7 (citations omitted).  They are also more likely to be at risk of homelessness.  Chang Decl. at Exh. 3, *HHS Info Memo* at 3.

Page 21 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Another fact that the state must consider is that there is no way to know or predict with certainty which children and young adults do or will identify as LGBTQIA2S+. Given the risk of rejection or mistreatment, not all LGBTQIA2S+ youth can be expected to identify as such to their families or friends, let alone to ODHS employees. *See* Chang Decl. at Exh. 6, *Supporting LGBTQ+ Youth* at 5 (noting that even the high percentages of LGBTQIA2S+ youth in foster care are "likely to be underreported because youth who come out often risk harassment and abuse"). Some youth, especially at young ages, might be unaware of or unable to articulate their own sexual orientation or gender identity. *See* Chang Decl. at Exh. 7, Caitlin Ryan et al., *Family Acceptance in Adolescence and the Health of LGBT Young Adults*, 23 J. Child & Adolescent Psychiatric Nursing 205, 212 (2010) (citing multiple studies observing that the average age of sexual or romantic attraction is about age 10); *cf.* Complaint, ECF #1 at ¶ 34 (explaining that Plaintiff desires to adopt children "who are younger than nine years old").

In short, for every child and young adult in foster care, there may be as high as one-in-three chance that that child is or will identify as LGBTQIA2S+. The state cannot know or predict which children those will be. Given those odds, the state's compelling interest in protecting the children in its care includes an interest in protecting *all* of those children from sources of harm that pose a particularly severe risk to LGBTQIA2S+ youth.

One such source of harm is parental rejection of the child's identity. A parent's refusal to accept a child's or young adult's SOGIE poses a significant risk of severe impacts on the child's or young adult's mental and physical health. As discussed above, research indicates that youth whose parents reject their SOGIE are more than eight times as likely to have attempted suicide, nearly six times as likely to report high levels of depression, more than three times as likely to use illegal drugs, and more than three times as likely to be at risk for sexually transmitted disease. Chang Decl. at Exh. 4, *Supportive Families, Healthy Children* at 5. The state has a compelling interest in protecting the children in its care from those harms.

Page 22 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

Further, research strongly indicates that the harms associated with parental rejection are present even if that rejection is motivated by the parent's religious beliefs. Whether or not a child's family is religious, lack of family acceptance of SOGIE is strongly linked with long-term harms to the child's health. Chang Decl. at Exh. 7, Ryan et al. at 208–09. The degree to which the child's family is religious or spiritual has been found to have no mitigating effect. *See id.* at 210 (study results showing that higher "childhood family religiosity" was not linked with improved health outcomes in young adulthood).

In other words, it does not matter *why* a parent rejects a child's SOGIE; the rejection itself causes severe harm. The state therefore has a compelling interest in protecting children against parental rejection regardless of the parent's motivations, religious or otherwise.

The state thus has a compelling interest in denying an exception to Plaintiff. *See Fulton*, 141 S.Ct. at 1881 (the government must have a compelling interest "in denying an exception" to the plaintiff). Plaintiff's refusal to respect, accept, and support a child's SOGIE poses a significant risk of severe harm to that child, regardless of the motivations for that refusal. If a child placed with Plaintiff were to be one of the youth in foster care who identify as LGBTQIA2S+, that child would suffer significantly increased risks of depression, drug abuse, and suicide. Crucially, ODHS would have no way of ensuring that any child placed with Plaintiff is *not* LGBTQIA2S+. Indeed, given that Plaintiff seeks to adopt children who are younger than nine years old, it is possible that those children would not yet be aware of their own sexual orientation or gender identity. ODHS would simply have to guess. The state would be blindly risking the future health of some of its most vulnerable children. The state has a compelling interest in avoiding that risk.

