IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JESSICA BATES,<br><br>    Plaintiff,<br><br> v.<br><br>DIRECTOR FARIBORZ PAKSERESHT,<br>DEPUTY DIRECTOR LIESL WENDT,<br>APRILLE FLINT-GERNER, REBECCA<br>GARRISON, and CECILIA GARCIA,<br><br>    Defendants. | Case No.: 2:23-cv-00474-AN<br><br><br>OPINION AND ORDER |

Plaintiff Jessica Bates brings this action against defendants Director Fariborz Pakseresht, Deputy Director Liesl Wendt, Aprille Flint-Gerner, Rebecca Garrison, and Cecilia Garcia (collectively, the "government"), alleging (1) violations of her First Amendment rights to freedom of speech, association, and assembly, (2) violation of her First Amendment right to free exercise of religion; and (3) violation of the Equal Protection Clause of the Fourteenth Amendment. On April 18, 2023, plaintiff filed a Motion for Preliminary Injunction. Oral argument was held on August 16, 2023. For the foregoing reasons, plaintiff's motion is DENIED.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the plaintiff must show that (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the favor of the plaintiff; and (4) an injunction is in the public interest. *Id.* at 20. "The first factor . . . is the most important," *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015), and if there are "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff," as well as a showing that the plaintiff will suffer irreparable harm and the injunction is in the public interest, then a preliminary injunction may still issue, *All. For The Wild Rockies*

*v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation marks omitted). "[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (internal quotation marks omitted).

"Irreparable harm is relatively easy to establish in a First Amendment case." *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). The Ninth Circuit has suggested that a plaintiff who brings a colorable First Amendment claim has necessarily shown that the remaining preliminary injunction factors also favor an injunction. *See Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 757-58 (9th Cir. 2019) (holding that colorable First Amendment claim compelled finding of irreparable harm and that balance of hardships and public interest tipped in plaintiff's favor); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (Internal quotation marks omitted.)).

However, "the mere assertion of First Amendment rights does not automatically require a finding of irreparable injury." *CTIA*, 928 F.3d at 851 (holding that plaintiff did not establish irreparable injury because ordinance in question complied with First Amendment). Rather, "[i]t is the 'purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for preliminary injunction purposes.'" *Id.* (second alteration in original) (quoting *Goldie's Bookstore, Inc. v. Superior Ct. of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984)).

## BACKGROUND

Plaintiff is a single mother of five children whose ages range between ten and seventeen years old. Compl., ECF [1], ¶ 20. Plaintiff became a single parent after her husband died in a car crash in January 2017. *Id.* ¶ 2. Plaintiff identifies with the Christian faith and regularly attends a nondenominational church with her family. *Id.* ¶¶ 18-19. After listening to a Christian radio broadcast about a man who had adopted a child from foster care, plaintiff felt called to adopt a child from foster care. *Id.* ¶¶ 29-33. Because

plaintiff's youngest biological child is ten years old, plaintiff wanted to adopt a sibling pair who were younger than ten years old. *Id.* ¶¶ 34-35. At the end of March 2022, plaintiff began the application process to become certified to adopt a child from Oregon's foster care system.[1] *Id.* ¶ 39.

As part of the application process, plaintiff submitted an application to the Oregon Department of Human Services ("ODHS") for a "Home Study," which is "a document containing an analysis of the ability of the applicant to provide safe and appropriate care of a child or young adult" in the care and custody of the state, Or. Admin. R. ("OAR") § 413-200-0260(25), and which must be approved by an ODHS employee,"[2] *id.* § 413-200-0274(1)(q). The Home Study includes interviews and a home inspection, with a goal of evaluating the applicant's ability to "meet the minimum standards for adoptive homes," rather than the applicant's suitability for a specific child. *Id.* § 413-120-0000(40). Approved applicants then wait for a match, which is facilitated by ODHS via a holistic assessment of the prospective parent's "knowledge, skills, and ability to meet, without agency oversight, the current and lifelong needs of the child." *Id.* § 413-120-0246(1)(b).

Under ODHS's administrative rules, "[a]pplicants have the burden of proving they possess the required qualifications to be approved as a certified resource family or as a potential adoptive resource." *Id.* § 413-200-0308(1). Approved adoptive resources must show that they can care for a child's "[p]hysical and emotional safety and well-being[,]" help the child develop and maintain familial ties, provide "[a]ppropriate social, educational, developmental, emotional, and physical support" and "[s]tability and permanency[,]" and maintain the child's "identity, cultural, religious, and spiritual heritage." OAR § 413-

---

[1] There are several avenues to adoption in the state of Oregon. The method that plaintiff chose involves adoption of a child in the care or custody of the state. Plaintiff applied to be an adoptive resource, defined as "an individual or individuals selected by [ODHS], another public child welfare agency, or a licensed adoption agency as the adoptive family for a child." OAR § 413-200-0260(1). The application to become an adoptive resource is the same as the process to become a certified resource family, defined as "an individual or individuals who hold a current Certificate of Approval from [ODHS] to operate a home to provide care, in the home in which the individual or individuals reside, to a child or young adult in the care or custody of [ODHS]." *Id.* § 413-200-0260(6).

[2] Plaintiff chose to seek approval from the state rather than through a private agency because it was allegedly unclear which private agencies would work with a Christian applicant and they are usually more expensive, and because plaintiff lives in a rural part of eastern Oregon without private agencies nearby. Pl.'s Mot. for Prelim. Inj., ECF [14, at 12-13.

120-0246(1)(b)(A)-(B), (D), (F)-(G).  Further, ODHS's requires that all applicants "[r]espect, accept and support the race, ethnicity, cultural identities, national origin, immigration status, sexual orientation, gender identity, gender expression, disabilities, spiritual beliefs, and socioeconomic status, of a child or young adult in the care or custody of [ODHS], and provide opportunities to enhance the positive self-concept and understanding of the child or young adult's heritage[.]"  *Id.* § 413-200-0308(2)(k).

Plaintiff attended a Resource and Adoptive Family Training ("RAFT") as part of the Home Study application process, where she learned that supporting a child's sexual orientation, gender identity, or gender expression meant that parents should use a child's preferred pronouns and affirm a child's gender identity.  Decl. of Jessica Bates ("Bates Decl."), ECF [15], ¶¶ 39-40.  The instructor also provided examples of supporting a child's LGBTQ+ identities, such as allowing the child to dress consistent with their gender expression and taking the child to LGBTQ-affirming events like gay-pride parades.  *Id.*  Training materials included additional examples of support, such as displaying a rainbow flag, "pink triangle," or other "symbols indicating an LGBTQ-affirming environment"; supporting a child's "self-expression" via clothes, jewelry, and room decorations; and not forcing children "to attend activities (including religious activities . . .) that are openly hostile or unsupportive of people with diverse" LGBTQ+ identities.  *Id.*, Ex. 3, at 14, 25, 26.

Plaintiff attests that she is "open to receiving any child regardless of the child's race, nationality, ethnicity, cultural identity, spiritual beliefs, or sexual orientation, gender identity, or gender expression."  *Id.* ¶ 23.  However, plaintiff alleges that her religious beliefs conflict with ODHS's policy because she believes that the "Bible accurately describes the differences between men and women," that "our souls are united with our physical bodies," that "a person's God-given sex has spiritual significance," and that people "should not seek to change their sex or engage in any behavior or speech to suggest a male can be a female, or vice-versa."  *Id.* ¶¶ 49-51, 54.  Therefore, plaintiff states that her beliefs dictate that she does not use a child's preferred pronouns, display a Pride flag or "pink triangle" in her home, affirm a child's desire to express themselves or dress as the opposite sex, take a child to a gay-pride parade, or facilitate the child's access to puberty blockers or cross-sex hormones.  *Id.* ¶¶ 113-17, 156-57.  Further, plaintiff states

that her beliefs dictate that she raise her children in the Christian faith, share the Gospel with her family, including her beliefs about biblical manhood and womanhood, lead Bible study in her home, and attend church with her children as a family. *Id.* ¶¶ 72-81, 85, 88-89.

On August 9, 2022, plaintiff notified ODHS employee Cecilia Garcia ("Garcia") of her potential conflict, explaining that she had "no problem loving [children] and accepting them as they are," but that she "would not encourage them in [sexual orientation, gender identity, and gender expression] behavior" because her "faith conflicts with this." *Id.*, Ex. 1. When plaintiff did not receive a response from Garcia, plaintiff sent a second email one month later. Compl. ¶¶ 172-73. Several weeks later, Garcia and plaintiff spoke on the telephone and Garcia informed plaintiff that she was ineligible to adopt because of her "objections to affirming a child's transgender identity." Bates Decl. ¶¶ 154-55. During the conversation, Garcia asked plaintiff "how [she] would respond if [ODHS] hypothetically asked [her] to take a child to receive hormone shots as part of a child's 'gender transition.'" *Id.* ¶ 156. Plaintiff stated that she would not take the child and added that she "thought that it was child abuse to administer these types of pharmaceutical interventions to a young child." *Id.* ¶ 157.

On November 22, 2022, plaintiff received an official denial letter from ODHS which cited plaintiff's failure to demonstrate compliance with Oregon Administrative Rule ("OAR") § 413-200-0308(2)(k) as the basis for her denial. In part, the letter acknowledged that plaintiff "would love and treat [the children] as [her] own but would not support their lifestyle or encourage any behavior related to their sexual orientation or gender identity or expression." *Id.*, Ex. 2, at 2. Further, the letter stated, "When asked what it would look like if the agency requested you to take the child or youth to medical appointments regarding hormone shot appointments as an example, you indicated you would not take them to the appointment and further indicated you think it 'would be considered child abuse.'" *Id.*

Plaintiff filed the present complaint on April 3, 2023, and the Motion for Preliminary Injunction on April 18, 2023. The state of Idaho filed an amicus brief in support of plaintiff's motion on May 26, 2023. Oral argument was held on August 16, 2023.

## DISCUSSION

Plaintiff is challenging OAR § 413-200-0308(2)(k) (the "Rule"), which states:

"Applicants must, as determined by [ODHS] pursuant to OAR 413-200-0274 to OAR 413-200-0298:
. . . . .
"Respect, accept and support the race, ethnicity, cultural identities, national origin, immigration status, sexual orientation, gender identity, gender expression, disabilities, spiritual beliefs, and socioeconomic status, of a child or young adult in the care or custody of [ODHS], and provide opportunities to enhance the positive self-concept and understanding of the child or young adult's heritage[.]"

## A.    Likelihood of Success on the Merits

### 1.    *Freedom of Religion Claim*

Plaintiff brings a Free Exercise Clause claim under the First Amendment to the United States Constitution, arguing that the Rule substantially burdens her sincere religious exercise. A plaintiff may demonstrate a free exercise violation in one of two ways. First, by "showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022). Second, by showing that the government has infringed on the traditional "scope of that right." *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2022) (discussing how history of constitutional right can inform whether law infringes on that right). When a government regulation or policy is either not neutral or not generally applicable, strict scrutiny applies. *Kennedy*, 142 S. Ct. at 2422. However, a neutral and generally applicable regulation or policy that imposes only an incidental burden on an individual's freedom of religion is subject to rational basis review. *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878 (1990), *partially superseded by statute as recognized in Ramirez v. Collier*, 595 U.S. 411 (2022); *see Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075-76 (9th Cir. 2015) (noting that neutral law of general application "need only survive rational basis review").

### a.    Neutrality

A government "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). "[I]f the object of a law is to infringe upon or restrict practices because of their religious

motivation, the law is not neutral[.]" *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). As a threshold matter, the law must not discriminate on its face. *Id.* A law "lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.*

Here, the Rule is facially neutral, as it makes no reference to any specific religious practice, nor does it implicate religion on its face. Although plaintiff argues that by referencing "spiritual beliefs," the Rule is not facially neutral, that argument is not well-taken. In the context of the Rule itself, it is not referring to a mandate that an applicant adhere to or practice a certain religion, nor does it mandate that an applicant cease exercising certain religious practices. *See id.* at 534 (noting that potentially religious term did not refer to "religious practices"). The Rule merely requires applicants to respect, accept, and support a *child's* spiritual beliefs. On its face, the Rule does not "infringe upon or restrict practices because of their religious motivation." *Id.* at 533.

However, "[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for government neutrality if it unduly burdens the free exercise of religion." *Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972). Such a burden may be established if "the object or purpose of a law is the suppression of religion or religious conduct." *Lukumi*, 508 U.S. at 533. Therefore, the Court turns to "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (internal quotation marks omitted).