The state also has a compelling interest in not granting the broad exceptions that Plaintiff asks this court to impose in her requested preliminary injunction. Plaintiff asks this court to bar the state from enforcing the requirement that an applicant respect, accept, and support a child's SOGIE whenever that requirement would conflict with any applicant's SOGIE-related beliefs,

Page 23 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

religious or otherwise.  *See* Plaintiff's Motion for Preliminary Injunction, ECF #14 at 2

(requesting that the court enjoin Defendants from "[e]nforcing the rule to exclude any person at

any stage of the adoption process, because of their beliefs related to sexual orientation, gender

identity, or gender expression").  Such an exception would eviscerate the protection that the rule

provides.  It would allow any person to refuse to respect, accept, and support a child's SOGIE

whenever the person believes that they should not be required to do so.  Plaintiff attempts to

narrow the exception by adding that Defendants may "consider" an applicant's views on SOGIE

to evaluate individual placements.  Plaintiff's Motion for Preliminary Injunction ECF #14 at 2.

But the ability to "consider" the applicant's views would mean nothing if ODHS were barred

from excluding applicants, based on those views, "at *any stage* of the adoption process."  I*d.*

(emphasis added).  Moreover, by suggesting that ODHS "consider" a person's refusal to accept

SOGIE when evaluating a particular placement, she is in effect suggesting that ODHS could

simply ensure that any children placed with that person are not LGBTQIA2S+.  As noted above,

that is not possible. There is no way to tell which children will identify as LGBTQIA2S+ unless

the child self-identifies as LGBTQIA2S+.

  In summary, children's need to be respected, accepted, and supported for who they are is

not a hypothetical concern.  A parent's willingness to provide that respect, acceptance, and

support is not a mere ideological question.  It is a question of a child's mental and physical

health and survival.  Parental rejection of SOGIE poses real and significant risks, to which

children in foster care are particularly vulnerable.  The state has a parental responsibility to

protect those children.  The state's interest is compelling.

    **b.**  **The rule furthers the state's compelling interest by ensuring that children are not exposed to the significant, documented harms associated with parental rejection of a child's sexual orientation, gender identity, or gender expression.**

  OAR 413-200-0308(2)(k) requires that all applicants to become certified resource

families and potential adoptive resources "[r]espect, accept and support the * * * sexual

Page 24 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

orientation, gender identity and gender expression * * * of a child or young adult in the care or custody of the Department." To maintain certification, a person must continue to meet that requirement. OAR 413-200-0308(3). That requirement furthers the state's compelling interest in protecting the children in its care and custody from the severe harms that arise from parental rejection. Just as parental rejection of SOGIE is linked with higher rates of depression, drug abuse, suicidal thoughts, and suicide attempts, parental *acceptance* of SOGIE is linked with significantly decreased risks in all of those areas. Chang Decl. at Exh. 7, Ryan et al. at 208–09.

As explained above, the need for acceptance is particularly acute in the foster care population, given the disproportionately high number of LGBTQIA2S+ children and young adults in foster care and the heightened vulnerability of that group. Although some children and young adults will self-identify as LGBTQIA2S+ to ODHS, many will not. ODHS cannot know or predict in every instance which children will prove to be LGBTQIA2S+ and will therefore require placement with a family willing to respect, accept, and support their LGBTQIA2S+ identity. Accordingly, the rule aims to ensure that *all* certified resource families and adoptive families are willing and able to provide for that need.

Plaintiff argues that because the state does not *remove* children from families like hers, the state must agree that such homes are safe for children. Plaintiff's Motion for Preliminary Injunction, ECF # 14 at 32–33. But the question is not whether Plaintiff is capable of parenting children; the question is whether the state must entrust Plaintiff with the care of the children and young adults for whom the state itself acts as a parent, given what the state knows about the characteristics, needs, and vulnerabilities of that population. The rule is targeted at furthering the interests of *those* children and young adults, and at fulfilling the state's special constitutional duty to protect them.

Plaintiff further argues that children who are themselves religious must be placed in homes like hers, and that excluding Plaintiff from those placements "doesn't promote the State's interest *at all*." *Id.* at 33. But the state's foremost interest is the child's safety and welfare. If

Page 25 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

Plaintiff's conduct, religiously motivated or otherwise, will place the child at risk of harm, then denying Plaintiff's application will further the state's interest.