Plaintiff likens her case to *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, arguing that the government is treating her inconsistently with other applicants on the basis of her religious beliefs. In that case, a Christian shop owner operating a bakery in Colorado believed that "God's intention for marriage from the beginning of history is that it is and should be the union of one man and one woman." *Id.* at 1724. The owner refused to make a wedding cake for a gay couple when requested, although he informed them that he would make "birthday cakes, shower cakes, . . . [or] cookies and

brownies." *Id.* At the time, Colorado did not recognize same-sex marriages. *Id.*

    Colorado had a public accommodation statute in place that prohibited discrimination on the basis of sexual orientation, as well as other protected characteristics. *Id.* at 1725. Discrimination claims were assessed through an administrative system where the Colorado Civil Rights Division investigated the claim and referred it to the Colorado Civil Rights Commission (the "Commission") if it determined that there was probable cause that the statute was violated. *Id.* The Commission would then initiate a formal hearing before a state administrative law judge ("ALJ") who would issue a written decision. *Id.* That decision could be appealed to the full Commission, which would hold a public hearing before voting on the case. *Id.* The gay couple filed a discrimination claim, and the Commission ultimately affirmed the ALJ's decision that found in favor of the gay couple, despite the owner's constitutional claims. *Id.* at 1725-26. Although the owner appealed to the Colorado Court of Appeals, it too affirmed the Commission's decision. *Id.*

    However, the U.S. Supreme Court reversed, finding that the statute, as applied to the owner, unconstitutionally infringed upon his right to religious freedom because it was not neutrally applied. *Id.* at 1729. In relevant part, the Court highlighted the Commission's "clear and impermissible hostility toward the sincere religious beliefs that motivated [the owner's] objection." *Id.* The Court highlighted numerous statements by the Commission members that demonstrated a hostility to the owner's sincere religious beliefs, which the Court determined "cast doubt on the fairness and impartiality of the Commission's adjudication of [owner's] case." *Id.* at 1729-30. Further, the Court noted the difference in treatment between the owner's case and other bakers who objected to making requested cakes on the basis of conscience. *Id.* at 1730. While the other bakers prevailed, the difference that the Court identified in the cases was that the bakers had refused to create cakes that conveyed "disapproval of same-sex marriage, along with religious text." *Id.* Although the Commission distinguished those cases by stating that the bakeries "refuse[d] the patron's request . . . because of the offensive nature of the requested message," the Court held that "[a] principled rationale for the difference in treatment of these two instances cannot be based on the government's own assessment of offensiveness." *Id.* at 1731 (first alteration in original).

Turning back to the case before this Court, plaintiff argues that the Rule is not neutral as applied to her because she is "willing to take in any child regardless of race, culture, sexual orientation, or gender identity." Pl.'s Mot. for Prelim. Inj. ("Pl.'s Mot."), ECF [14], at 26. It appears that plaintiff is arguing that her willingness to take in any child, but her inability to encourage or respect a child's LGBTQ+ identities, is analogous to the baker's willingness to make some baked goods for gay couples, but not wedding cakes. Such an analogy holds no weight.

A vital difference between *Masterpiece Cakeshop* and this case is that plaintiff is not a business owner providing services to the public; she is seeking certification for a position that would imbue her with a responsibility to care for members of an exceptionally vulnerable population. A willingness to take in an LGBTQ+ child, but disavow their identity, cannot by analogy be compared to a business owner's willingness to provide some services, but not others, to LGBTQ+ individuals. To make such a claim demonstrates a lack of understanding of the importance of providing a child with the holistic support and care required to produce well-rounded and confident adults.

Further, while a refusal to make a wedding cake for an LGBTQ+ couple will likely cause the couple the type of psychological harm that commonly stems from discrimination, refusal to, at the very least, respect a child's LGBTQ+ identity imposes collateral harm on the child's development, safety, and physical well-being.[3] In short, this Court questions whether plaintiff's willingness to "love and support" a

---

[3] In the *2022 National Survey on LGBTQ Youth Mental Health*, a survey of approximately 34,000 LGBTQ youth aged 13-24 was conducted. *2022 National Survey on LGBTQ Youth Mental Health*, TREVOR PROJECT (2022), https://www.thetrevorproject.org/survey-2022/assets/static/trevor01_2022survey_final.pdf. In part, the survey showed that forty-five percent of respondents seriously considered suicide in 2021 and fourteen percent attempted suicide in 2021. *Id.* at 5. Seventy-three percent of respondents reported symptoms of anxiety and fifty-eight percent of respondents indicated symptoms of depression. *Id.* at 8. Further, symptoms of anxiety and consideration of suicide have increased each year since 2020. *Id.* at 10. Although eighty-two percent of respondents indicated they wanted access to mental health care, sixty percent were unable to get it, of which forty-five percent listed "[c]oncerns with obtaining parent/caregiver permission" as a cause. *Id.* at 11-12. Notably, respondents who lived "in a community that is accepting of LGBTQ people" reported lower rates of attempting suicide compared to those who did not, at thirty-seven percent and fifty-five percent respectively. *Id.* at 20. Further, respondents who felt supported by their parents or caregivers reported lower rates of attempted suicide, with sixteen percent of respondents who attempted suicide reporting low to moderate support from parents or caregivers while only six percent of respondents who attempted suicide reported high support from parents or caregivers. *Id.* at 23.

child is sufficient to ensure that the child will *feel* loved and supported.[4]  That is, after all, the aim of the Rule, as underscored by the numerous ODHS policies promoting the health, safety, and welfare of all children in ODHS custody.  *See, e.g.*, Or. Rev. Stat. § 418.046(3)(f)(C) (permitting Child Welfare Equity Advisory Committee to provide "recommendations for changes to policies, procedures, administrative rules or legislation to ensure that the commission and the department are effectively serving . . . [l]esbian, gay, bisexual, transgender, queer and other minority gender identity communities"); *id.* § 413-200-0335(1)(b)(A) (requiring ODHS to "consider [a child's] age, gender, gender expression, and gender identity . . . when determining appropriate sleeping arrangements"); *id.* § 413-200-0352(1)(d) (requiring that certified resource families provide "adequate clothing that is age-appropriate and meets the cultural and gender identity and gender expression of the child or young adult").  None of these regulations, nor ODHS's behavior and decisions, implicate a hostility toward plaintiff's religious beliefs; rather, they are focused on the welfare of the child.

Plaintiff also argues that the Rule is not neutral because the government "respects secular reasons for avoiding certain conduct" but not religious reasons, and therefore does not require all applicants to be willing to respect, accept, and support characteristics like a child's cultural or religious identity.  The government rebuts this argument, asserting that the Rule addresses "a social harm" that is "a legitimate concern of government for reasons quite apart from discrimination."  Govt.'s Resp. in Opp. to Mot. for Prelim. Inj. ("Govt.'s Resp."), ECF [25], at 12 (quoting *Lukumi*, 508 U.S. at 535).  That is, the government argues that the Rule is designed to address the severe harm that LGBTQ+ children in foster care face when they lack necessary parental support.

Plaintiff's hypothetical example of differential treatment suffers from obvious deficiencies.  She argues that "[a] Muslim family that prays five times a day facing the qibla may not be able to 'support' a child's desire to pray the Rosary."  Pl.'s Reply in Support of Mot. for Prelim. Inj. ("Pl.'s Reply"), ECF

---

[4] The survey noted above also identified the five most common ways that LGTBQ+ youth reported feeling supported by their parents or caregivers as (1) welcoming their LGBTQ+ friends or partners; (2) talking with them respectfully about their LGBTQ+ identity; (3) using their name and pronouns correctly; (4) supporting their gender expression; and (5) educating themselves about LGBTQ+ people and issues.  *Id.* at 23.

[32], at 11.  However, this takes too narrow an interpretation of the word "support."  Although a Muslim family may not share a Catholic child's beliefs, it could support that child's beliefs by ensuring that they have access to a rosary and space to conduct such a prayer, if the child so chooses.  If, however, a Muslim family stated that it would restrict a child's access to a rosary or forbid the child from engaging in Catholic prayers and force the child to engage in Islamic prayer, the object of the Rule would be contravened.[5]  In the same manner, the Rule does not bar plaintiff from attending church and teaching her biological children about the Bible; however, it does not permit plaintiff to force a child in the care and custody of the state to attend church or listen to Bible readings if those acts do not support a child's LGBTQ+ identity.  In essence, what plaintiff has identified is not differential treatment of "conscious-based objections," but rather similar treatment of objections that would harm the children under state care.  Plaintiff's belief that the government is "inferring that [she is] hostile to children with certain characteristics" is contradicted by the purpose and application of the Rule.  The question posed by the Rule is not whether plaintiff would be hostile to children with certain characteristics; it is whether she would be able to properly care and support children with certain characteristics.  The government's assessment of that ability may incidentally impact plaintiff's religious beliefs, but it is not driven by plaintiff's religious beliefs.

Plaintiff also argues that the government's accommodation for applicants who decline to take children with "sexual behaviors," defined apparently as "inappropriate sexual activity," "elevates one view of what is offensive over another." *Masterpiece*, 138 S. Ct. at 1731.  That is, in plaintiff's view, the government is condoning applicant preferences not to take in children with "sexual behaviors," yet penalizing her because she would not take or permit her children to attend Pride parades because she perceives them as sexually inappropriate.  Plaintiff argues that her choice is a religious view about sexually inappropriate behavior that the government punishes her for because the government only accommodates applicants that share its view on what is "inappropriate."

Plaintiff does not identify the specific regulation or policy that permits an accommodation

---

[5] Inapposite to the Rule itself, such a scenario would also implicate the child's right to free exercise of religion, in which case the government would be obligated to protect the child's constitutional rights.

for applicants who decline to take children with inappropriate sexual behavior. For that reason alone, this argument lacks weight. Without reference to the policy that permits such accommodations, this Court cannot adequately assess the context and objective of the policy.

Finally, plaintiff relies heavily on *Blais v. Hunter*, a recent case from the Eastern District of Washington. 493 F. Supp. 3d 984 (E.D. Wash. 2020). In *Blais*, the plaintiffs were a couple who sought to foster, and eventually adopt, their great-granddaughter who was in the care of the Idaho Department of Health and Welfare ("IDHW"). *Id.* at 989. The plaintiffs were Seventh-day Adventists who were denied a foster care license following a home study based on their answers to a series of hypothetical questions involving a foster child who might, in the future, develop or identify as LGBTQ+. *Id.* at 989-91. In their responses, the plaintiffs stated that their faith obliged them "to love and support all people," but that they could not support hormone therapy treatment. *Id.* at 990. However, they affirmed that, if their great-granddaughter developed gender dysphoria, they "would provide her with loving, medically and therapeutically appropriate care that is consistent with both then-accepted medical principles and [their] beliefs as Seventh-day Adventists and Christians." *Id.* When the plaintiffs' foster care license application was denied, the plaintiffs sued and sought a preliminary and permanent injunction, alleging that IDHW's regulations and policies violated their right to freely exercise their religion. *Id.* at 992.

The district court examined the various bases for the state's denial of the plaintiffs' application and found that there was "no evidence the Department promulgated these regulations with discriminatory intent." *Id.* at 996. However, the court found that the regulations and policies, in practice, burdened "potential caregivers with sincere religious beliefs yet almost no others" in part because "[f]or the most part, the only foster care applicants who might object to supporting certain issues LGBTQ+ children might face will likely do so on religious grounds." *Id.* Further, the court found that IDHW's interpretation of its regulations and policies favored certain secular viewpoints over certain religious viewpoints by favoring "religious and non-religious applicants who have neutral or pro-LGBTQ+ views over religious and non-religious applicants who have non-neutral or anti-LGBTQ+ views." *Id.* Finally, the court found that the policy operated to bar more religious conduct than necessary to achieve its stated ends because

alternatives were available, such as "address[ing] the issue at a later, more appropriate age" or "rely[ing] on caseworkers to carry out medical decisions that the [plaintiffs] [could not] support for religious reasons," or "chang[ing] placements in the rare situation where the [plaintiffs] might be unable, consistent with the religious beliefs, to carry out the Department's decisions with respect to a particular child." *Id.* at 996-97. In sum, the court found that the policies and regulations were not neutral in their effect because they "disproportionately exclude[d] persons who observe certain religious faiths from qualifying as foster parents based solely on speculative future conduct." *Id.* at 998.

        *Blais* shares similarities with the case before this Court; however, the decision of a fellow district court is not binding on this Court. Notably, the Washington district court provided no reference or support for its proposition that "the only foster care applicants who might object to supporting certain issues LGBTQ+ children might face will likely do so on religious grounds." That assertion presupposes that the primary reason a foster care applicant may disagree with or oppose the LGBTQ+ community is the applicant's religious beliefs. However, that presupposition is not necessarily accurate. There are a number of reasons why an individual may not support LGBTQ+ identities, religious or not. While a deep dive into the various rhetoric fueling anti-LGBTQ+ missions need not obtain a platform here, suffice to say that rationale has included (1) that the LGBTQ+ community cultivates sexual predators, (2) that LGBTQ+ identities are manifestations of mental disorders, and (3) that LGBTQ+ individuals are "abnormal."[6] None of these rationales are innately rooted in religious beliefs, yet people believe them all the same. The more specific issue of gender-affirming care has attracted numerous opponents, not all of whom disagree on

---

[6] *See* Kat Tenbarge, *LGBTQ People Face 'Groomer' Accusations and Trolling as Culture War Rages On*, NBC NEWS (Apr. 10, 2022), https://www.nbcnews.com/tech/internet/lgbtq-abuse-spikes-online-fueled-intensifying-culture-war-rcna24904 (discussing long history of accusations that LGBTQ+ individuals are pedophiles, child abusers, or groomers); *Being LGBTQ Was Long Considered a "Mental Disorder,"* FOUNTAIN HOUSE (June 23, 2022), https://www.fountainhouse.org/news/being-lgbtq-was-long-considered-a-mental-disorder (noting that homosexuality was not removed from the Diagnostic and Statistical Manual of Mental Disorders until 1973); Matt Lavietes, *Texas GOP's New Platform Calls Gay People 'Abnormal'; and Rejects Trans Identities*, NBC NEWS (June 21, 2022, 10:30 a.m.), https://www.nbcnews.com/nbc-out/out-politics-and-policy/texas-gops-new-platform-calls-gay-people-abnormal-rejects-trans-identi-rcna34530 (discussing Texas Republican Party's platform which stated that "[h]omosexuality is an abnormal lifestyle choice").

religious grounds.[7]

The LGBTQ+ community has existed in controversy for reasons that expand well beyond religion, even if this basis is the one most frequently discussed. Any time a movement or identity counters the norm, there will be dissenters who oppose that change. It is a part of the human condition to cling to the traditions and beliefs upon which we are raised, and anti-LGBTQ+ rhetoric is no different in that regard. For many individuals, the LGBTQ+ community challenges their understanding of what is "normal" and what is "right," but the basis of those understandings is not inherently tied to religion. In short, plaintiff has provided no evidence or support for the idea that the bulk of foster care applicants who would object to issues that LGBTQ+ children face would do so on religious grounds, and this Court is not convinced that that assertion is entirely accurate.