Plaintiff also argues that ODHS policy is inconsistent, because prospective parents can "prefer" a boy or a girl but cannot prefer a child based on gender identity. Plaintiff's Motion for Preliminary Injunction, ECF #14 at 35. But this case does not present a question of whether ODHS must accommodate Plaintiff's preference for a particular gender identity; Plaintiff repeatedly insists that she has no such preference. *See, e.g.*, *id.* at 26 ("Plaintiff is willing to take in any child regardless of race, culture, sexual orientation, or gender identity."). In any event, if Plaintiff were to have such a preference, ODHS would be unable to accommodate it, regardless of rules or policies. That is because of the simple fact that ODHS cannot predict or guarantee that any child placed with Plaintiff will never come out as LGBTQIA2S+. ODHS must therefore require that all applicants be willing to respect, accept, and support a child's or young adult's identity. The rule furthers the state's interest.

> ### c.    The rule is narrowly tailored to the needs of the children that ODHS serves.

OAR 413-200-0308(2)(k) is narrowly tailored to protect children who are wards of the state. The rule requires applicants to respect, accept, and support the SOGIE of "a child or young adult in the care or custody of the Department." The rule applies only to people who wish to foster or adopt children who are in ODHS care and custody. It does not require any other person to respect, accept, or support anyone else's SOGIE. The rule applies only to people who seek approval to act as caregiver to children for whom the state itself is the *de facto* parent. For that reason, the rule, like many other requirements that apply to resource parents and adoptive resources, goes beyond the legal requirements that apply to parents generally. By applying for approval to foster or adopt a child who is in the state's care, a person opens herself, her family, and her home to government involvement that would not otherwise apply. *See, e.g.*, OAR 413-200-0308 (listing required personal qualifications for all applicants); OAR 413-200-0388(1)

Page 26 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

(requiring certified resource family to "[a]llow on-going in-home visits, both scheduled and unscheduled, by Department staff"); OAR 413-200-0388(3) (requiring certified resource family to "[a]llow Department staff access to each room" in the residence). An applicant submits herself to such requirements voluntarily. The applicant has no fundamental right to care for children from ODHS custody and care. The children, on the other hand, have a fundamental right to state protection.

OAR 413-200-0308(2)(k) is tailored to provide that protection. The rule only concerns children and young adults who are "in the care or custody of the Department." The rule is tailored to the particular needs of that population, who have a deep need for respect, acceptance, and support, and who are disproportionately likely to be LGBTQIA2S+.

Granting the broad religious exemption suggested by Plaintiff would severely undermine the protection that the rule provides. Granting the even broader exemption sought by Plaintiff in her proposed preliminary injunction, which would allow *any* "beliefs related to sexual orientation, gender identity, or gender expression" to override the rule, would eviscerate the rule itself. *See* Plaintiff's Motion for Preliminary Injunction, ECF #14 at 2. Effectively, that exemption would allow anyone to reject a child's SOGIE whenever they believe that they should be allowed to do so. That rejection poses a real risk of harm to the child, regardless of the beliefs that motivate it.

Plaintiff asserts, on information and belief, that some private agencies in Oregon grant religious exemptions to the rule. *Id.* at 36; Complaint, ECF #1 at ¶ 249. But the adoptions to which Plaintiff refers are *independent* adoptions, which are subject to a distinct set of rules. *See id.* at ¶¶ 247–48 (citing OAR 413-140-0035(2)–(3)); OAR 413-140-0035 (listing requirements for an "adoption home study"); OAR 413-140-0010(1) (defining "adoption home study" for the purposes of OAR Chapter 413, Division 140, "Independent Adoptions"); *cf.* OAR 413-200-0260(26) (defining "home study" for the purposes of OAR Chapter 413, Division 200, "Foster Home Certification"). Independent adoptions do not involve the particularly vulnerable children

Page 27 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

who are in the state's care and custody.  OAR 413-200-0308(2)(k), by its terms, applies only to those children.