Although the court in *Blais* determined that Washington's interpretation of its regulations and policies favored certain secular viewpoints over certain religious viewpoints, this Court again is unconvinced. Prioritizing applicants who will respect and affirm an LGBTQ+ child's identity is not, in and of itself, an endorsement of a secular viewpoint because, as the court in Washington acknowledged, religious applicants may also have neutral or pro-LGBTQ+ views. Further, as discussed above, religious beliefs are not the only basis for anti-LGBTQ+ views, which the court in Washington, again, acknowledged. Thus, it is difficult to parse how the government would be endorsing a secular viewpoint over a religious viewpoint when its application of the Rule could reasonably certify a religious individual as a resource parent or adoptive resource if the applicant believed that their religion encouraged them to accept LGBTQ+ identities.[8]

This distinction is illuminated, in part, by *Lukumi*. In that case, the Supreme Court held

---

[7] *See* Chad Terhune, Robin Respaut & Michelle Conlin, *As More Transgender Children Seek Medical Care, Families Confront Many Unknowns*, REUTERS (Oct. 6, 2022, 11:00 a.m.), https://www.reuters.com/investigates/special-report/usa-transyouth-care/ (discussing disparity in perspectives on gender-affirming care across United States and internationally).

[8] In particular, members of the same faith as plaintiff may hold different views than her about LGBTQ+ identities. Thus, the government is not endorsing one secular viewpoint, or even one religion's viewpoint over another religion's viewpoint, precisely because religion has no role in the assessment.

that the city had unconstitutionally infringed upon individuals who practiced the Santeria religion by enacting three ordinances that prohibited religious animal sacrifice. *Lukumi*, 508 U.S. at 524. A core tenet of the Santeria faith is demonstrating devotion through animal sacrifice. *Id.* at 524-25. In relevant part, the Court noted that the ordinances deemed animal killings for religious reasons unnecessary, yet the city condoned hunting, the slaughter of animals for food, eradication of insects and pests, and euthanasia. *Id.* at 537. Thus, the Court found that the ordinance required a system of "individualized governmental assessment of the reasons for the relevant conduct" and that the "application of the ordinance's test of necessity devalue[d] religious reasons for killing by judging them to be of lesser import than nonreligious reasons." *Id.* at 537-38.

However, in this case, the government does not conduct any form of assessment regarding the reasons why an individual may be unable to respect, accept, and support a child's LGBTQ+ identities. Nor does the government apply less judgment on nonreligious reasons over religious reasons. Indeed, it appears that the rationale behind why an applicant would be unable to accommodate a child's LGBTQ+ identities is irrelevant. The only relevant inquiry is the applicant's willingness and ability, not their reasoning. Plaintiff has not shown that the government is endorsing secular viewpoints over religious viewpoints in its application of the Rule.

Finally, the Court has concerns about the adequacy of the alternatives proposed both by plaintiff and discussed in *Blais*. Although addressing LGBTQ+ concerns at a later age may be a suitable alternative in the foster care context where the state remains involved, plaintiff is seeking to adopt. There will not be an opportunity for state intervention at a later age in plaintiff's case. Thus, this is an inadequate remedy. For that same reason, relying "on caseworkers to carry out medical decisions that [plaintiff] cannot support for religious reasons" is inadequate. Nor does the Court find that changing placements would be a proper alternative to ensure that the Rule achieves its stated ends. If the goal is to prevent unnecessary harm to the child, removing the child from the home because of their LGBTQ+ identity seems inherently contradictory. Removal would only foster the feelings of instability that all children in the foster care

system face, while imposing the specific harm of rejection upon an LGBTQ+ child.[9]  Further, removal

would not even be an option in the case of adoption.

In sum, the Court finds that the Rule is neutral, both facially and as applied.  Although

*Blais* is beneficial in its analysis, this Court comes to a different conclusion in light of the facts of the case

before it.  Plaintiff has not demonstrated that the Rule operates, or is applied, in a non-neutral manner.

b.    General Applicability

"A law is not generally applicable if it invite[s] the government to consider the particular

reasons for a person's conduct by providing a mechanism for individualized exemptions."  *Fulton*, 141 S.

Ct. at 1877 (internal quotation marks omitted, alteration in original).  "[W]here the State has in place a

system of individual exemptions, it may not refuse to extend that system to cases of religious hardship

without compelling reason."  *Id.* (internal quotation marks omitted).  A law may also lack general

applicability "if it prohibits religious conduct while permitting secular conduct that undermines the

government's asserted interests in a similar way."  *Id.*

Plaintiff first argues that the government offers exemptions in numerous ways, including

(1) through OAR § 413-140-0032, which permits ODHS to grant home-study waivers for independent

adoptions; (2) individual exemptions, as outlined in plaintiff's hypothetical examples; (3) waiving home

studies for some individuals looking to adopt; and (4) by accommodating certain sex-based preferences.

Plaintiff also argues that the government undermines its own interests because it does not enforce its policy

evenhandedly by contracting with private agencies that conduct and independently approve home studies.

That scenario, plaintiff argues, leads to arbitrary enforcement of the government's rules because some

agencies are willing to approve applicants like plaintiff even though the government denied her application.

---

[9] *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-22-104688, FOSTER CARE: FURTHER ASSISTANCE FROM HHS WOULD BE HELPFUL IN SUPPORTING YOUTH'S LGBTQ+ IDENTITIES AND RELIGIOUS BELIEFS 6-7 (Apr. 2022) (identifying studies indicating that LGBTQ+ youth in foster care "are more likely to report being mistreated," "experience a greater number of placements and time in foster care," and "are less likely to be placed in family-based settings"); U.S. GOV'T ACCOUNTABILITY OFF., GAO-19-288, CHILDREN AFFECTED BY TRAUMA: SELECTED STATES REPORT VARIOUS APPROACHES AND CHALLENGES TO SUPPORTING CHILDREN 5 (Apr. 2019) (noting that "trauma is common among children who enter the child welfare system").

As for plaintiff's first argument, premised on OAR § 413-140-0032, the government accurately notes that this regulation allows waivers of home study requirements only in the independent adoption context. Notably, the home study requirements for independent adoptions do not include OAR § 413-200-0308(2)(k). Further, the home study waiver for independent adoptions is available only when "[o]ne biological parent, including birth mother, or adoptive parent retains parental rights; or [t]he petitioner qualifies as a relative." OAR § 413-140-0032(2)(b)(A)-(B). Thus, the state's role as the *de facto* parent is diminished in the independent adoption context, and its obligation to ensure that the child's needs will be met is shared, in part, with the biological parent. *See Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010) ("'Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care[.]'" (Quoting *Lipscomb ex rel. DeFehr v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992))). Although plaintiff is correct that the government maintains the same interest in both an independent adoption and foster care placement, the government's role in each context differs. Therefore, the manner in which the government may assert those interests naturally differs. Permitting waivers of the home study requirement in the independent adoption context is not analogous to a waiver of the home study in the foster care context, particularly in light of the fact that OAR § 413-200-0308(2)(k) is not even a requirement for independent adoption home studies.

Plaintiff's reference to the fact that private agencies can conduct home studies implicates the same problem. Plaintiff cites to OAR § 413-140-0035(2)-(3) for the proposition that private agencies have the power to independently approve home studies. However, again, this regulation references an agency's power to approve home studies in the independent adoption context, not foster care certification. Like OAR § 413-140-0032, the home studies that these agencies are permitted to conduct are subject to a different standard than the home studies for resource parent certification. Again, that differing standard is related to the government's diminished role as the child's *de facto* parent. Like the waivers available for independent adoption home studies, an outside agency's ability to conduct an independent adoption home study does not indicate that the government is undermining its interest in protecting children in its care. Rather, it is an acknowledgment of the fact that the government's role in advancing that interest is different

in the independent adoption context.

Plaintiff's hypothetical examples of the government's individual exemptions for the Rule include (1) questioning whether same-sex couples would need to affirm that marriage is the union of one man and one woman if a foster child shared plaintiff's biblical beliefs about marriage; (2) questioning whether a family that eats meat must begin eating a vegan diet if caring for a vegan child; (3) questioning whether non-Jewish families could support a Jewish child's need to observe complex social and dietary customs; and (4) whether a member of an Abrahamic faith could foster a Hindu child who wished to erect a shrine to a Hindu god.  In sum, plaintiff argues that secular applicants are not required to support cultural or spiritual beliefs that violate their consciences, while religious believers must agree to support beliefs and practices that violate their conscience.

Plaintiff has provided no examples where the government has approved secular applicants who indicated that they could not, or would not, support a child's cultural or spiritual beliefs.  Plaintiff has provided no examples, for that matter, where the government has approved secular applicants who indicated that they would not support any of the identities or beliefs outlined in the Rule.  It is true that "the rules of evidence do not strictly apply" at the preliminary injunction phase.  *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013).  Thus, even inadmissible evidence may hold weight at this stage.  *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc).  Even with this low bar, the Court is unpersuaded by plaintiff's assertions.  Evidence need not be "admissible" at this stage, but plaintiff's examples fall far below the threshold for what this Court may, and should, consider.  At best, plaintiff's hypotheticals are a series of conjecture based on "information and belief" and nothing else.  To assert that a preliminary injunction is warranted based on completely unsubstantiated claims disregards this Court's obligation to fairly and accurately assess the action before it.  The Court declines to do so.

Further, plaintiff's examples do not imply that the government grants exemptions for secular reasons.  Each example given by plaintiff is a hyper-specific scenario that would be assessed at the placement stage, provided that the applicants affirmed that they could respect, accept, and support a foster

child's beliefs.  Respecting a child's beliefs and identities does not necessarily require disavowing one's own beliefs.  For example, a meat-eating family would not need to cease eating meat to support a vegan child; they would merely need to provide the child with vegan food.  A follower of an Abrahamic faith need not erect their own shrine to a Hindu god; they would merely need to provide the child with the opportunity to practice their own unique faith.  Plaintiff's hypotheticals, even if true scenarios, do not indicate that secular applicants would not be required to respect, accept, and support a child's spiritual and cultural beliefs and identities.

Along the same lines, plaintiff argues that the government provides categorical exemptions by permitting certain sex-based preferences.  In plaintiff's view, such a preference "turns on biology as much as gender identity."  Pl.'s Mot. 29.  However, allowing a foster parent to state a preference is not the same as exempting that foster parent or adoptive resource from the general certification requirements. Notably, these preferences occur at the *placement* stage, not the certification stage.  Plaintiff does not allege that an applicant who stated that they would only accept male children would comply with the Rule, nor does plaintiff allege that such an individual would be granted certification.  Plaintiff does not provide any examples of such individuals who have indeed received certification.  Rather, plaintiff is pointing to the fact that already certified foster parents and adoptive resources have the option to state gender preferences regarding the child placed in their home.  Inherent in the fact that the foster parents are already certified is the understanding that they have agreed to respect, accept, and support any child that is placed with them, regardless of their gender.  Thus, by allowing those parents to subsequently select *preferences*, the government is not undermining its own policy.  It has already confirmed that the individuals comply with the Rule, and allowing preferences is not the same as permitting a foster parent to refuse a child on the basis of their gender.

In sum, plaintiff has not demonstrated that the government undermines its interests or that the Rule is not generally applicable.  Plaintiff has not demonstrated that there is a system of exemptions that invites the government to examine the particular reasons for an applicant's conduct.  Plaintiff has highlighted the fact that independent adoptions are treated differently than resource parent certification;

however, that difference is logical in light of the state's differing roles in the two contexts. Further, plaintiff has shown that the government permits already certified resource parents to submit gender preferences, but has not shown that the government treats those preferences as stipulations, or that these individuals indicated during the application process that they would only accept a specific gender.

c.    Burden on Religious Exercise

Because the Rule is both neutral and generally applicable, strict scrutiny applies only if plaintiff shows that it imposes an undue burden on her religious freedom. Plaintiff likens her position to that of the adoption agency in *Fulton v. City of Philadelphia*, arguing that Oregon has similarly put her to a choice by conditioning her access to adoption services on her willingness to violate her beliefs. 141 S. Ct. at 1876. Plaintiff's reliance on *Fulton* is misplaced. In *Fulton*, an independent foster agency contracted by Philadelphia refused to certify same-sex couples as foster parents because doing so endorsed a relationship that contradicted the agency's religious belief that "marriage is a sacred bond between a man and a woman." 141 S. Ct. at 1874-76. Philadelphia ceased referring children to the agency upon learning this information and refused to enter into a new contract unless the agency agreed to certify same-sex couples. *Id.* at 1875-76. The agency brought suit, arguing that the referral freeze violated the Free Exercise and Free Speech Clauses of the First Amendment. *Id.* at 1876.