Plaintiff suggests that the rule could instead require that an applicant merely "be sensitive" to a child's SOGIE, without having to respect, accept, or support it.  Plaintiff's Motion for Preliminary Injunction, ECF #14 at 36.  Plaintiff does not explain what that means.  But if it means that an applicant may, for example, deny a child's gender identity, then that would risk the harms to the child's health associated with rejection of a child's SOGIE.  *See* Complaint, ECF #1 at ¶ 137 (explaining that Plaintiff will refuse to "affirm[] that a child *is* transgender").

Plaintiff further suggests that the state could "address[] LGBTQ+ concerns" when evaluating a particular placement.  *Id.* at 37.  In other words, Plaintiff is asking that ODHS pair her with children who are not LGBTQIA2S+.  Plaintiff herself argues that some very young children "cannot express an LGBT identity at all."  Plaintiff's Motion for Preliminary Injunction, ECF #14 at 38.  But she asks that ODHS select young children for her, and for similarly situated applicants, based on a blind guess that each particular child is straight and cisgender.  ODHS cannot do that, and it will not take that risk.

Nor can ODHS "address the issue at a later, more appropriate age."  *See id.* at 37 (quoting *Blais v. Hunter*, 493 F.Supp.3d 984, 1000 (E.D. Wash. 2020)).  Plaintiff does not explain what "address[ing] the issue" would mean.  She draws that language from a district court opinion that was discussing foster care, not adoption.  That opinion suggested that a state agency "rely on caseworkers to carry out medical decisions that the [foster parents] cannot support for religious reasons," or, if necessary, simply "change placements."  *Id.*  Neither of those options would be a possibility after a person *adopts* a child, as Plaintiff seeks to do.  And even in foster care, neither of those options would effectively "address the issue."  The "issue" would be the resource parent's refusal to accept the child as they are.  ODHS involvement in medical decisions would not solve that problem; it would not provide the parental respect, acceptance, and support that the child needs and that the rule guarantees.  Indeed, the need for state intervention would worsen

Page 28 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

the sting of the parent's rejection, confirming the child's perception that the child is not supported in their own home. The problem would be compounded even further if ODHS were to "change placements"—that is, remove the child from the home. Removal would confirm a child's fears that they do not belong in the home. It would worsen the harms of rejection that the rule seeks to prevent, and it would further expose the child to the harms caused by depriving children of permanency and stability—harms to which LGBTQIA2S+ youth are already especially susceptible. *See* Chang Decl. at Exh. 2, *GAO Report* at 6–7 (LGBTQIA2S+ youth overrepresented among youth in unstable housing and more likely to experience a greater number of placements in foster care). And more fundamentally, there is *no* "appropriate age" for *any* child, LGBTQIA2S+ or otherwise, to be removed from their home because their caregiver will not accept who the child is. Such an outcome is precisely what the rule is designed to avoid.

In summary, the rule applies only to people who wish to care for children who are in the state's care and custody, and it is tailored to the need to protect those children. The broad exceptions requested by Plaintiff would severely weaken that protection. The alternatives that Plaintiff proposes either are impossible or would worsen the problems that the rule is designed to remedy. ODHS serves a youth population that is disproportionately LGBTQIA2S+ and is particularly susceptible to the real physical and mental harms that result from a parent's rejection of a child's identity. The state, as *de facto* parent, must protect those children. Requiring that all caregivers for those children be willing to respect, accept, and support the children's identities, including SOGIE, is the least restrictive means of providing that vital protection. The rule is narrowly tailored to further the state's compelling interest.

### 3.    The rule is not overbroad.

For the same reasons that Plaintiff argues that the rule is not narrowly tailored, Plaintiff also argues that the rule is overbroad. Plaintiff's Motion for Preliminary Injunction, ECF #14 at 37–39. For the same reasons, Plaintiff's overbreadth argument fails. "Invalidation for overbreadth is strong medicine that is not to be casually employed." *United States v. Williams*,

Page 29 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

553 U.S. 285, 293 (2008) (internal quotation marks omitted). A court may invalidate a law for overbreadth only if the overbreadth is "*substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* at 292. As explained above, OAR 413-200-0308(2)(k) is narrowly tailored to protect the children who are in the state's care and custody. To the extent that protection impacts the potential speech or religious exercise of persons who apply to care for those children, those impacts are not *any* more broad than necessary to further the legitimate and compelling interest in the children's health and survival. Accordingly, the rule is not *substantially* overbroad relative to its plainly legitimate sweep.