The Supreme Court held that the freeze violated the Free Exercise Clause of the First Amendment because it was not generally applicable. *Id.* at 1877. The Court arrived at this conclusion after determining that a section of the city's contract with the agency, which prohibited the agency from rejecting prospective foster parents based on their sexual orientation, was not generally applicable because it incorporated a system of individual exemptions. *Id.* at 1878. That is, the contract provision prohibited rejection based on sexual orientation, *unless* the Commissioner granted an exception. *Id.* It was the "creation of a formal mechanism for granting exceptions" that rendered the policy not generally applicable, and the failure to utilize that mechanism for the agency is what the Court determined imposed an undue burden on the agency's religious exercise. *Id.* at 1879, 1881.

Here, plaintiff has not identified any state-created mechanism for granting exceptions, nor

has plaintiff demonstrated that the Rule is not generally applicable.  The analysis in *Fulton* is simply not applicable in this case and does not demonstrate that the government has burdened plaintiff's religious exercise in the way that the city burdened the agency's religious exercise in *Fulton*.  As the Supreme Court aptly stated, "[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."  *Smith*, 494 U.S. at 879.

   d.  Historical Protection for Religious Speech

   In the alternative, plaintiff argues that the Rule triggers strict scrutiny because it "treads on historical protections for religious speech."  Pl.'s Mot. 30.  Plaintiff argues that "religious speech lies at the heart of the First Amendment" and that "penalizing religious speech is the paradigmatic example of government overreach."  *Id.* at 31.  Further, plaintiff argues that it is a religious right "of parents . . . to direct the education of their children."  *Id.*

   The importance of the First Amendment right to freedom of religion as a core tenet of American traditions cannot be understated.  As the Supreme Court stated in *Watson v. Jones*, "In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all."  80 U.S. 679, 728 (1871).  And when that right does not infringe personal rights, statutory exemptions are utilized to eliminate infringement on an individual's right to freely practice and speak in accordance with their religious beliefs.

   Here, the impact on others' personal rights is precisely the issue.  Plaintiff seeks to "share the Gospel and to instruct her children in the faith."  Pl.'s Mot. 32.  Such a goal is within plaintiff's rights, unless and until her application of that right infringes on other individuals' freedoms.  It is true that "the values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society."  *Yoder*, 406 U.S. at 213-14.  However, the issue in this case is not that plaintiff is seeking to provide religious instruction to her child.  She is seeking to provide religious instruction to a child in the care and custody of the state.  She does not possess the same rights as

a parent in this situation because the state is the *de facto* parent. Although plaintiff's ultimate goal is adoption, she is seeking a certification that grants her only the opportunity to house and care for a child under the state's umbrella of protection. In seeking to become an adoptive resource, plaintiff has not gained parental rights over any child in the care and custody of the state. *See Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 845 (1977) ("[W]hatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset."). Thus, she cannot invoke a parent's right to instruct that child religiously. *See Backlund v. Barnhart*, 778 F.2d 1386, 1389-90 (9th Cir. 1985) (compiling cases supporting proposition that "foster parents do not enjoy the same constitutional protections that natural parents do"). In essence, plaintiff seeks an accommodation that would permit her to impose her beliefs on another, and she has not, and cannot, identify any constitutional right to do so. *See Fulton*, 141 S. Ct. at 1882 (highlighting that agency sought accommodation that would allow it to continue serving foster children consistent with its beliefs, not an accommodation that would permit it to impose its beliefs on others); *see also Backlund*, 778 F.2d at 1390 (holding that foster parents did not establish constitutional right to exercise religious beliefs about discipline on foster child).

Nor has the government applied the Rule in a manner which regulates plaintiff's speech because of its religious motivations. At no point has plaintiff contended that the government instructed her to never speak of her faith. Rather, the government required that she not disaffirm or disavow a child's LGBTQ+ identities. That the form of that speech contains religious views is inapposite. The government did not inquire into the reasons why plaintiff wanted to share such speech, nor would the reasons matter under the Rule. Speech that does not respect a child's LGBTQ+ identity is barred under the rule, regardless of the motivation behind the speech. *See Minersville Sch. Dist. v. Gobitis*, 310 U.S. 586, 594-95 (1940) ("Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs."), *overruled on other grounds by W. Va. State Bd. Of Educ. v. Barnette*, 319 U.S. 624 (1943). In short, plaintiff has not demonstrated that the Rule treads on the historical protection of religious speech.

e.    Rational Basis Review

Therefore, because the Rule is neutral, generally applicable, and poses only an incidental burden on plaintiff's right to freedom of religion, it is reviewed under rational basis. *Stormans*, 794 F.3d at 1084. Under rational basis review, the Rule will be upheld if it is "rationally related to a legitimate governmental purpose." *Id.* Plaintiff bears the burden of negating the legitimacy of the government's expressed purposes or the government's chosen method of achieving that purpose, and she has failed to meet that burden here. *Id.* The Rule is rationally related to the government's legitimate interest in protecting LGBTQ+ children in ODHS care from harm. Plaintiff's free exercise claim is not likely to succeed on the merits.

2.    *Freedom of Speech – Facial Challenge*

Plaintiff raises both a facial overbreadth challenge to the Rule, as well as an as-applied challenge. A facial challenge "is an attack on a [regulation] itself as opposed to a particular application." *Project Veritas v. Schmidt*, 72 F.4th 1043, 1054 (9th Cir. 2023) (citations and internal quotation marks omitted). If successful, a facial challenge invalidates the law in its entirety. *Foti v. Coty of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).

Plaintiff contends that the Rule is facially invalid because it imposes an overbroad restriction on speech. Because facial challenges seek to invalidate the challenged law in its entirety, invalidation of a regulation based on a facial challenge "is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (internal quotation marks omitted). To strike down a regulation as overbroad under the First Amendment, "a substantial number of [the regulation's] applications" must be unconstitutional when "judged in relation to the [regulation's] plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (internal quotation marks omitted). If a regulation is not "specifically addressed to speech or to conduct necessarily associated with speech," an overbreadth challenge is unlikely to succeed. *Virginia v. Hicks*, 539 U.S. 113, 124 (2003). When assessing an overbreadth challenge, the court must construe the challenged regulation as constitutional "if [it] reasonably can do so." *United States*

*v. Rundo*, 990 F.3d 709, 714 (9th Cir. 2021) (per curiam).

The first step of analysis in an overbreadth challenge is construing the regulation in question. For convenience, the language of the Rule is provided again:

> "Applicants must, as determined by [ODHS] pursuant to OAR 413-200-0274 to OAR 413-200-0298:
> . . . . .
> "Respect, accept and support the race, ethnicity, cultural identities, national origin, immigration status, sexual orientation, gender identity, gender expression, disabilities, spiritual beliefs, and socioeconomic status, of a child or young adult in the care or custody of [ODHS], and provide opportunities to enhance the positive self-concept and understanding of the child or young adult's heritage[.]"

In the referenced context, "respect" is best defined as "to consider worthy of esteem" and "to refrain from obtruding upon or interfering with." *Respect*, WEBSTER'S THIRD NEW INT'L DICTIONARY 1934 (1993). In the referenced context, "accept" is best defined as "to give admittance or approval to," to "endure or tolerate with patience," and "to regard as proper, suitable, or normal." *Id. Accept*, at 10. In the referenced context, "support" is best defined as to "promote the interests or cause of," "to uphold by aid, countenance, or adherence," "to defend as valid, right, just, or authoritative" and "to supply with the means of maintenance." *Id. Support*, at 2297.

Plaintiff argues that the Rule, by its plain meaning, facially regulates speech because "'[i]t requires the individual to communicate by word and sign his acceptance of the [state's] political ideas.'" Pl.'s Mot. 14 (quoting *Barnette*, 319 U.S. at 633). However, the government argues that the Rule "is a regulation on applicants' conduct as caregivers." Govt.'s Resp. 14. Based on the plain language of the statute, the Court agrees with the government.

On its face, the Rule appears to regulate the type of environment that children in ODHS care experience when they are placed in certified family homes. That is, by requiring applicants to confirm their ability to respect, accept, and support the various aspects of a child's identity, the Rule seeks to confirm that an applicant can provide the type of environment that will aid the child's development and well-being within the context of the child's identities. This finding is supported when the Rule is viewed in the context of its accompanying regulations. *See, e.g.*, OAR § 413-200-0358(2)(f) (prohibiting certified resource

family from using "derogatory remarks about the child," or the child's "family characteristics, physical traits, culture, ethnicity, language, immigration status, sexual orientation, gender identity and expression, or traditions"); *id.* § 413-200-0358(2)(l) (prohibiting certified resource family from threatening child with removal from the home); *id.* § 413-200-0308(2)(d) (requiring applicants to demonstrable ability to "[m]aintain conditions in the home that provide for the safety, health, and well-being for the child or young adult in the care or custody of [ODHS]" and "meet the safety, health, and well-being needs for that child or young adult"); *id.* § 413-200-0308(2)(f) (requiring applicants to "[h]ave a lifestyle and personal habits free of criminal activity, and abuse or misuse of alcohol or drugs"); *id.* § 413-200-0308(2)(j) (requiring applicants to "[d]emonstrate an ability to learn and apply effective childrearing and behavior intervention practices focused on helping a child or young adult in the care and custody of [ODHS] grow, develop, and build positive personal relationships and self-esteem"). Such a scope does not, on its face, extend to speech, let alone pure speech as plaintiff contends. Rather, it focuses on the applicant's conduct to determine the applicant's ability to cultivate a supportive environment.

Instructive to the Court's finding is *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006). There, the Supreme Court addressed whether a statute that conditioned federal funds for higher education institutions on the provision of equal access to the institutions' campuses for military recruiters unconstitutionally violated the institutions' freedoms of speech and association. *Id.* at 55. In holding that the statute regulated conduct, not speech, the Court noted that the statute "neither limits what law schools may say nor requires them to say anything" and that it "affects what law schools must *do* . . . not what they may or may not *say*." *Id.* at 60 (emphases in original). Although the schools had to send out scheduling-emails or post notices on bulletin boards, the Court held that such compelled speech was "plainly incidental to the [statute's] regulation of conduct[.]" *Id.* at 62.

In crafting a supportive and affirming environment for a child, it is true that speech may be incidentally impacted. For example, a supportive environment for an LGBTQ+ child cannot reasonably be understood to include an environment where the child is regularly subjected to hate speech. However, a supportive and affirming environment could just as easily be created with no impact on speech at all. For

example, a supportive and affirming environment for an LGBTQ+ child could reasonably be crafted simply by allowing the child, without interference or dissuasion, to express their identity in ways that they are comfortable doing so or ensuring that a child is able to attend events that validate their identity. Neither of these examples implicate or require the applicant's speech.[10] The applicant is not required to begin dressing the same way as the child, nor would the applicant be required to attend affirming events alongside the child. Put simply, the Rule does not require applicants to conform to or adopt the child's identities. Rather, it merely requires applicants to provide space for the child to express and develop their identities. In sum, the Rule could reasonably be interpreted as regulating an applicant's conduct, rather than their speech.

Plaintiff, however, interprets the Rule differently. In plaintiff's view, the Rule compels speech because it "require[s] Home Study applicants to agree to use preferred pronouns and to otherwise affirm a child's sexual or gender identity." Pl.'s Mot. 37. However, nowhere in the Rule is there a requirement that applicants agree to use a child's preferred pronouns. Rather, plaintiff draws this conclusion from the trainings and training materials that she received. When assessing an overbreadth challenge, however, this Court is obligated to construe the Rule in a manner that would render it constitutional if it is reasonable to do so. *Tennison v. Paulus*, 144 F.3d 1285, 1287 (9th Cir. 1998). Additionally, in determining the scope of the Rule, this Court looks at established practices only to see if they *narrow* the scope of the rule; whether established practices seemingly broaden the scope of the Rule is inconsequential to the relevant analysis for an overbreadth challenge. *See id.* (distinguishing principle that "a narrowing construction of an impermissibly overbroad statute can save it from unconstitutionality" from proposition that an "established practice had *broadened* the reach of the law").

Plaintiff also argues that the Rule clearly impacts religious speech. However, nothing in the Rule clearly impacts speech at all, let alone religious speech. Therefore, this too is an insufficient basis for invalidating the Rule in its entirety.

Based on the plain language of the Rule, it does not facially compel or restrict speech, but

---

[10] If anything, the former serves to support the free speech and associative rights of the child.

rather seeks to regulate an applicant's conduct in creating a respectful, affirming, and supportive home for a child in ODHS care. The regulation of such conduct may incidentally impact speech in some instances; however, this is insufficient to establish that the Rule, as a whole, facially infringes on the right to free speech, let alone that it substantially does so. *Ams. for Prosperity Found.*, 141 S. Ct. at 2387. Because the Rule does not clearly implicate speech on its face, plaintiff's overbreadth challenge is unlikely to succeed on the merits.