**B.     Plaintiff is unlikely to suffer irreparable harm in the absence of preliminary relief.**

Plaintiff cannot establish that she will suffer irreparable harm in the absence of a preliminary injunction. Plaintiff relies solely on the alleged unconstitutionality of the rule to establish irreparable harm. However, "the mere assertion of First Amendment rights does not automatically require a finding of irreparable injury." *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). Instead, "[i]t is the 'purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for preliminary injunction purposes.'" *Id.* (quoting *Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984)). As discussed above, ODHS's rule does not constitute "purposeful unconstitutional suppression of speech" or even unconstitutional speech. Plaintiff's reliance only on the supposed unconstitutional infringement on her First Amendment rights does not establish irreparable harm.

In contrast, irreparable harm is likely to result from the injunction requested by Plaintiff, which would force ODHS to place children with resource families who refuse to support a child's SOGIE. As discussed above, the harms associated with that type of rejection can be significant and irreparably harm the child for their entire life; ODHS's rule is designed to try to prevent that rejection. Barring the application of the rule would inflict irreparable harm on children in ODHS's care.

Page 30 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

C.    **The balance of equities weighs against an injunction, because of the likely harm to the children whom the rule protects.**

Given the likelihood, severity, and long-lasting nature of the harm to LGBTQIA2S+ children and young adults placed with resource families that refuse to support, accept and respect their SOGIE, if an injunction were allowed—and given the lack of any irreparable harm to Plaintiff with the rule in place—the balance of the equities and public interest greatly weigh in favor of denying Plaintiff's request for a preliminary injunction.

V.    **CONCLUSION**

ODHS has a heavy responsibility to protect the children in its care and custody. As discussed above, many of these children already come from vulnerable backgrounds and have experienced traumas that most adults have not. When ODHS takes custody of a child, the biological parent(s) no longer have the right or ability to make decisions regarding what is in the best interests of the child. Instead, ODHS steps into the role of parent, and in that role the agency seeks to provide respectful, affirming, supportive care for each and every child in its care. Given the overrepresentation of LGBTQIA2S+ youth in foster care and the very real mental, physical, and emotional harm that can result in placing them in a home that will not support and respect them as they are, ODHS has promulgated rules that require all resource parents and adoptive resources to respect, accept, and support, among a host of other things, the SOGIE of a child or young adult experiencing foster care.

OAR 413-200-0308(2)(k) does not impermissibly infringe on Plaintiff's right to free speech or exercise of her religion. Even if strict scrutiny applied to the rule, which it doesn't, ODHS's compelling interest in protecting extremely vulnerable youth and the narrow manner in which the rule is fashioned passes constitutional muster. Plaintiff is unlikely to prevail on the merits of her claim. Moreover, Plaintiff cannot establish that she will be irreparably harmed by not being able to act as a resource parent or adoptive parent until this case proceeds through trial. The harm to any potential LGBTQIA2S+ child that may be placed with her could very well be irreparable. Finally, the equities and public interest in protecting at-risk youth in the custody and

Page 31 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

care of ODHS far outweigh any potential harm Plaintiff may experience between now and when the case is resolved on the merits.  Plaintiff's motion for a preliminary injunction should be denied.

DATED June <u>1</u>, 2023.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General


<u>    s/ Deanna Chang    </u>
DEANNA CHANG #192202
Senior Assistant Attorney General
ALEX C. JONES #213898
Assistant Attorney General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Deanna.J.Chang@doj.state.or.us
Alex.Jones@doj.state.or.us
Of Attorneys for Defendants

DC4/sv3/784806409

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000