3. *Freedom of Speech – As-Applied Challenge*

Unlike a facial challenge, "an as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others[.]" *Project Veritas*, 72 F.4th at 1054. A successful as-applied challenge does not invalidate the law itself, but rather invalidates only the particular application of a law. *Foti*, 146 F.3d at 635.

Plaintiff alleges that the Rule, as applied to her, unconstitutionally infringes upon her freedom of speech. The right to freedom of speech, although not unequivocal, has been fiercely protected in American jurisprudence. As the Supreme Court has repeatedly highlighted, "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "The First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster . . . an idea they find morally objectionable." *Id.* at 715. "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, . . . a law commanding 'involuntary affirmation' of objected-to beliefs [ ] require[s] 'even more immediate and urgent grounds' than a law demanding silence." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) (quoting *Barnette*, 319 U.S. at 633). However, compelled speech that is plainly incidental to the regulation of conduct does not infringe upon the First Amendment. *Rumsfeld*, 547 U.S. at 62. Thus, if a regulation seeks to regulate conduct, but that conduct "was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed," the regulation does not necessarily abridge freedom of speech. *Id.* (internal quotation marks omitted).

Plaintiff argues that the Rule, as applied, regulates her speech both by compelling and restricting what she may say. As evidence, plaintiff highlights language from training materials that she received, such as the RAFT Participant Guide, which includes language like "[u]sing the correct pronouns of each person we meet is an important way to show others respect and create an inclusive environment," Bates Decl., Ex. 3, at 3, and, as a pronoun etiquette tip, "[a]lways use someone's chosen (preferred) pronouns unless you've been asked not to do so for a specific reason," *id.* at 35. Plaintiff received a handout that states, "Respecting [a child's] gender identity and expression is very important" and discouraged prospective parents from "forcing youth to attend activities (including religious activities . . .) that are . . . unsupportive of people with diverse [sexual orientation, gender identity, and gender expression]." *Id.* at 25-26. That same handout suggested "[d]isplay[ing] 'hate-free zone' signs or other symbols indicating an LGBTQ-affirming environment (e.g., pink triangle, rainbow, or ally flag)," and suggested "support[ing] [the child's] self-expression through their choices of clothing, jewelry, hairstyle, friends, and room decoration." *Id.* at 25.

Plaintiff argues that the application of the Rule compels her speech by requiring her to speak in a manner that violates her sincerely held religious beliefs about gender and sexual orientation. As already stated, the policy does not on its face compel speech. However, that conclusion is not as clear when considering the Rule's application to plaintiff. On one hand, many of the training materials that plaintiff highlights were suggestions and examples of how to create a safe and affirming home for an LGBTQ+ child. They were not, as plaintiff suggest, mandatory requirements. Nor are all the suggestions within the materials necessarily required to create an affirming environment. Displaying LGBTQ-affirming symbols may facilitate the creation of an affirming environment, but they do not in and of themselves *create* an affirming environment.

On the other hand, there are aspects of the training materials that seem inescapably tied to plaintiff's speech. For example, using a child's preferred pronouns goes hand in hand with creating an affirming environment for the child, because intentionally using a child's incorrect pronouns could not be understood as respecting the child's gender identity. Yet, as plaintiff points out, if a child's preferred

pronouns are at odds with their sex assigned at birth, using them would violate her sincerely held religious beliefs.  In the same vein, supporting a child's self-expression of their gender identity may not require plaintiff to openly state that she agrees with the self-expression, but it does require that plaintiff not dissuade the child from such self-expression.

Viewing the application of the Rule in its totality, it does appear to, in some instances, compel plaintiff's speech in a manner that would violate her sincerely held religious beliefs.  However, the government argues that certified resource families are a "licensed profession," and that regulation of professional conduct that incidentally involves speech is constitutional.  *See Nat'l Inst. Of Fam, & Life Advocs. v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2372 (2018).  Yet, the Supreme Court clearly stated in *NIFLA* that it "has not recognized 'professional speech' as a separate category of speech," and declined to create such a category.  *Id.* at 2371-72.  Thus, whether a certified caregiver is a licensed profession is inapposite to the actual inquiry: whether the Rule regulates plaintiff's conduct while imposing only an incidental burden on her speech.  The Court finds that it does not.

In *West Virginia State Board of Education v. Barnette*, the Supreme Court found that the West Virginia State Board of Education's requirement that all teachers and pupils "participate in the salute honoring the nation represented by the Flag" unconstitutionally violated the plaintiffs' rights to free speech.  319 U.S. at 626, 642.  In so holding, the Court highlighted that the act "require[d] the individual to communicate by word and sign his acceptance of the political ideas [that the flag] thus bespeaks" and that "the compulsory flag salute and pledge requires affirmation of a belief and an attitude of mind."  *Id.* at 633. Similarly, in *303 Creative LLC v. Elenis*, the Supreme Court held that Colorado's public accommodation law forbidding businesses from engaging in discrimination unconstitutionally violated the plaintiff's right to free speech because "[i]f [plaintiff] wishe[d] to speak, she must either speak as the State demands or face sanctions for expressing her own beliefs[.]"  143 S. Ct. 2298, 2313 (2023).

Here, the Rule's impact on plaintiff is similar to the plaintiffs in *Barnette* and *303 Creative*. In applying the Rule, the government primarily focused on the content of plaintiff's message, not her conduct.  To be sure, there are important differences between the plaintiffs in *Barnette* and *303 Creative*

and plaintiff in this case.  That is, in this case, the speech impacted by the Rule is linked to creating a supportive environment for a child in ODHS care, whereas the impacted speech in *Barnette* and *303 Creative* was not connected to a population that the state had a duty to protect.  Even with this consideration, however, the Rule does compel plaintiff's speech.  For that same reason, the Court finds that the Rule also restricts plaintiff's speech.  Although not expressly stated, inherent in the application of the Rule is the expectation that plaintiff will not espouse disaffirming or negative views about a child's LGBTQ+ identities.  Thus, the Rule operates on plaintiff by compelling positive speech, while simultaneously restricting negative speech.

Further, the Court finds that the Rule compels and restricts plaintiff's speech in a content-based manner.  As applied to plaintiff, the Rule compels and restricts her speech as that speech relates to concepts of gender and sexual orientation.  Therefore, the Rule is a content-based regulation.  *See A.C.L.U. of Nevada v. City of Las Vegas*, 466 F.3d 784, 793 (9th Cir. 2006) ("'As a general rule, laws that by their terms distinguish favored speech on the basis of the ideas or views expressed are content based.'" (Quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989))).  Further, the Rule, as applied, utilizes viewpoint discrimination because it requires positive speech and restricts negative speech in the context of gender and sexual orientation.  *See Matel v. Tam*, 582 U.S. 218, 243 (2017) (finding that trademark regulation prohibiting registration of "disparaging" trademarks was viewpoint-discriminatory law); *Boardman v. Inslee*, 978 F.3d 1092, 1110 (9th Cir. 2020) (describing viewpoint discrimination as regulation that "regulates speech *based on* the specific motivating ideology or perspective of the speaker" (emphasis in original)).

Because the Rule compels and restricts plaintiff's speech in a content-based and viewpoint-based manner, the Rule is presumptively invalid and strict scrutiny applies.  *See Am. Beverage Ass'n*, 916 F.3d at 759 (Ikuta, J., concurring in the result) ("A government regulation 'compelling individuals to speak a particular message' is a content-based regulation that is subject to strict scrutiny[.]" (Quoting *NIFLA*, 138 S. Ct. at 2372-73)).  When a regulation is content-based, the Supreme Court has employed a stronger version of strict scrutiny because "[d]iscrimination against speech because of its message is presumed to be

unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Therefore, a content-based regulation may be employed only "where it is *necessary* to serve the asserted [compelling] interest[.]" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 398 (1992) (internal quotation marks omitted, emphasis in original, first alteration in original). "The existence of adequate content-neutral alternatives thus 'undercut[s] significantly' any defense of such a statute[.]" *Id.* (alteration in original) (quoting *Boos v. Barry*, 485 U.S. 312, 329 (1988)).

a.    Compelling Interest

In an as-applied challenge, the government must provide a compelling interest that necessitated the specific action that it took. In this case, the government must provide a compelling interest that necessitated denying plaintiff's application. The government asserts the following interests in support of the Rule: (1) ensuring the health, safety, and welfare of the LGBTQ+ children who are entrusted to ODHS care; and (2) protecting LGBTQ+ children in ODHS's care from the severe harms that arise from parental rejection.[11]

The government argues that plaintiff's refusal to respect, accept, and support a child's sexual orientation, gender identity, and gender expression poses a "real and significant threat to the physical and psychological well-being of the children in the state's care and custody."[12] Govt.'s Resp. 19. In *R.A.V. v. City of St. Paul*, the defendants asserted a similar interest. At issue in that case was a city ordinance that criminalized activities that were known to "arouse[ ] anger, alarm or resentment in others" when based on race, color, creed, religion, or gender. 505 U.S. at 380. In part, the city argued that the ordinance helped to "ensure the basic human rights of members of groups that have historically been subjected to discrimination, including the right of such group members to live in peace where they wish." *Id.* at 395.

---

[11] Plaintiff's initial motion predicted the government's proposed interests as "promoting the best interests of the children in its custody." Pl.'s Mot. 32. Thus, plaintiff argued that this described the government's interest at too "high [a] level of generality." *Id.* (quoting *Fulton*, 141 S. Ct. at 1881). However, the interests that the government has actually asserted are specific to its denial of plaintiff's application; therefore, the Court does not address plaintiff's generality arguments.

[12] *See supra* note 3.

Although the Supreme Court acknowledged that this was a compelling interest promoted by the ordinance, it ultimately held that the content discrimination within the ordinance was not reasonably necessary to achieve that interest because an ordinance not limited to specific topics could have had the same beneficial effect. *Id.* 395-96.

One distinguishing factor in this case is that the government has an affirmative duty to protect the population at issue. In the foster care context, "the state functions as the *de facto* parent of a child," and has a responsibility "to safeguard the well-being of this helpless and vulnerable population." *Tamas*, 630 F.3d at 943. That is, "[o]nce the state assumes wardship of a child, the state *owes* the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care . . . ." *Id.* at 842 (emphasis added) (quoting *Lipscomb*, 962 F.2d at 1379). The foster child's liberty interest derives from the substantive due process clause of the Fourteenth Amendment and obligates the state to protect the child "from harm inflicted by a foster parent." *Id.* Thus, although the city in *R.A.V.* may have *desired* to protect its citizens with marginalized identities, the government in this case has a *responsibility* to protect the children in its care.

Further, the Supreme Court has emphasized that "a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" *New York v. Feber*, 458 U.S. 747, 756-57 (1982) (quoting *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982)). As such, legislation "aimed at protecting the physical and emotional well-being of youth" has been sustained "even when the laws have operated in the sensitive area of constitutionally protected rights." *Id.* at 756. However, "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804-05 (2011).

Additionally, the government highlights that, as the custodian of the children in ODHS care, it is required "to ensure that [the child's] rights are respected." Govt.'s Resp. 5. Under Oregon Revised Statute § 418.202(1), ODHS is required to adopt rules that identify the rights of foster children in Oregon. As such, OAR § 413-010-0180 sets forth the rights of children and young adults in ODHS care, and grants them, in part, the right "[t]o receive respect, be nurtured, and attend activities in accordance with their

background, religious heritage, race, and culture" and the right "[t]o receive encouragement and be afforded reasonable opportunities to participate in extracurricular, cultural, and personal enrichment activities consistent with their age and developmental level[.]" OAR § 413-010-0180(j), (m). Further, the Oregon Foster Children's Bill of Rights, created by ODHS, informs children and young adults in ODHS care that they have the right to "[c]lean and appropriate clothes that fit [them] and correspond to a gender identity of [their] choice," to "be allowed to dress and groom [themselves] according to [their] culture, identity and within good hygiene standards for [their] health," and to "determine and express [their] gender and sexual identity for [themselves]." Decl. of Deanna Chang ("Chang Decl."), Ex. 5, ECF [26], at 1; *see* OAR § 413-200-0352(1)(d) (requiring that certified resource families provide "[a]dequate clothing that is age-appropriate and meets the cultural and gender identity and gender expression of the child").

The circumstances of this case make the compelling interest analysis more complicated, in part because of the competing rights at stake in this case. On one hand, plaintiff is alleging an infringement on her freedom of speech. On the other hand, the government is asserting a compelling interest both in protecting LGBTQ+ youth from harm *and* protecting that population's fundamental rights. Within this tension, the Court acknowledges and is sensitive to the barriers and experiences that LGBTQ+ youth in the foster care system, and elsewhere, face. Seeking to minimize harm to an already at-risk population, and protecting the rights of that population, are undoubtedly compelling state interests. However, the question remains whether denying plaintiff's application was necessary to advance those interests.

Plaintiff raises numerous arguments for why denying her application was not necessary to further the government's interests. First, relying on *Brown v. Entertainment Merchants Association*, plaintiff argues that the evidence offered by the government does not prove that unsupportive environments *cause* negative outcomes for LGBTQ+ children. In *Brown*, the Supreme Court assessed a California bill that prohibited the sale or rental of "violent video games" to minors. *Brown*, 564 U.S. at 789. Video game and software companies sought a permanent injunction against enforcement of the bill, arguing that it violated the Free Speech Clause of the First Amendment. *Id.* at 790. Although the Court acknowledged that California had a legitimate interest in protecting children from harm, it found the state's evidence that

violent video games caused harm to minors insufficient.  *Id.* at 800-03.  The state had presented research from psychologists whose studies showed a connection between exposure to violent video games and harmful effects on children; however, the Court found that these studies did not prove "that violent video games *cause* minors to *act* aggressively."  *Id.* at 800 (emphases in original).  The Court found that, at best, the studies showed "some correlation between exposure to violent entertainment and miniscule real-world effects, such as children's feeling more aggressive or making louder noises in the few minutes after playing a violent game than after playing a nonviolent game."  *Id.*  Further, the Court noted that the effects of violent video games on children where "small and indistinguishable from effects produced by other media" and that the research suffered "from significant, admitted flaws in methodology."  *Id.* at 800-01 (internal quotation marks omitted).  However, the state did not attempt to restrict other forms of media with similar effects.  *Id.* at 801.  Therefore, the Court held that the law was underinclusive and thus, was not narrowly tailored to serve the state's interest.  *Id.* at 801-02.

In essence, plaintiff in this case argues that the government's evidence, at best, shows only a correlation between negative mental health and health outcomes in LGBTQ+ youth who are unsupported in their home.[13]  The Court disagrees.

Among the government's submitted evidence is a factsheet citing a study that concluded that LGBTQ+ people "experience higher rates of anxiety, depression, alcohol and drug use, and other mental health challenges" due to "the stigma and discrimination that LGBTQ+ people experience from others and from navigating hostile environments and barriers to access mental health services."  Chang Decl., Ex. 6, at 4 (depicting *Supporting LGBTQ+ Youth: A Guide for Foster Parents*, CHILD WELFARE INFO. GATEWAY 4 (2021) (citing Miriam M. Moagi et al, *Mental Health Challenges of Lesbian, Gay, Bisexual and Transgender People: An Integrated Literature Review*, 26 HEALTH SA 1487 (2021))).  Additionally, the government relies heavily on two studies conducted by Dr. Caitlin Ryan, among others.

---

[13] Although plaintiff attempts to frame the inquiry as whether an LGBTQ+ youth would suffer negative outcomes from exposure to religious beliefs, this is not the correct question.  The inquiry is both whether speech that disaffirms an LGBTQ+ youth's identity, religiously motivated or otherwise, causes that child harm, and whether the specific speech that plaintiff seeks to utilize would cause an LGBTQ+ youth harm.

In the first study, researchers had conducted a study on the impact of family rejection on LGBTQ+ youth, finding that "[h]igher rates of family rejection were significantly associated with poorer health outcomes." Caitlin Ryan et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay and Bisexual Young Adults*, 123 PEDIATRICS 346 (2009).  Specifically, LGBTQ+ young adults who experienced higher levels of family rejection during adolescence "were 8.4 times more likely to report having attempted suicide, 5.9 times more likely to report high levels of depression, 3.4 times more likely to use illegal drugs, and 3.4 times more likely to report having engaged in unprotected sexual intercourse." *Id.*  Each of these findings were made after comparing answers from respondents with higher levels of family rejection to answers from respondents who reported no or low levels of family rejection. *Id.*

In the second study, the same researchers analyzed the effect of family acceptance on the health and mental health of LGBT adolescents and young adults.  Caitlin Ryan et al., *Family Acceptance in Adolescence and the Health of LGBT Young Adults*, 23 J. CHILD & ADOLESCENT PSYCHIATRIC NURSING 205 (2010).  That study included a review of existing literature regarding the relationship between LGBTQ+ youths' perceived family support and mental health and health outcomes.  *Id.* at 205-06.  Some of that literature indicated that perceived rejecting reactions from family when a child came out "were reported to predict substance use," however, "accepting reactions did not directly reduce substance use."  *Id.* at 206 (citing Margaret Rosario et al., *The Psychosexual Development of Urban Lesbian, Gay, and Bisexual Youths*, 33 J. SEX RSCH. 113 (1996).  The Ryan study was composed of a sample of 245 LGBT Latino and non-Latino white young adults, aged 21-25.  *Id.*  In part, the study found "clear links between family acceptance in adolescence and health status in young adulthood" and that "young adults who reported low levels of family acceptance had scores that were significantly worse for depression, substance abuse, and suicidal ideation and attempts."  *Id.* at 208.  The study noted that "family religious affiliation, although linked to lower family acceptance, was positively associated with young adult social support"; however, "[religious] association is consistent for LGBT young adults only after differences between low and high family acceptance are taken into account."  *Id.* at 209.

Given the government's proffered research, the concerns noted by the Supreme Court in *Brown* do not arise in this case. In part, the Supreme Court had concerns about the quality of the research because it indicated that video games' impact on children was "small and indistinguishable" when compared to other forms of violent media. *Brown*, 564 U.S. at 800-01. Yet, the research presented by the government in this case indicates that a disaffirming family environment can have a severe impact on LGBTQ+ youth. While it is true that other sources may impact an LGBTQ+ youth's mental health and health outcomes, such as their school environment, access to health care, etc., the research presented by the government does not indicate that the impact of a child's home environment is "small or indistinguishable" when compared to other sources.

The Supreme Court also took issue with the "significant, admitted flaws in methodology" in the research presented in *Brown*, and plaintiff seeks to discount the Ryan studies in particular because they were cross-sectional studies that did not track participants over time. That is, plaintiff argues that the Ryan studies can, at best, show only correlation because cross-sectional studies measure "the exposure and the existing or prevalent outcome" at the same point in time, making "the direction of association" difficult to determine. GORDAN GUYATT ET AL., USERS' GUIDES TO THE MEDICAL LITERATURE: ESSENTIALS OF EVIDENCE-BASED CLINICAL PRACTICES 197 (3d ed. 2015). Undoubtedly, a more detailed study that followed children over a longer stretch of time would be beneficial. However, the Court acknowledges that the amount of academic literature assessing the impact of home environments on LGBTQ+ youth is limited. *See* Ryan et al., *Family Acceptance*, at 205 (noting the surprising "lack of literature on family support" and LGBTQ+ youth). While more thorough research in this area appears to be necessary, at this stage of the case and with the research currently available, the government has presented sufficient evidence that a disaffirming home environment can negatively impact an LGBTQ+ youth's mental health and health outcomes. *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 964 (9th Cir. 2009) (noting that state is not required to "demonstrate a 'scientific certainty'" to support compelling interest). Further, the government has presented evidence that an affirming home environment can mitigate the harm that other factors cause to an LGBTQ+ youth's mental health and health outcomes.

Second, plaintiff argues that, as applied to her, the Rule does not further the government's stated interests because an LGBTQ+ youth placed in plaintiff's home would not face the type of harm contemplated by the government.  That is, plaintiff argues that "a parent can disagree with a child without disparaging or rejecting them" and that she "will accept, love, and respect any child regardless of how they identify," but would not use "preferred pronouns," take "a child to events like Pride parades," or "otherwise say[ ] or do [ ] things that would violate her conscience."  Pl.'s Reply 3, 21.  Plaintiff takes too narrow a view of what it means to support a child's identity.  While plaintiff is correct that disagreement does not equate to disparagement, the Court also recognizes that the term "rejection" takes many forms, and it includes the impact that invalidation can have on an LGBTQ+ youth.  Put another way, the harm arises from how plaintiff's actions are *perceived* by the child, not from her personal intent.  In essence, plaintiff's proposed methods would still invalidate a child's LGBTQ+ identity, even if plaintiff does not outright reject the child because of their identity.  *See 2022 National Survey on LGBTQ Youth Mental Health*, *supra* note 3, at 23 (noting that LGBTQ youth identified using their correct name and pronouns, talking with them respectfully about their LGBTQ identity, and supporting their gender expression were among the top five ways that they felt supported by parents or caregivers); Caitlin Ryan, *Parents Don't Have To Choose Between Their Faith and Their LGBT Kids*, Commentary, WASH. POST (Jan. 7, 2015, 5:31 p.m.) (noting that "trying to change, deny or use religion to condemn a child's LGBT identity pushes the child away, [and] reinforces his or her isolation"); Caitlin Ryan, *Supportive Families, Healthy Children*, FAM. ACCEPTANCE PROJECT 8 (2009) (discussing finding that "blocking access to gay friends and resources" was "just as harmful as physically beating a gay or transgender child").  To argue that invalidation is less harmful than rejection, or not harmful at all, is mere wordplay.

Although plaintiff asserts that her proposed methods are in line with recommendations by the experts cited by the government, the Court is less convinced.  Plaintiff contends that her desire to "talk openly with her child about their sexual orientation, gender identity, or any other aspect of their life" is the same as Ryan's recommendations that a parent "talk[ ] respectfully with [the] child to begin to understand [the] child's experiences[,] requir[e] that other family members respect [the] child even if they disagree[,]

and advocat[e] for [the] child when others mistreat them." Pl.'s Reply 22; Ryan, *Parent's Don't Have To Choose*. However, this comparison is belied by plaintiff's own statements and, again, indicates a misunderstanding of what it means to respect and support a child's identities. For example, plaintiff states, "I cannot affirm that a male can be a girl, or that a female can be a boy[,]" "I cannot use a child's preferred pronouns if the pronouns conflict or obscure the child's biological sex[,]" "I also cannot 'support' a child's desire to live or identify with anything that is not aligned with a binary male/female human identity[,]" "I cannot support a child's desire to dress or otherwise express themselves as the opposite sex[,]" "I cannot take or permit my children to attend 'LGBTQ-affirming' events or activities like Pride parades[,]" and "I [ ] want to instruct my children about biblical manhood and womanhood and the significance of our sexual differences." Bates Decl. ¶¶ 92, 96, 102, 115, 117, 138. It is difficult to perceive how this is not the equivalent of denying a child's LGBTQ+ identities. Refusing to use the child's preferred pronouns, refusing to allow the child to dress in a manner consistent with their gender identity, and refusing to provide access to LGBTQ+ communities are entirely inconsistent with the recommendations that plaintiff purports she would meet. Ryan, *Parents Don't Have To Choose* (highlighting that denying or trying to change an LGBTQ+ youth's identity "pushes the child away" and "reinforces his or her isolation"); Ryan, *Supportive Families*, at 8 (recommending that families "[b]ring [their] child to LGBT organizations or events," "[s]upport [their] child's LGBT identity even though [they] may feel uncomfortable," and "[s]upport [their] child's gender expression"). Put simply, although plaintiff may believe that speaking openly with a child about their LGBTQ+ identities is sufficient to make the child feel respected and supported, this belief is unsupported by the evidence on the record.

Plaintiff also argues that denying her application undermines the government's interests because "some children can and should be placed in homes with traditional religious view on sex and our human identity." Pl.'s Mot. 33. Plaintiff's position misstates the inquiry. The question is whether denying plaintiff's application is necessary to further the government's interest in protecting LGBTQ+ youth in its care from invalidating and disaffirming environments. Whether denying her application furthered the government's interest in placing children with specific religious views in affirming environments is

inapposite.

In sum, the government has put forth sufficiently compelling interests and provided sufficient evidence that denying plaintiff's application furthered those interests.

b.      Narrow Tailoring

Although the government has asserted compelling interests that necessitated denying plaintiff's application, to survive strict scrutiny, a challenged regulation must "target and eliminate[ ] no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). Generally, narrow tailoring focuses on two aspects: (1) whether the challenged regulation is overinclusive and (2) whether the challenged regulation is underinclusive. An overinclusive restriction may emerge "[i]f a less restrictive alternative would serve the state's compelling interest with the same level of effectiveness[.]" *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1228 (9th Cir. 2019). If a plaintiff proposes "a plausible, less restrictive alternative" to the regulation, then "it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Id.* (quoting *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000)). Mere "anecdote and supposition" is insufficient to meet the government's burden; it must "point to evidence in the legislative record or present other evidence that demonstrates why the challenged restriction, rather than a less restrictive alternative, is necessary to further its significant interests." *Id.* (citing *Playboy*, 529 U.S. at 820-22).

On the other hand, an underinclusive regulation will fail strict scrutiny by failing to cover too little speech. *Id.* That is, the state is essentially regulating "'one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest *in a comparable way*.'" *Id.* (emphasis in original) (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 451 (2015)). Underinclusive restrictions "can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Williams-Yulee*, 575 U.S. at 448 (internal quotation marks omitted).

i.      *Overinclusivity*

Plaintiff makes numerous arguments for why the Rule is overinclusive. First, she argues

that the government could require caregivers to provide equal care without compelling them to violate their beliefs. That is, she argues that her openness "to any child regardless of sexual or gender identity" and willingness "to love and accept that child like her own" demonstrates an ability to provide equal care. Pl.'s Mot. 34. The Court has already addressed and rejected this argument. To be clear, the Court does not doubt the sincerity of plaintiff's willingness to love a child placed in her home; rather, it recognizes that the totality of plaintiff's statements indicates a lack of understanding about the unique support and care that LGBTQ+ children require.

Plaintiff does raise a new angle for this argument, which the Court must address. Plaintiff cites to *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, where the Supreme Court held that a Massachusetts public accommodations law had been applied in a manner that infringed on the free speech rights of private parade organizers who did not want an organization composed of gay, lesbian, and bisexual individuals to have its own parade unit in the parade. 515 U.S. 557 (1995). However, *Hurley* is readily distinguishable from the case presently before this Court.

Plaintiff focuses primarily on the Supreme Court's statement that "[w]hile the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one[.]" *Id.* at 579. As an initial matter, the context of *Hurley* is significantly different than that presently before the Court. In *Hurley*, the Court emphasized the public aspect of the parade, noting that "[o]ur tradition of free speech commands that a speaker who takes to the street corner to express his views in this way should be free from interference by the State based on the content of what he says." *Id.* In this case, plaintiff is not prevented from publicly stating her views on gender and marriage, nor is she necessarily required to speak, or not speak, in a particular way outside of her interactions with any child placed in her home.

Although plaintiff repeatedly characterizes the Rule as requiring her to "adopt an attitude that affirms the State's views," such a perspective is at odds with the reality of the record. Pl.'s Mot. 18. The Rule in no way prevents plaintiff from sharing these beliefs with her biological children. Nor does it prevent her from attending church, holding Bible study, or practicing her own faith. It does, however,

prevent her from imposing her beliefs on a child, *in ODHS care*, when doing so would disaffirm the child's LGBTQ+ identities. Put another way, the Rule prevents plaintiff from extending her right to free speech in a manner that infringes on the child's rights.

Further, as already discussed at length, the government has presented significant evidence that supports its reasons for enforcing the Rule that is wholly unrelated to merely "promoting an approved message or discouraging a disfavored one." *Hurley*, 515 U.S. at 579. If anything, the government's stated reasons and evidence demonstrate that the Rule was applied to promote specific conduct "in place of harmful behavior." *Id.* Put simply, the government in this case is not infringing on plaintiff's free speech rights with the goal of promoting an approved message merely for the sake of doing so; the infringement occurs because the government is relying on evidence that certain messaging creates a holistically supportive environment for LGBTQ+ children, while other messaging creates a harmful environment.

Second, plaintiff argues that the Rule is overinclusive because the government is refusing to place *any* child with plaintiff, regardless of the child's LGBTQ+ identity. That is, plaintiff argues that the government is applying the Rule more broadly than is necessary because it could, instead, place a child who is not LGBTQ+ in her care. Conversely, the government argue that denying plaintiff's application protects children who openly identify as LGBTQ+, those that have not disclosed their LGBTQ+ identities, and those who have yet to develop those identities.

Plaintiff argues that this reasoning is insufficient for three reasons: (1) the statistics that the government relies on are not representative of the LGBTQ+ population in Oregon; (2) the government cannot predict or quantify the risk that an LGBTQ+ child could be placed in plaintiff's home; and (3) the government's position reveals that its underlying belief is that plaintiff is not fit to parent any child. These arguments are addressed in turn.

Plaintiff's first argument is premised on the government's statement that "for every child and young adult in foster care, there may be as high as [a] one-in-three chance that that child is or will identify as LGBTQIA2S+." Govt.'s Resp. 22. This statement was derived from two separate resources that the government interprets as indicating that "nationally, up to 30% or more of youth in foster care may

identify as LBTQIA2S+." *Id.* at 21.

    The first resource is a report from the United States Government Accountability Office, which states that "studies in some localities indicate that up to 30 percent of youth in foster care identify as lesbian, gay, bisexual, transgender, and queer or questioning." *Id.* Ex. 2, at 1.  The report then cites four separate studies conducted between 2015 and 2021.  One study, conducted in 2019, reviewed survey responses from 895,218 students submitted through the cross-sectional California Healthy Kids Survey from 2013 to 2015.[14]  Baams, Wilson & Russell, *LGBTQ Youth in Unstable Housing and Foster Care*, 143 PEDIATRICS 1, 2 (2019).  In part, the study determined that LGBTQ youth were overrepresented in the foster care system, making up approximately 30.4 percent of the students who reported being in the foster care system. *Id.*  The second study, conducted in 2021, reviewed survey responses from 251 youth between the ages of twelve and twenty-one who were in foster care in Cuyahoga County, Maryland.  *The Cuyahoga Youth Count: A Report on LGBTQ+ Youth Experience in Foster Care*, UNIV. MD. SCH. SOC. WORK 4 (2021), https://theinstitute.umaryland.edu/media/ssw/institute/Cuyahoga-Youth-Count.6.8.1.pdf.  Of the 251 responses, thirty-two percent reported diverse sexual orientation and/or gender identity.[15] *Id.*  The third study, conducted in 2015, reviewed survey responses from youth in the foster care system submitted through the Los Angeles Foster Youth Survey.  Wilson & Kastanis, *Sexual and Gender Minority Disproportionality and Disparities in Child Welfare: A Population-Based Study*, 58 CHILD. & YOUTH SERVS. REV. 11 (2015).  The study reported that approximately nineteen percent of Los Angeles foster youth identified as LGBTQ. *Id.*  The fourth study, conducted in 2020, compiled information from multiple sources to estimate the youth LGBTQ+ population in the United States.  Kerith J. Conron, *LGBTQ Youth Populations in the United States*, WILLIAMS INST. 3 (2020).  Based on that information, the study estimated that approximately 1,994,000 youth between the ages of thirteen and seventeen in the United States

---

[14] The survey is conducted in middle and high schools across California and includes self-reported information.

[15] Of that thirty-two percent, sixty-eight percent identified, or indicated, a diverse sexual orientation, eleven percent identified, or indicated, a diverse gender identity, and twenty-one percent identified, or indicated, a diverse sexual orientation and diverse gender identity.

identified as LGBTQ+.  *Id.* at 1.  Of that total amount, it estimated that 23,000 LGBTQ+ youth resided in Oregon.  *Id.* at 2.

The second resource relied upon by the government is a factsheet developed by the Children's Bureau, a subdivision of the U.S. Department of Health and Human Services.  Chang Decl., Ex. 6.  That resource references two different studies; one study is the same Cuyahoga County study already discussed.  *Id.* at 5.  The second study, conducted in 2020, utilized survey responses to estimate the proportion of youth in foster care in New York City who identified as LGBTQAI+.  Theo G.M. Sandfort, *Experiences and Well-Being of Sexual and Gender Diverse Youth in Foster Care in New York City*, N.Y.C. ADMIN. FOR CHILD.'S SERVS. 6 (2020).  That study received 659 survey responses from youth between the ages of thirteen and twenty-one who were in foster care in New York City at the time of the survey.  *Id.*  Of the survey responses, 34.1 percent of respondents were identified as LGBTQAI+ based on self-reporting.  *Id.*

Plaintiff argues that the government's submitted evidence is insufficient to support the thirty percent statistic because it has provided no information on the percentage of foster care youth in Oregon who identify as LGBTQ+.  However, it is not clear to the Court that information on the LGBTQ+ population in Oregon's foster care system is readily available.  In a different First Amendment context, the Supreme Court acknowledged that "[t]he First Amendment does not require a city . . . to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1996).  In this case, the government has relied upon evidence that it reasonably believes is relevant to the problem it seeks to address: the overrepresentation and protection of LGBTQ+ youth in the foster care system.  The mere fact that the evidence the government relies upon is not specific to Oregon does not negate the validity of that evidence given the apparent dearth of such specific information.  If anything, the continuity of the thirty percent statistic in almost all the studies, despite the varied locales where the studies were conducted, supports the validity of the estimate.

Plaintiff also argues that the statistic is irrelevant because it does not contain responses from children under the age of nine, the age group that plaintiff seeks to adopt from. *See* Bates Decl. ¶¶ 153, 162. Essentially, plaintiff argues that the government has not provided evidence of the percentage of children in ODHS care, within the age range that she seeks to adopt, that identify as LGBTQ+, nor has the government provided evidence of the "odds" that a child in that age range may identify as LGBTQ+ in the future. This argument fails for much the same reason as plaintiff's prior argument. In essence, she is faulting the government for failing to provide data on information that she herself acknowledges is not readily available. *See* Pl.'s Reply 24 ("[N]o one knows when or why the older children surveyed came to identify as LGBT[Q]."). Children within the age range that plaintiff seeks to adopt are unlikely to be surveyed on their LGBTQ+ identities precisely because they are unlikely to have developed, or recognized, these identities in themselves at that age. Thus, such data, even if available, would likely be susceptible to serious questions of reliability. For that same reason, it is unclear how exactly the government could provide accurate or reliable data for the percentage of foster care youth in plaintiff's preferred age group that will likely identify as LGBTQ+ in the future. Put simply, the government has provided reliable evidence that is reasonably related to the problem it is seeking to address. Any additional information that plaintiff contends is necessary is either unavailable or inherently unreliable.

Yet, plaintiff further argues that the government's inability to identify which children in its care might identify as LGBTQ+ is, in itself, a concession that the Rule cannot withstand strict scrutiny. Again, the Court reiterates that the government has not presented zero or negligible proof that children in its care are, or will identify as, LGBTQ+. On the contrary, the government has provided reliable evidence of the percentage of children in Oregon's foster care system who may openly identify as LGBTQ+ and has provided supported reasons for why such evidence is not available for younger children. Although plaintiff references *United States v. Playboy Entertainment Group, Inc.* to support her argument, the context of the Supreme Court's holding in that case differs from the case presently before this Court. 529 U.S. at 803. In *Playboy*, the Court highlighted the fact that the government's conclusions rested entirely on assumptions and inferences and the government lacked any proof to support its conclusions. *See id.* at 824 ("Having

adduced *no evidence* in the District Court showing that an adequately advertised § 504 would not be effective to aid desirous parents in keeping signal bleed out of their own households, the Government can now cite nothing in the record to support the point." (Emphasis added.)). Here, the government has provided proof that LGBTQ+ youth are overrepresented in the foster care system and that children in the age range that plaintiff seeks to adopt usually have not yet developed a diverse sexual orientation or gender identity even if they may do so in the future.

Nor does plaintiff's reference to *Brown* affect the Court's determination. Though the Supreme Court in that case noted that the state bore "the risk of uncertainty," the context of that case is important. *See Brown*, 564 U.S. at 799-800. The Court in *Brown* identified a plethora of issues with the evidence presented by the state in that case, but, as already discussed, those concerns do not bear out in this case. Further, the state in *Brown* was attempting to *aid* parental authority by enacting the law limiting the purchase of violent video games to adults; it was not *acting* as a parental authority, nor did it have an independent obligation to protect the children that it argued the law was aimed at serving. Conversely, in the case before this Court, if the government were to "bear the risk of uncertainty," it would be requiring the government to simply wash its hands of its obligation to the children in its care if those children do not disclose their LGBTQ+ identities.

In essence, plaintiff faults the Rule as overinclusive because the government is protecting *all* children in its care, including those who have not developed LGBTQ+ identities and those who have not disclosed them. Yet, if the government instead applied the rule to protect only the children who have *disclosed* their LGBTQ+ identities, it would no longer be addressing its compelling interest: protecting children in its care who have LGBTQ+ identities. Further, such a scenario would put the burden on the children in ODHS custody to disclose their LGBTQ+ identities, even when doing so is impossible due to their age or is seen as violating or unsafe due to their individual circumstances. *See* Chang. Decl, Ex. 6, at 5 (noting that LGBTQ+ youth in foster care may not disclose their LGBTQ+ identity out of fear of harassment and abuse). The Court will not require that this already vulnerable population choose between having their rights protected and having their privacy protected.

As an alternative, plaintiff argues that the government could support its interest in protecting LGBTQ+ youth from harm by addressing concerns at the placement stage. In rebuttal, the government argues that the particular type of harm that parental rejection imposes on LGBTQ+ youth render it necessary that any child-welfare provider be required to affirmatively support a youth's LGBTQ+ identity. Further, the government argues that addressing these concerns at the placement stage rather than the licensing stage would be less effective because many children in the foster care system either do not disclose that they are LGBTQ+, or are at an age where they have not yet determined if they identify with those identities. That is, the government argues that ensuring that any potential foster or adoptive parent will affirm a child's LGBTQ+ identity is necessary at the licensing stage precisely because the government cannot know at the placement stage if a child does, or will, identify as LGBTQ+. In the government's view, this is especially true in plaintiff's case because plaintiff is seeking to adopt a child under the age of ten, and many children do not realize they are LGBTQ+ until a later age. *See* Ryan, *Supportive Families*, at 1 (noting study that found that average age that youth realized they were LGBTQ+ was thirteen years old).

The Court agrees that addressing plaintiff's appropriateness for housing an LGBTQ+ youth at the placement stage, rather than the licensing stage, would not be as effective at promoting the government's interests. As both parties acknowledge, young children often have not processed or determined their sexual orientation, gender identity, or gender expression; however, this does not mean that they will not identify as LGBTQ+ in the future. Such information lays well beyond the realm of knowledge of the government or plaintiff because it lies within the development of the child themselves. Thus, addressing LGBTQ+ concerns at the placement stage is an inadequate method of ensuring that a child will not be exposed to the potential harm of living in an environment where their identity is unsupported or unaffirmed. Nor would that harm be mitigated by consequent actions that the government could take, such as removing the child from the placement. In fact, removal would be all the more likely to magnify the harm by creating instability and strengthening the child's feelings of rejection. *See* Chang Decl, Ex. 2, at 11-12 (citing U.S. GOVT. ACCOUNTABILITY OFF., GAO-22-104688, *supra* note 9) (noting that "LGBTQ+ youth are more likely to . . . experience a greater number of placements and time in foster care" and that

"[t]hese experiences may add to the trauma that many children experience when removed from their homes and placed in foster care").

Although plaintiff argues that concerns about the child's identity in the future are immaterial if the child is to be adopted, that argument is at odds with caselaw and plaintiff's own citations. Plaintiff notes that current regulations require the government to evaluate a caregiver's "knowledge, skills, abilities, and commitment . . . to best meet the current *and lifelong* needs" of a child when evaluating placement options. OAR § 413-120-0760(3)(b) (emphasis added). Support of a child's sexual orientation, gender identity, and gender expression is clearly among a child's lifelong needs, even if the need for such support occurs later in the child's lifetime. Although plaintiff is correct that "[o]nce the foster child is adopted, the adoptive parent assumes the role of caregiver previously occupied by the state[,]" *Tamas*, 630 F.3d at 843, the state still has a duty to not affirmatively create a danger that the adopted child would not have otherwise faced, *id.* Thus, the government's interest in ensuring that a child's needs will be met if they later identify as LGBTQ+ is not diminished by the fact that plaintiff seeks to adopt, rather than solely foster a child.

Plaintiff also identifies alternatives from other states, such as states that accommodate child-welfare agencies that decline to place children in homes where the placement violates the agency's religious tenets. *See, e.g.*, Tex. Hum. Res. Code Ann. § 45.004 (prohibiting governmental adverse action against child welfare services provider if provider declined to "provide, facilitate, or refer a person for child welfare services that conflict with . . . the provider's sincerely held religious beliefs"). Plaintiff also alleges that other states have narrower policies that could be adopted, such as Alaska's requirement that caregivers support a "child's choice of participation in religious or faith-based services" and "ethnic or cultural events," and West Virginia's policy that caregivers "encourage and support the religious beliefs, heritage and language" of a child while being "sensitive to a child's gender identity and sexual orientation." Alaska Admin. Code tit. 7, § 67.230(a)(1)-(2) (2022); W. VA. DEP'T OF HEALTH & HUM. SERVS., OFF. OF CHILD. & ADULT SERVS., HOME FINDING POLICY 57 (2022). Finally, plaintiff argues that the government could provide specific exemptions to people who believe in biblical marriage and biological sex, as both

Mississippi and Georgia do. *See* Miss. Code Ann. § 11-62-5(3) (2016) (prohibiting discrimination against prospective foster parents based wholly or partially on the person's desire to guide, instruct, or raise a child in a manner consistent with a sincerely held religious belief or moral conviction); Ga. Code Ann. § 49-5-281(a)(3) (2019) (affording foster parents right to "continue with his or her own family values and beliefs, so long as the values and beliefs of the foster child and the birth family are not infringed upon").

As the government points out, plaintiff does little to explain how these alternatives would be as effective at furthering the government's compelling interest in protecting the LGBTQ+ youth in its care. It is unclear how requiring plaintiff to support a "child's choice of participation in . . . ethnic or cultural events" would be less restrictive when plaintiff takes issue with this application of the Rule as well. *See* Bates Decl. ¶ 117. Although plaintiff equates being "sensitive to a child's gender identity and sexual orientation" to requiring applicants to not "scream, use slurs, threaten, and berate," Pl.'s Reply 32, the Court has addressed at numerous points in this opinion how this characterization fundamentally misunderstands the manner in which invalidation and disaffirmance operate on an LGBTQ+ child. Denying a child's identity is not harmless regardless of how it is conveyed.

The more foundational problem with plaintiff's alternatives, however, is that they do not plausibly serve the government's compelling interest *with the same level of effectiveness. Victory Processing*, 937 F.3d at 1228. Granting plaintiff a broad religious exemption would require the government to agree that invalidating and disaffirming a child's LGBTQ+ identities, if done respectfully, is permissible—yet, the Court has already discussed at length the type of harm this poses for that population. More concerning, however, is the fact that permitting these exemptions would diminish the rights of children in ODHS care with LGBTQ+ identities. If plaintiff is not required to respect or support a child's LGBTQ+ identities, she would not be required to provide clothing for the child, or allow the child to wear clothing, that matches the child's gender identity,[16] nor would she be required to facilitate the child's

---

[16] Plaintiff has indicated that she would not permit or encourage this behavior. *See* Bates Decl. ¶ 115.

engagement with age-appropriate activities in the LGBTQ+ community.[17]  Although plaintiff argues that the government has not provided evidence that these alternatives would not work, it appears obvious to the Court.  To adopt the alternatives proposed by plaintiff would, in effect, elevate plaintiff's rights over the rights of the LGBTQ+ children in ODHS care.  Such a scenario cannot plausibly serve the government's interest with the same level of effectiveness, if it could be described as serving that interest at all.[18]  *See McCullen v. Coakley*, 573 U.S. 464, 495 (2014) ("To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests[.]").

ii.    <em>Underinclusivity</em>

Having determined that the Rule is not overinclusive, the Court now turns to plaintiff's underinclusivity arguments.  First, plaintiff argues that it is underinclusive because "Oregon already provides exemptions to its policy."  Pl.'s Mot. 34.  As an example, she asserts that children who identify with certain religions, or have dietary restrictions, must similarly be placed in affirming homes.  Yet, she argues that the government does not demand spiritual or cultural uniformity for these categories.  This, she argues, indicates that the government is motivated by ideology rather than child safety.

As already stated, plaintiff characterizes the government's asserted interests too broadly. In this case, the government's compelling interest is protecting the children in ODHS care who are, or may later identify as, LGBTQ+.  Thus, how children with certain spiritual or cultural identities are placed is irrelevant to the inquiry at hand.  And, even if that inquiry were relevant, plaintiff again is painting broad strokes on a small canvas.  In her view, the government is demanding uniformity in applicants' views on sexual or gender identities, while declining to demand such uniformity when it comes to spiritual or cultural

---

[17] Again, plaintiff has indicated that she would not permit, encourage, or facilitate these activities.  *See* Bates Decl. ¶ 117.

[18] This conclusion is unaffected by the amicus brief submitted in this case by Idaho, Alabama, Mississippi, Arkansas, Missouri, Georgia, Montana, Iowa, Nebraska, Kansas, South Carolina, Kentucky, and Texas.  Though the brief addresses Oregon's "status of wards of foster children," it is silent on the fact that Oregon has an obligation to protect the rights it has bestowed upon the children in ODHS care.  Nor does it speak to whether these states have bestowed similar rights on the foster children in their care.

beliefs.  The Court disagrees.

It is true that the government has the same obligation to place children with certain spiritual or cultural beliefs in affirming homes as it does to place children with LGBTQ+ identities in affirming homes.  However, if plaintiff indicated that she would not permit a Muslim child to pray five times a day, but rather would require that the child attend her church, there is no question that this would not respect, accept, or support the child's spiritual beliefs.  Similarly, when an applicant, like plaintiff, indicates that they will in no way support or encourage a child's expression of their LGBTQ+ identities, such as by permitting the child to wear clothing that aligns with their gender identity, or facilitating the child's attendance at a Pride parade in the interest of finding an LGBTQ+ community, it seems unlikely that the child's LGBTQ+ identities would be respected, accepted, or supported.  In both scenarios, the government is not demanding a uniformity of beliefs.  It is, in essence, requiring plaintiff to allow a child placed in her home to express their identities, to provide avenues for the child to express and develop their identities, and to refrain from negating or invalidating the child's identities.  Put simply, far from requiring a "uniformity of thought," the Rule operates within the narrow confines of the relationship between plaintiff and the child, but no further.

Plaintiff's second argument focuses on the fact that prospective parents may assert a preference for a boy or a girl.  This argument has already been addressed at length in Section I.A.1.b of this opinion.  Nevertheless, the Court reiterates that permitting *already certified* foster parents to select preferences does not undermine the government's interests, because certified families and individuals have already demonstrated an ability to respect, accept, and support a child placed in their home, regardless of the child's gender.  Further, permitting certified foster parents to state a gender preference is not the same as permitting a foster parent to refuse a child on the basis of the child's gender.

In sum, the government has asserted compelling interests in protecting the LGBTQ+ youth in its care from harm and protecting the rights of the LGBTQ+ youth in its care.  Those interests necessitated the denial of plaintiff's application, and plaintiff has provided no plausible alternatives that would further the government's interests with the same effectiveness.  Therefore, plaintiff has not demonstrated a

likelihood of success on her free speech claim.

4.    *Freedom of Association Claim*

Finally, plaintiff brings a freedom of association claim under the First Amendment. Implicit in the rights bestowed by the First Amendment is the right to "join together to advance shared beliefs, goals, and ideas, which, if pursued individually, would be protected by the First Amendment." *Sullivan v. Univ. of Washington*, 60 F.4th 574, 579 (9th Cir. 2023) (citing *Buckley v. Valeo*, 424 U.S. 1, 22 (1976)). In this context, the freedom of association has been understood as a freedom of expressive association. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984) (describing difference between freedom of intimate association and freedom of expressive association). "Freedom of association . . . plainly presupposes a freedom not to associate." *Id.* at 623.

Government action may unconstitutionally infringe on the right to associate in many ways, including (1) seeking "to impose penalties or withhold benefits from individuals because of their membership in a disfavored group," (2) attempting "to require disclosure of the fact of membership in a group seeking anonymity," or (3) attempting "to interfere with the internal organization or affairs of the group[.]" *Id.* at 622-23 (citations omitted).

Plaintiff argues that the Rule restricts her freedom of association in the following ways: (1) going to church with her family; (2) sharing the Gospel with her children during Bible Study; and (3) sending her children to youth group. In plaintiff's view, because prospective parents are discouraged from bringing LGBTQ+ children to a church that is "unsupportive of people with diverse [sexual orientation, gender identity, and gender expression]," she would be unable to participate in these associative activities.

She also argues that the Rule compels her association in the following ways: (1) encouraging prospective parents to seek out LGBTQ+ community events; and (2) encouraging families to take their LGBTQ+ children to events like Pride parades. In plaintiff's view, compelling her to associate with these events would require her to alter the views that she intends to express.

Like plaintiff's other claims, she again reads the Rule more broadly than it has been applied. The larger problem with plaintiff's reading, however, is that her interpretation of how the Rule infringes on

her freedom of association implies that she has a right to infringe on the freedom of association rights of a child in ODHS care. The Rule does not prevent plaintiff from attending church with her family; however, it does prevent her from compelling a child placed in her home to attend church, particularly when attendance would place the child in a disaffirming environment. Nor does the Rule prevent plaintiff from conducting Bible Study with her biological children or sending her biological children to a youth group. It does, however, prevent her from compelling a child placed in her home to attend youth group or Bible Study, to the extent that these activities would place the child in a disaffirming environment. Put simply, the Rule does not prevent plaintiff from continuing to associate with her religious activities and communities, nor does it prevent her from including her biological children in those activities. What the Rule does do is protect the associative rights of a child, in ODHS care, who is placed in plaintiff's home, particularly when the activity that plaintiff seeks to expose the child to would disaffirm the child's LGBTQ+ identities.

The same is true for plaintiff's compulsion argument. In seeking out LGBTQ+-affirming events, plaintiff is not required to attend those events. It is sufficient that she merely facilitates the attendance of a child placed in her care. She is not, as plaintiff puts it, required "to hold a Bible in one hand while she waves the Pride flag in the other during a gay-pride parade." Pl.'s Mot. 22. She is not required to attend LGBTQ+-affirming events, but she is also not permitted to prohibit a child placed in her care from attending those events. Again, to read the Rule in such a manner would elevate plaintiff's associative rights over the rights of the child and plaintiff cannot extend her own associative rights so far as to compel the government to infringe upon a child's rights.

Briefly, the Court acknowledges that a parent's interest "in controlling a child's associates is as obvious as the influence of personal associations on the development of the child's social and moral character." *Troxel v. Granville*, 530 U.S. 57, 78 (2000) (Souter, J., concurring). However, as stated numerous times, plaintiff has no parental rights over a child, under ODHS care, who is placed in her home. Consequently, she can assert no right to control how, or with whom, the child associates. Indeed, Oregon regulations indicate that determining who a child in ODHS care associates with is a right reserved to ODHS.

*See* OAR § 413-200-0308(3)(d) (requiring that certified resource families "[r]espect and support [ODHS's] efforts to develop and maintain the relationships of the child . . . with their birth family, their siblings, their relatives, and any other significant individual"); *id.* § 413-200-0308(3)(f) (requiring that certified resource families "[f]ollow [ODHS] direction and comply with prescribed services and activities in the case plan"); *id.* § 413-200-0356(1)(c) (requiring that certified resource families consult "with the child or young adult's caseworker when determining whether to allow a child . . . to participate in extracurricular, enrichment, cultural, and social activities").

Because plaintiff likely cannot establish that the Rule infringes on her freedom of association, her freedom of association claim is unlikely to succeed on the merits.

**B.     Irreparable Harm**

Because plaintiff has failed to meet the threshold inquiry of whether her claims are likely to succeed on the merits, this Court need not consider the other preliminary injunction factors. *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).   Plaintiff has not established that she is entitled to the "extraordinary remedy" of a preliminary injunction.

## CONCLUSION

Accordingly, plaintiff's Motion for Preliminary Injunction, ECF [14], is DENIED.

IT IS SO ORDERED.

DATED this 14th day of November, 2023.

Adrienne Nelson
United States District Judge